U.S. District Court for the District of Columbia

| | |
|---|---|
| Zachariah Mills (pro se) <br> Plaintiff, <br> v. <br> David Reitman, <br> American University | Case Number Not Assigned <br><br> JURY TRIAL DEMANDED <br><br> Case: 1:22–cv–01001 JURY DEMAND <br> Assigned To : Kollar–Kotelly, Colleen <br> Assign. Date : 3/31/2022 <br> Description: Pro Se Gen. Civ. (F–DECK) |

## COMPLAINT

Pro se Plaintiff Zachariah Mills ("Mills"), for his Complaint against Defendants David Reitman (Reitman), American University ("AU") alleges as follows:

I.    INTRODUCTION

1.    Mills was the only Black[1] male Ph.D. student at AU School of International Service ("SIS"). He experienced discrimination due to his race and ethnicity. When he exercised his civil rights to oppose discrimination, he experienced sophisticated retaliation that he had never heard of in his life. High-level, sophisticated actors from all levels of AU acted on Mills. He matriculated at AU SIS to do research, but defamation, false prosecution, gaslighting, lies, and

---

[1] Throughout the complaint, "Black" is capitalized to refer to both Mills' race and his ethnicity, which is distinct from other human beings with black skin.

betrayals took over his life. Only when it was too late, did he finally understand why almost no black male Ph.D. students have ever graduated from SIS. It was not because black male students could not handle the academic rigor, or were angry, insane or violent. It was that they could not have prepared for SIS' institutional racism; that they have too much integrity to submit to institutional racism, and that not enough people stand up to do the right thing.

2.      Mills left SIS without a degree. AU SIS only left Mills with the knowledge that racism underlies one of the top liberal institutions in America. He cannot unlearn that knowledge, just as AU SIS cannot cover up what it has done.

3.      America faces a choice. National unity, or pretension, in-fighting and an eventual demise from within.

II.     JURISDICTION AND VENUE

4.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this suit asserts claims pursuant to the Civil Rights Act and the United States Constitution.

5.      This court has supplemental jurisdiction over Mills' related claims asserted under the laws of Washington, D.C. pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant AU and Reitman resides in this district and because the events giving rise to Mills' claims occurred in this district.

7.     Defendant American University is a private research university in Washington, DC, originally chartered by an 1893 Act of Congress.  AU's student body numbers over 13,000, and its main campus is located at 4400 Massachusetts Ave., NW, in Washington DC.

8.     American University includes the American University Police Department. On information and belief, the AUPD is a subdivision of AU that is wholly controlled by AU. AU, through AUPD, employs more than 60 individuals who are licensed as special police officers in the District of Columbia. These special police can carry weapons and wear uniforms. As employees, they are required to follow the directions of AU and its officials.

9.     David Reitman is the medical director of AU's Student Health Center.

10.    Plaintiff Zachariah Mills was a resident of the District of Columbia at all times relevant to this Complaint. At all times relevant to this Complaint, Mills resided off-campus at an apartment building in the District not related to AU. Mills was a full-time Ph.D. student at AU School of International Service.

III.   Mills' Experience at AU

11.    In the fall of 2017, in a required course, Mills experienced discrimination from the professor.

12.    Mills asked for an official investigation.

13.    AU decided erroneously that the progressor did not violate AU Discrimination Policy.

14.     Under District of Columbia law, the University's codes and policies are terms in a contractual relationship between Mr. Mills and the University.

15.     That contractual relationship began in at least August 2016, when Mr. Mills matriculated as a Ph.D. student at AU SIS. The Student Code of Conduct, the Discrimination and Sexual Harassment Policy form a part of that relationship. The Code and the Policy set forth specific procedures that both the student and University must follow, and they show both parties' clear intent to be bound.

16.     In consideration for his tuition and attendance at the University, Mr. Mills received and was given assurances by the University that it would follow and comply with numerous policies and procedures adopted and put forth by the school, including those in its Discrimination and Sexual Harassment Policies, [academic freedom policy] and the Codes of Conduct established the University's standards for acceptable conduct and also described the procedures by which the University would investigate and adjudicate alleged violations of its standards.

17.     For the 2017 school year, Mills paid tuition and otherwise complied with his duties under the Academic Rules and Regulations for Graduate Students of American University ("AU Academic Rules"), ratified on May 13, 2015 and revised on January 27, 2016.

18.     The syllabus also defines the evaluation criteria for students. As long as the student produces a policy analysis paper, the student can choose whatever academically acceptable methodology for the paper. "Assessment is based on

participation, attendance, a midterm examination, and an article-length manuscript submitted to a peer-reviewed, JCR-listed journal." "Assessment: 1. Class participation 20% It is essential that every student in the course make regular contributions to class discussions. Quality beats quantity. Contributions that include specific references to readings are usually the most effective in moving the discussion forward. " "3. Article-length manuscript submitted to a peer-reviewed journal 55% All students produce article-length manuscripts, each providing an analysis of a specific policy or set of policies.

19.   Professor Esser exercised excessive subjectiveness that amounts to disparate treatment of Mills on the basis of his race and ethnicity.

20.   Esser consistently assumed that Mills lacked diligence, intelligence and knowledge. These are common negative stereotypes of BLACK. Esser told AU that Mills was a poor student "in form [and] in content[,] a marked contrast with the rest of the cohort."

21.   Because of Professor Esser's conducts, it become impossible for Mills and a student in Mills' position to trust that 1) Professor Esser treats BLACK students equally as he treats students of other race and ethnicity; 2) Professor Esser is educating rather than indoctrinating BLACK students; 3) Professor Esser is not undermining BLACK students' success. Therefore, it became impossible for Mills to continue SIS-808.

22.   Crawford investigated Mills' discrimination complaint. For years, Mills did not know that Crawford's role extends to being the fact-finder and the

judge. Crawford represented herself as Faculty Relations Investigator. Crawford did not tell Mills, and AU website did not show that Crawford had a law degree and decades of legal experience. Mills only knew that Crawford interviewed him and asked Mills to submit evidence. Crawford requested and Mills agreed that Crawford would interview Mills again at some point in the investigation. However, thereafter, Crawford never contacted Mills again. Mills was expecting Crawford's call when he received Leff's decision letter.

23.     In the decision letter, Leff never mentioned Crawford's role beyond interviewing Mills. Leff wrote, "The investigation in this case involved interviewing and corresponding with witnesses, including   yourself and others suggested by you in Ms. Crawford's discussion with you. It also involved   the collection, review, and analysis of documents relevant to the allegations made in this case."

24.     Leff wrote Mills that Leff alone was the fact-finder and interpreter of AU policy. "Based on my review and analysis of the information gathered in this process, I have determined   that Professor Esser's actions do not constitute racial discrimination, nor do they constitute  discriminatory harassment as defined in American University's Sexual Harassment and   Discrimination Policy ("Discrimination Policy")."

25.     Leff's decision letter gave no hint that a separate Investigation Summary Report and Recommendation by Crawford exists. Neither did AU's policies, website or any communications indicated that AU's the Investigation

Summary Report and Recommendation. Mills understood Crawford's role to be limited to interviewing and receiving emails of evidence. Mills believed that the entire record of his complaint consists only of Leff's decision letter, until years later, after Mills has been dismissed from AU, when Mills made a FERPA request for "all disciplinary records."

26.     Intentional or otherwise, AU hid the Investigation Summary Report and Recommendation, a part of Mills' FERPA educational records, from Mills. [make a FCA claim.] Intentional or otherwise, AU's omission produced a false belief in Mills. As a result, Mills reasonably formed an erroneous belief regarding the extent of AU's negligence or intentional cover-up during the investigation. As evidence, during years of advocating for his civil rights, until Mills received the Investigation Summary Report and Recommendation, Mills never mentioned errors that can only be gleaned from the Investigation Summary Report and Recommendation.

27.     Crawford is an attorney with decades of experience. She is a member of the Maryland State Bar. She received a Juris Doctor in 1992 from the University of Maryland School of Law. From 1992 to 1993, she served as Law Clerk to the Honorable Ann S. Harrington of the Sixth Judicial Circuit of Maryland. From 1993 to 1997, she served as Assistant Public Defender with the Maryland Office of the Public Defender, in Rockville. From 1997 to 2014, she served as Assistant State's Attorney, Chief of the Special Prosecutions Team, and First Assistant State's Attorney at the Office of the State's Attorney for

Montgomery County, Maryland. As a prosecutor, she was responsible for the prosecution of complex and violent felony matters to include homicides, wiretap investigations, white-collar crimes, and police use of deadly force.

28.     From 2014 to 2017, Crawford served as Director/Investigative Counsel with the Maryland Commission on Judicial Disabilities, in Annapolis and Linthicum. In this role, she prosecuted  Baltimore Chief Circuit Judge Alfred Nance for unprofessional courtroom conduct - referring to a female public defender as "lady," "mother hen" and "child." Crawford argued, "[a] judge is not a king, not a queen, not a god". "It's preposterous that because a judge is from a certain generation or viewpoint, it somehow excuses their conduct." "Men are respectable only as they respect." "Every one of us would do well to remember that, especially Judge Nance." The Commission called for "the strongest possible sanction" and unanimously recommended expelling Judge Nance. Instead of risking being the first judge to be expelled since 1984, Judge Nance chose to retire just months before he reached the mandatory retirement age of 70.

29.     From 2017 to 2021, Crawford was the Faculty Relations Investigator at American University. In that capacity, she investigates complaints of discrimination as directed by Dean Lisa Leff, then acting Dean of Academic Affairs and Senior Vice Provost. Leff does not have a legal degree. She is a Ph.D. in history and taught history for 16 years. She became an administrator in 2017. She was promoted twice in a year. Thereafter, she oversaw Mills' case and Crawford.

For Mills' complaint against Esser, Crawford served as the investigator, the fact-finder, and the judge. Crawford conducted all interviews; she collected and analyzed all evidence. She determined which facts were true or false; and which facts are relevant to the outcome. She determined the proper interpretation of AU's Discrimination and Sexual Harassment Policy and Procedures (Discrimination P&P). She then weighed the relevant facts under a "preponderance of the evidence" whether Esser violated AU policy.

With a decades-long background as a fierce attorney and certified as a civil rights investigator, Crawford made several mistakes:

Crawford misinterpreted the Discrimination P&P and applicable laws.

1.

Under Discrimination P&P, which "is intended to be consistent with applicable local and federal laws and regulations", an unconscious "adverse ... decision" can constitute unlawful "Discrimination".

DCHRA imported the concept disparate impact. D.C. Code § 1-2532 (1987) ("[a]ny practice which has the effect or consequence of violating any of the

provisions [is] unlawful discriminatory practice." ); Gay Rights Coalition v. Georgetown Univ, 536 A.2d 1, 29 (D.C. 1987) ("despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason."); McCaskill v. Gallaudet Univ., 36 F. Supp. 3d 145, 157 (D.D.C. 2014) (citing Gay Rights Coalition v. Georgetown Univ. (D.C. 1987)). Mills, although not a Juris Doctor, raise the relevance of statistical analysis that underly disparate impact claims to Crawford: "It is extremely improbable that someone who communicates almost obsessively through email and is always stressing the importance of knowing guidelines and due dates would [communicate a wrong, critical due date]."; "Why, if [Esser] is so concerned with communicating changes to the syllabus and ensuring that everyone follows the syllabus, was I the only one not to find out about the major change to the policy paper for the class and why was it not communicated in an email or as a change to the syllabus like every over minute change that was made the entire semester?" Mills gave Crawford the numerous emails that shows Esser "communicate[d] almost obsessively through email" and "is so concerned with communicating changes to the syllabus". As the investigator, Crawford did not [solicit more evidence]. As a fact-finder, Crawford did not find [that Esser consistently communicated changes to the syllabus via email]. As a judge and a fact-finder, Crawford held that it was more likely than not that "Esser is [not] a racist" and that "Esser [did not] discriminated against Mills based upon his race.

2

Hopkins v. Price Waterhouse, 825 F.2d 458, 468–69 (D.C. Cir. 1987), rev'd, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)

"the requirements *469 **332 of discriminatory motive in disparate treatment cases does not function as a "state of mind" element, but as a method of ensuring that only those arbitrary or artificial employment barriers that are related to an employee or applicant's race, sex, religion, or national origin are eliminated"

"unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination"

"the fact that some or all of the partners at Price Waterhouse may have been unaware of that motivation, even within themselves, neither alters the fact of its existence nor excuses it. Nor is this surprising, as unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination."

3

Under Discrimination P&P and applicable law, "Discriminatory harassment" is conceptually an independent misconduct from "Discrimination". That is, a conduct can constitute discriminatory harassment without constituting discrimination.

Mills did alleged both discrimination and discriminatory harassment.

Crawford, however, held that "Discriminatory harassment, as articulated in the Policy, is predicated upon the presence of discrimination. Any harassment would

then flow from the presence of the racial discrimination." As such, Crawford held, "Having been unable to find that Esser is a racist or discriminated against Mills, it is unnecessaiy for me to reach the question of whether discriminatmy harassment occurred."

Crawford first interviewed Mills on July 10, 2018. 46 days later, she summarized her work in an Investigation Summary Report and Recommendation to Leff. 6 working days later, Leff provided Mills and Esser with "a summary of the investigation and findings, followed by [her] conclusions."

After investigating Mills' case, Crawford became an adjunct professor at American University's law school. [she got a promotion to dean]

Leff stayed as acting Dean for one semester, and then left American University.

 was appointed as an Immigration Judge to begin hearing cases in December 2021.

Crawford: I have given significant weight to her   comments as follows:   "Daniel is not a racist but could appear to be a racist."   "Zachariah was vulnerable, but Daniel held him to standards."   "Zachariah was not being held to different standards than other students in the PhD program."   Regarding the potential d iscipline of Esser, " It's unfair because he's not a racist."   " I think Zachariah really thinks this was racist."

3 A transparent lie, the Syllabus incident.

Mills also believed that Esser lied to the investigator regarding the syllabus incident regarding their third in-person meeting, which solidified Mills belief that Esser is utterly untrustworthy. While it is too early to say whether what Esser told Crawford was a lie, Leff's decision letter reasonably indicated to Mills that 1) that the syllabus never called for a policy analysis paper, and so there was never a "syllabus update"; 2) that Esser merely "clarified" the syllabus in class. While the first determination could plausibly come from Leff's independent and erroneous reading of the syllabus, the second determination seems most likely to come from Esser.

Coupled with the fact 1) it appears from Leff's decision letter that Leff credited all of Esser's statement but none of Mills' statements that contradicted Esser's; 2) Mills only submitted student witnesses and reasonably believe that the interpretation comes from either Esser or Crawford/Leff, it was reasonable for Mills to suspect [always says suspect instead of conclude to explain why Mills was highly suspicious of Esser] that Esser stated to Leff or Crawford that his syllabus did not require a policy analysis paper.

That Esser, on top of ridiculing his academic work, would dare to lie in an official investigation, where a whole cohort and their papers can testify to the contrary / where Esser said so in the recorded 3rd meeting, and that AU would accept such a transparent lie - intimidated, ridiculed and insulted Mills.

Mills was intimidated from relying on AU internal procedures for civil rights, because an University civil rights investigation that could not see through the emperor's new clothes is either dangerously incompetent or malicious to those asserting civil rights. Mills has to stay in a school that doesn't care about civil rights - and cannot transfer with his credit. An objective person asserting one's civil rights in Mills' position would be intimidated. What is such a school capable of? Are they concerned about breaking the law? Mills would find out in a year.

Mills was ridiculed and insulted as a Ph.D. student 1) who reads a syllabus's paper requirement wrong, 2) after attending classes about policy analysis, scratching his brain for an policy analysis paper topic, and drafting an abstract and a literature review for a policy analysis paper over a semester, who persisted in a mistaken belief that the course did not require a policy analysis final paper until Leff gave him the "truth".

How stupid and illiterate must Mills be. [insult] How stupid and illiterate must people who read Leff's decision letter think Mills is. [intimidation and insult] How stupid, illiterate, subservient and soulless (No moral arc. No uplifting historical arrow. ) must AU and Esser assumed Mills was, that they would expect Mills to live with instead of fight a transparent lie.

[Mills wrote to people that AU was ridiculing him for not being able to read] Mills wrote to Program Director Atzili on 9/24/2018 that "I apparently cannot read or interpret words correctly anymore because my reading of the syllabus finds a clear

indication that the policy analysis class term-paper is supposed to be about a
policy."

[2 hours after receiving Leff Report, as a result of the intimidation, insult and
ridicule, Mills sent an email from his AU account to his personal account. He
backed up his hard work over the last two years - his reading notes, prospectus
ideas and comprehensive exam preparations. [list paper ideas]. He wrote a note
to himself: "I hate the Unamerican University of White Supremacy."

Mills could have transferred to another Ph.D. program if he was rich and can
afford to lose one year of course credit during transfer. But, he reached the
lifetime maximum for federal student loan. He saw no other choice but to
continue at AU. He returned to school work on the same day.

# # other minor unintelligible mistakes # #

Esser seemed to disbelieved that Mills was actually taking care of his mother.

Esser claimed that he is legally protected. Mills was not.

--------------------------------

Some of the mistakes that reinterviewing Mills would have solved

Esser claimed to Crawford that Mills said stats is voodoo.

Esser claimed to Crawford that Mills is a poor student in substance and in form.

Mills could have provided his transcript to the contrary.

Someone from the Provost's office told Atzili the standard is "beyond a reasonable doubt".

# # effects of unintelligible mistakes # #

Intentional or negligent, Leff's decision letter made unintelligible AU's errors in handling Mills' complaint, errors that are explicit in the secret Investigation Summary Report and Recommendation.

Intentional or negligent, AU's practice to hide Investigation Summary Report and Recommendation for all students who assert their civil rights produced an expectable or expected effect: it made reasonably certain that Mills would not have exercised his FERPA rights to access the Investigation Summary Report and Recommendation, a document he did not know existed. If Mills had known that the document existed, Mills would have researched whether he has a right to read

it, and would have asked to read it under FERPA. But, Mills did not know, and so he did not try. Without the document, Mills' ability to appeal AU's errors (that are unintelligible from Leff's letter but explicit in the ISRR) within AU, in the court of public opinion, and in the courts was prohibitively diminished.

------

Re lazy incident and implicit bias x-scrivener-

item://C:/Users/Titan/Dropbox/Lawsuit Stuff/Mills v. AU/main ZvAU complaint.scriv?id=1D91BE6C-7CA1-4F2D-9769-0A8DBBF30651

[Mills reasonably concluded from Leff report that Esser admitted to Crawford/Leff that he was being biased during the lazy incident. Leff not being a mind-reader, how else would Leff be able to conclude that Esser expressed unconscious bias, as opposed to being an unfortunate coincidence?]

"Daniel failed to mention to me that his syllabus can apparently be interpreted as stating that a term-paper related to POLICY is not in fact a requirement of the policy analysis class--a claim that is upheld by the office of the provost."

[Mills had false beliefs as follows, in 8/27/2019 email to boaz

the one in which Burwell lied to you about her knowledge of the situation and I had to show you the email she'd sent me confirming her knowledge of the situation? The one where they claim to have interviewed Jacklyn and Veronica but in fact did not? The one where they didn't listen to a recording where Daniel contradicts what he wrote me in emails several weeks before but also contradictions what he told the provost? The one where the provost explained the situation by literally saying I cannot read a syllabus? Remember, you read that syllabus and agreed with my interpretation and not Daniel's? I take it as 100% evil to tell a Black PhD student the reason they think they are experiencing racism is because they are incapable of reading, as a Black person. ]

[FCA claim - ask the court to suspend electronic access pending federal government deciding whether to investigate and prosecute the FCA claim]

Mills finally obtained the secret report by luck. Prior to his being dismissed by the University, Mills had realized that

Mills had tried to get all of his FERPA records by

# # apparent mistakes # #

[Mills was reasonably offended by some mistakes; he protested some of the mistakes]

The concept of unconscious bias.

Crediting only Esser's words over Mills'

That Mills originated the rumor that Esser is an Nazi.

Crediting Esser's email behavior when Mills' alleged that Esser is only rude in person, not in emails.

Syllabus did not require policy analysis paper.

" Prof. Esser did not tell   the class you were behind in general, simply on posting on blackboard, which was accurate" ???

# #  "mistakes" that raise \*\*a plausible inference\*\* that the university discriminated against Mills on the basis of race or ethnicity # #

[this note and the note of "mistakes could have resolved by thorough investigation" are both actionable under contract theory.]

Race and ethnicity was a motivating factor in AU's decision to find that Professor Esser did not violate AU's Sexual Harassment and Discrimination Policy with regard to Mills' complaint.

. Secret Intervention by Weiner. White Weiner dictated the result to Crawford - that White Esser is not a racist.

. Implicit bias - made Mills appear ridiculous and illiterate

Crawford:

Esser is of German heritage and articulated   passionately during our interview his awareness of the privilege that he possesses as a white, straight   male. Esser is ve1y much aware of the potential for biases in his own psyche as well as in others. In   creating instructional units of an undergraduate course to examine biases, he has evidenced a willingness   to confront and address these issues. [Attachment C] [asserted awareness of racial privilege is fully credited as impossibility of being racist. In other words, when a white person says he is not racist, he is fully believed; when a black person say that a white person is a racist, the black person is not believed]

That said, there is no doubt that Esser and Mills are not a productive pairing in the academic arena. [White Crawford and White Leff attributing racism to personality mismatch]


# # mistakes could have resolved by thorough investigation # #


"his misleading you about the due date for your Incomplete". Did Esser deal with Incompletes with other students?

"his saying an answer   you provided in class was wrong when in fact it was correct. ". An interview with other students in class could have revealed Esser had a pattern against Mills.

Attendance grade. Is it a transcription error or Esser failed to count Mills' virtual attendance? This relates to disparate impact. Could have inspected the original records held by TA.

Harassing to turn in assignments during family emergency. Did Esser ask Mills to submit official documentation of family emergency as the syllabus required? Or did Esser said not to worry? The reality is the latter.


"Given the mistake Prof. Esser found in calculating the participation grade" How can one calculate a participation grade by mistake?

With Crawford report, it is more apparent that Leff also misinterpreted AU rules.


Atzili


Between 09/2018 and 08/2019, Mills asked SIS Ph.D. Program Director Boaz Atzili to address the erroneous and discriminatory Leff Report as well as other unlawful practices of AU. Mills did so in reasonable manner, based on a reasonable, good-faith belief that Leff Report and AU's practices are illegal.

[Supervisor]As the SIS Ph.D. Program Director, Atzili was the direct supervisor of Mills and Esser. [expand... so is [[Weiner]], who clearly had enough power to illegally and covertly intervene in Leff Report.]

On 9/24/2018, Mills wrote Atzili. Mills noted illegal and discriminatory errors in Leff Report, and provided evidence and logic for his reasonable belief that the errors are illegal and discriminatory.

In the same email, Mills also noted the illegal and discriminatory consequences of Leff Report.

Mills met with Atzili multiple times for hours during the year to raise similar points as the 9/24/2018 email.

On 9/26/2019, while Mills was meeting Atzili and discussing whether SIS-808 Policy Analysis required a policy analysis final paper, Mills emailed Atzili the syllabus. Atzili admitted that there is no way to read the syllabus other than that a policy analysis paper was necessary.

On 10/3/2018, Atzili wrote Mills that Mills was not "engaging in any academic activity in the last few weeks." If this continues, Atzili said he will conclude Mills was making "unsatisfactory academic progress" under AU academic regulation,

"which might eventually result in dismissal". Atzili offered three options for Mills: 1) withdraw; 2) resume academic work and take the comprehensive exam as scheduled; 3) provide medical documentation that Mills suffer from "medical conditions" to obtain accommodation or "a medical leave."

On 10/5/2018, Mills replied and noted that the following:

1) Mills' inability to study. Mills "find it very difficult being around [my peers]. I feel humiliated now since AU claims I am not even capable of reading a syllabus, and going to class exacerbates that feeling"; that he feel humiliated because Leff Report made it as if he made up Esser's discrimination.

2) Mills' inability to study was the result of illegal discrimination. "I'm not randomly depressed and therapy or medicine isn't going to cure the underlying cause, which is me being treated as a second class citizen first by Daniel and then by AU."

3) Atzili is in a unique position to remedy institutional racism where others would not. "I did attend the AU NAACP meeting and was shocked by what the Black undergraduate students shared in regard to the racism they have experienced [in class].... this is a major problem that really needs to be addressed by people other than the office of the provost and other AU administrators because they seem completely unable or unwilling to do anything about it. The students were essentially in agreement of the fact that their reports [of discrimination to the

Provost's office], when they do make them in spite of fear of retaliation, never seem to be adequately addressed."

On 10/25/2018, Atzili wrote to Mills with grave concern about Mills' inability to study. Atzili asked Mills to confirm Mills will attend his comprehensive exam; that Mills work out a plan with his professor to finish the core course, which Mills stopped attending the day he received Leff Report[fact check]; that Mills is ready to serve as a teaching assistant as expected next semester.

On 11/2/2018, Mills asked Atzili to support his petition to delay the comprehensive exam, originally set for 11/7 and 11/14.

1) Mills documented his inability to study. He was only able to study for "3 or 4 weeks during the last 6 months;" "I have not produced any practice essays [for the upcoming comprehensive exam] this semester or discussed anything with the GEP faculty."

2) Mills noted that his inability to study was first caused by attending Esser's class. "[I]t did not get extremely bad until after the Office of the Provost [Leff] and [President] SMB herself decided to gaslight me and jerk me around like I have the IQ of a 5-year-old." "It had not occurred to me to investigate [AU academic regulation about the extension] until I was starting to feel more mentally capable again yesterday evening due to the change in medicines and the therapy."

3) Mills noted the therapy and medication he had to take as a result of discrimination.

4) Mills noted that he was in class the day he received the Leff Report. "People could visibly see that there was something wrong with me emotionally in class. Continuing to be around my peers who didn't experience what I did and who get to [be a teaching assistant in fall 2018] as planned was very unhealthy for me. I have done absolutely nothing wrong and have been 100% truthful [in my complaint]. I just couldn't sit there and listen to everyone endlessly talk about their [teaching assistant] experiences for one more day since I know I'd be a [teaching assistant] too now if a racist professor had not mentally tortured me for months; I'd bet my life on that wager."

5) Mills told Atzili that he intend to use speech to get accountability instead of engaging with AU and the Office of the Provost. "Since the AU administration is not interested in holding itself or [Esser] accountable, I find it important to my self-respect and personal integrity to pursue actions in non-institutional arenas to generate some level of accountability." "I talked to a reporter [from a prominent national Black college publication who] found my story very disturbing and outrageous and will publish it...."

6) Mills recounted Atzili informing Mills in-person that Esser "told [Atzili that Esser] was humiliated by the investigation[.]" Mills compare it to a rumor of Esser's past retaliation against a female faculty who complained about him for

sexual harassment: "[Esser] first sexually harassing a female professor and then retaliating against her through defaming her character and calling into question her mental stability[.]" Mills noted that a professor with [first/second hand???] knowledge told an SIS Ph.D. student who then told Mills. Mills noted that he told Atzili the story in-person.

7) Mills noted an indication that Esser was broadcasting that Mills aggrieved Esser in retaliation. "A professor who I thought I had connected with well at the PhD reception [on 9/14/2018] ghosted me after I emailed her for a meeting. [Later,] I bumped into her in the Atrium ... [she said]: 'oh. You. Wow. You're famous.' [She then promised to write back but never did.] As far as I know, I am the opposite of famous; this odd interaction makes me wonder what sort of information she had received between the PhD reception and bumping into her in the atrium that caused her to tell me I'm famous and ghost me."

8) Mills noted that he takes being a teaching assistant seriously and that he expect to be ready for the role "if I continue to recover from the racial trauma I've sustained ... and continue to work with the therapist to develop strategies to [cope with inevitable racism]".

9) Mills closed with "[a]s always, I am more than willing to discuss anything you like to openly which I mentioned in this email if you have any questions, comments, or concerns."

On the same day, 11/2/2018, Atzili replied: "I'll support your petition, but I recommend that in your petition ... only include that you suffer from mental health issues and recently had medication changes. Including all the details why may complicate things and make it longer than we can afford." Atzili also explained that he did not inform Mills of the option for an extension because he did not believe Mills could obtain medical records. [AU policy] did not require medical documentation but a "compelling rationale".

In another email three hours later, Atzili added "a slight correction": "[i]n your petition please do not state mental health just health reasons. No need to specify." He said, as long as the Dean of Students office has Mills' medical records, the office will not tell the decision-maker (AU Associate Dean for Graduate Studies) "any details, but confirm that you have a serious situation". He promised to personally tell the decision-maker that he supports the petition.

On the next day, 11/3/2018, Saturday, Mills wrote to Atzili that he wants to know if it is for political or other reasons he need to submit medical records to the Dean of Students office but should not mention in the petition what caused the health condition or that it is a mental health condition.

On the same day, Atzili replied that he would rather Mills call about the question he raised because Mills had misunderstood him. When Mills did not reply to the email for two hours, Atzili wrote Mills that "your petition has a greater chance of success the way I advised you to write it." "When writing the petition, you have

the right to base it on whatever logic you see fit. I will still support your request if asked but I can't help you if you don't want my help." He advised Mills - instead of writing about his discrimination in detail, Mills' time is "better spent on studying for the comps" in four days. Atzili then suggested that Mills can withdraw if Mills doesn't think he can pass the comprehensive exam.

Mills called Atzili the same day. The next day, Mills sent Atzili a draft petition, adding "I have taken [your] advice .... If [you] think that the statement could be altered in any way to make it more likely to be successful, please let me know and I will make those changes."

Mills' petition reads: "Over the past 13 months, I experienced a great decline in health due to a series of events which resulted in a dramatic diminishment in my ability to engage with academic work." It did not refer to mental health or discrimination. He requested four extra weeks: "I believe that a roughly four-week period in which I am no longer experiencing significant health issues will allow me to successfully study for and pass the field comp exams."

Mills' petition was approved without medical documentations the day after submission.

Mills passed the exam on 11/28 and 12/5.

On 2/1/2019, Mills met with Atzili again to discuss Esser. Mills asked Esser to be suspended from teaching and to be removed from the SIS Ph.D. Committee. Atzili in turn accused Mills of retaliation for making the requests. Mills conveyed that

other professor and student had told him in confidence of Esser's racial and sexual

discriminatory behaviors. Atzili insinuated that Mills made up the confidential

accounts. Atzili also equivocated Mills complaining to Atzili about Esser with Esser

telling other professors about Mills, causing those professors to treat Mills poorly.

Mills emailed Atzili a summary of the meeting. Atzili did not reply.

Atzili retweeted an article about Dr. Ibram X. Kendi, then the director of AU's

Anti-Racism Research Center. On 2/3/2019, Mills replied to Atzili's tweet with a

quote from Dr. Kendi: "the heartbeat of racism is denial." This is the entire reply.

Atzili emailed Mills on 2/6/2019, that Mills "completely crossed the line with the

tweet" and "misinterpreted what I say." Therefore, "from now on I will only

discuss with you  your academic progress."

To summarize, Mills opposed the following unlawful practices of AU by

reasonably communicating with his supervisor Atzili:

1) hostile environment that prevents Mills from effectively study and that caused

depression and anxiety

2) erroneous Leff Report that enables the hostile environment

3) Esser retaliating against Mills for alleging discrimination, by telling Atzili and other SIS professors that Mills was lazy and vindictive

4) Atzili refusing to remedy Mills' hostile environment, even though he has a positive obligation to do so under Faculty Manual/Discrimination P&P and the KKK Act because he does not believe racism/anti-black racism exists.

5) AU's fraudulent inducement of black Ph.D. applicants by publishing SIS Ph.D. graduation rate as a whole but withholding black graduation rate (which is almost zero).

Mills notified Atzili that he will 1) discuss Esser's discrimination openly; 2) discuss Leff Report's error openly; 3) discuss discriminatory incident during a Ph.D. admissions committee with the target of the discrimination; 4) discuss Atzili's knowledge of 12 and refusal to address 1 and 2; 5) ask other SIS Ph.D. students for a symbolic vote of no confidence against Atzili;

# # AU's materially adverse decision # #

For SIS Ph.D. students, Wednesdays afternoons are "PhD Time." In half of the weeks, students and faculty present their research; in the other half of the week, there are "discussions on various topics important to either all of our community or to certain portions of it[,]" according to Atzili. The person being protested - Atzili - had, on 8/22/2019, asked Ph.D. students to attend PhD Time on 8/28/2019 at 2:30P.M.: "A meeting with the grad student's union representative and AU representative about the new graduate student Union and what it means for you. Required for all students employees (RA or TA or other employment with AU) but recommended to all the others. " SIS Handbook says Ph.D. students in year 1~4 are expected to be research assistants or teaching assistant.

Mills emailed Weiner and Atzili about his plan to protest Atzili late afternoon on 8/27/2019. On the same day, Weiner contacted Atzili and Gallaher about Mills' email.

Before noon on 8/28/2019, Weiner filed a care report about Mills. Weiner reported that Mills' email contains "rage" "threatened harm to self"; that Weiner is worried that Mills might "create disturbances on campus". As context, Weiner added that Mills "accuses a couple of people of being white supremacists and states that he will publicly accuse them because everyone needs to know 'the truth'". Weiner also called Esser's cellphone because she was "acutely concerned" for Esser's safety. Weiner told Esser that her interpretation of Mills' email was that Mills planned a "campaign to destroy [Esser] professionally." Weiner added that "the student might be considering harming [Esser physically]"; that Mills suffers from "severe" "acute mental issues" and that Mills "is not in control [of himself] anymore." Weiner did not read or otherwise share the text of the email with Esser. As a result, Esser called AUPD  and MPD. Esser told AUPD that he is "apparently being threatened" and "there is evidence of it"; that there is a "frenzy" about his safety that warranted "break[ing] privacy".

Atzili also filed a care report about Mills, that Mills is suicidal in "the near past but I'm not sure if that is not the case today."

Mills emails to Weiner and Atzili cannot reasonably be interpreted to mean any of the above. Instead, Mills committed to stay in the program. He said he intend to discuss SIS institutional racism with other SIS students so that they can address it democratically.

Before noon, Mills' email to Weiner and Atzili about a vote-of-no-confidence had been forwarded to Christine Chin (SIS Dean); Carol Gallaher (SIS Associate Dean for Faculty Affairs, "the number 2" at SIS according to an SIS dean), Mary Clark (Deputy Provost and Dean of Faculty), Jeffery Brown (Dean of Students), Traci Callandrillo (Asst. VP of Campus Life), Fanta Aw (VP of Campus Life and Inclusive Excellence). Gallaher called it an "emergency situation" and that some professors are worried about "their personal safety". Dean Chin advised Esser that Esser should not leave his home, implying Mills knew where Esser lived. Dean Chin also told Esser that if he comes to campus "you must tell us your location." Dean Chin, Gallaher and Mike Rosenberger then met with an AUPD sergeant who was dubious of Esser's police report to persuade him to act on Mills. Due to the lack of a probable cause, the sergeant did not take action on Mills.

Hours later, Office of Campus Life instructed AUPD to go to Mills at his off-campus private home.

AUPD called MPD emergency line for assistance for an "welfare check" because Mills lived off-campus in his private home. AUPD confirmed that AUPD officers are in uniform and in a marked police vehicle. AUPD first told MPD Mills expressed "suicide ideation". When MPD asked AUPD where did the information came from, AUPD said that "the faculty member involved in the situation against [Mills] was the person who reported it because they did not feel safe and felt as though their lives were in." AUPD abruptly stopped. AUPD then told MPD that the faculty member's safety was not the reasons for the welfare check, and that the real reasons was "the Dean of Students requested it. He intervened."


MPD was the first to arrive at Mills' home, which was a mile and a half away from the campus. MPD officers told Mills they had been contacted by AUPD and asked to check in on him. Mills invited them into his apartment  MPD Officer Adam Sotelo told Mills that he thought AUPD's request was strange. He therefore rushed to Mills' home. The other MPD officer waited in the hallway as is customary practice for such welfare checks.

Mills and Sotelo sat in Mills' living room and talked. Things were going fine -- both Mills and Sotelo said they had a normal, friendly conversation for at least ten minutes -- until two officers from AUPD arrived. The AUPD officers first met the MPD officer in the hallway. The AUPD officers then entered Mills' apartment without Mills' consent, along with the MPD officer that was in the hallway. The

AUPD officers were aggressive and threatening. They kicked Mills' dog. They walked through the foyer and observed whether there were weapons or other contrabands Mills' bathroom, kitchen and bedroom. They yelled at Mills and repeatedly demanded to see his university-issued identification card. Mills felt confused and fearful but sat calmly with his hands in his lap and asked the AUPD officers to leave his apartment several times. The AUPD officers ignored Mills' repeated requests until Officer Sotelo, a certified crisis intervention officer, shouted at the top of his lung for the AUPD officers to shut up. Officer Sotelo said that things were under control and that they could go. The AUPD officers complied.

AU employees, under the instruction of various AU administrators, unlawfully entered and searched Mills' home. They assaulted Mills' dog. AU employees illegally detained Mills in his home until MPD Officer Sotelo put a stop to the false arrest. AU employees was not authorized by D.C. law to operate in Mills' off-campus private home. Yet, they acted under the color of D.C. law.

According to AUPD documents, AUPD officers were investigating an "off-campus criminal incident" and "conducting check on person" in relation to "Esser, Daniel". On the same day, either before or after AUPD officers illegally entered Mills' home, AU requested a TLOxp report about Mills. TLOxp report contains "public and proprietary data" and serves the purposes of "skip tracing, investigative research and risk management." On the same day, either before or after AUPD officers illegally entered Mills' home, AU Threat Assessment Team consisting of

AUPD, Dean of Students' office and Office of General Counsel met about Mills. The Team "concluded that there was no evidence of criminality" nor "indicators of pathways to violence." But, the Team also determined that Mills "should be monitored should his behavior change[.]" Months later, AUPD also confirmed to Mills that, at the request of "Office of Campus Life" and "according to information provided by OCL[,]" the AUPD officers were assessing Mills and determined that Mills was "not a harm to yourself and/or others[.]"

AU is a person within the meaning of Section 1983 because various AU administrators had the authority to make policy, and made policy, on behalf of AU when they directed AUPD officers to enter and search Mills' home and detain Mills in his home with the intention to conduct a criminal investigation and/or welfare check.

# # causal link between the two # #

By invading Mills' private home, AU retaliated against Mills for opposing unlawful discrimination by AU.

AU insists that the AUPD officers were solely conducting a welfare check for Mills' benefit and denies that any faculty members alleged Mills would commit a crime.

However, AU denied Mills access to relevant AUPD records. The AUPD records that Mills obtained later show that AU was conducting a criminal investigation of Mills in his private home as a result of Esser reporting Mills as a violent threat.

AU insists that Associate Dean of Students Jaris Williams (Black) decided independently to order AUPD to conduct a welfare check at Mills' home. However, Williams' direct supervisors Callandrillo and Brown received the emails supporting the welfare check first. Moreover, Williams denied having read those emails. That AU would choose a junior Black employee outside of the wrongful SWATTING decision making process to take the fall indicates a discriminatory motive. Williams also tried to utilize his Black identity to gain Mills' trust. Williams shared his own experience of anti-Black racism, especially from the police, to persuade Mills that Williams, as a victim of racism, ordered the welfare check in good faith.

The true motive of Weiner is in question.

1 Weiner knew that Mills thinks the Leff Report was a cover-up. Weiner never informed Mills that she participated in the Crawford Report, and told Crawford not to find Esser violated AU Discrimination Policy.

2 After Mills received the Leff Report, Weiner made an effort to retain Mills' trust as a personal friend. For example, she wrote Mills emails that only a close friend

would write. She also wrote Mills that "I have given you plenty of evidence that I care and plenty of evidence that I do not think your [racism] problem is fake." As a result, Mills trusted Weiner with personal thoughts about racism at AU that otherwise he only shared with Atzili for official reasons, or with personal friends. Weiner never contradicted Mills' opinion about AU's racism.

3 When Mills wrote a paper with critical race theory as the primary theoretical lens, Weiner insisted that Mills de-racialize the paper. Mills' paper argues that Maduro's government represents the interest of non-white population and that the opposition party represents the interest of the white population. Mills therefore infers a theoretical significance that the late 2010s exodus of refugees from South American countries such as Venezuela and Columbia are mostly white. Weiner commented that there is no significance to the fact that most of the refugees are white because she "would assume that a quasi-marxist government would produce flight from the rich classes and I would expect those classes to be overwhelmingly white." Weiner could be expressing a belief that white people are naturally rich. Or, Weiner knew that white South Americans are rich from contemporary statistics, but discounted the history that white South Americans are rich because of slavery and discrimination.

Weiner also commented that she did not understand why Mills problematized the phenomenon that White Supremacy within majority-white societies is not being recognized as such.

Weiner also suggested that Mills consider racism a problem of realism rather than a problem with liberalism. Along the same line, while she conceded the U.S. intervention in Venezuela internal politics a violation of international law, she argued that such interventions are a continuation of Cold War behavior, rather than motivated by White Supremacy.

When Mills theorized White Supremacy Internationalism as an essential driver in international politics, Weiner asked to meet Mills in person, requesting Mills to call his theoretical construct anything other than that name.

It is impossible to separate the theoretical from the personal. Weiner's various comments on Mills' paper suggests that she seeks other explanations for events that racism can explain.

4 Weiner told Crawford that while Esser can "appear to be a racist" Esser "is not a racist" and therefore Esser would not violate AU Discrimination Policy. Her comment suggests that she believe racism depends on the actor's intention. This belief is contrary to the law which does not require discrimination to be intentional.

5 Weiner also assumes criminality from free speech. Mills' 08/27/2019 email to her only discusses a plan to speak at a student meeting about institutional racism and racial injustice. Mills never suggested that he would disrupt the student meeting beyond proposing a vote of no confidence on Weiner's successor. Mills' email referred to AU institutional racism and its impact on him as "the truth" that he intended to communicate publicly. In her care report, Weiner presented "the truth" as if it came from a delusional domestic terrorist. Her concern for campus safety is so urgent that she chose to violate FERPA and fed Esser her mental imagination of a black man contemplating physically harming people. Alternatively, she may have deliberately exaggerate Mills' as a threat to Esser. She refused to read Esser Mills' email. She knew that Esser is a racist and would take the bait, in the hope that Esser would retaliate against Mills, in order to rid SIS of Mills' complaint of institutional racism.

Her behaviors suggest that she is either incapable of or does not care to separate a black person using free speech opposing discrimination from insane, unlawful and physically violent action. No doubt, Weiner applauds when white Patrick Henry says "Give me liberty or give me death." When a black person says the same thing in the same exact words, Weiner is frightened. She then proceeds to racially profile, preemptively criminalizes and calls the black person delusional.

6 Prior to AUPD entering Mills' home, Weiner wrote Mills that she is "very concerned about you.  Have you tried to see a therapist to discuss these feelings? Will you please do so?  I am worried about you." Mills then sent Weiner two emails: "Are you free now? Meet at the park to talk? You'll long my dog even though you say you aren't a dog person!" "I'm home if you are in the area. We could grab a coffee in the lobby of my building and chat in the park?" Weiner never reported the two emails to AU. Weiner also showed no concern for sending police to Mills home, knowing that Mills experienced racial trauma and that sending the police would certainly exacerbate that racial trauma.


7 Weiner knows that Wednesday afternoon is the only occasion during a week when SIS Ph.D. students and faculty congregate for one hour and a half. Weiner was the Ph.D. Program Director in SIS between 2012 and June 2018. Since Mills matriculated in August 2016, and until Atzili took over in July 2018, Weiner regularly emailed SIS Ph.D. students and faculty about the topics for upcoming congregations. Weiner knows that if Mills wanted to speak in person to as many people in SIS as possible about institutional racism at SIS and a vote of no confidence regarding the Program Director, Mills would certainly choose to do so on Wednesday afternoon. However, when AU investigated her role in the 8/28/2019 swatting, Weiner stated that she did not know that Mills intended to meet with SIS students, or that there would be an SIS meeting on 8/28/2019

Wednesday afternoon. Her false statements indicate that she was attempting to cover up her discriminatory actions.

8 By information and belief, AU orders AUPD to carry out about 300 welfare checks every year. As the head of a Ph.D. program within AU, Weiner is familiar with AU procedure for care reports by training and by immersion. However, when AU investigated her role in the 8/28/2019 swatting, Weiner stated that she knows nothing about AU procedure for care reports, or whether AUPD carries out welfare checks.

Weiner also grew up in the U.S. and is familiar with common anti-Black tropes and U.S. racial dynamics. Citing the election of former President Donald Trump, she signed on an open letter to support black students' right to free speech in all forms and to condemn all forms of discrimination and bigotry. However, when AU investigated her role in the 8/28/2019 swatting, she implied that she does not know what would happen when police receive reports of suicide and violent threats. She implied that she does not know that a common method of intimidating a black person is to take advantage of common anti-Black racial tropes and to exaggerate his or her mental health conditions and violent tendency. She implied that she does not know that sending police to the home of a black person experiencing racial trauma and protesting racism would have out-

sized impact compared to sending police to another person. Her false statements indicate that she was attempting to cover up her discriminatory actions.

When Mills complained of being unable to study due to discrimination, Atzili inquired whether Mills' father was present in his childhood. When Mills said his father is Black and did not raise him, Atzili implied Mills' is unprepared for rigorous academic study because of his absent Black father. However, Atzili admitted that Mills' prior academic record is of the same caliber as that of other applicants admitted to SIS Ph.D. program.

Atzili also falsely accused Mills of unjustifiably racializing Atzili's error. Atzili is responsible for disbursing summer research fund for 2019 summer. By his admission, Atzili miscommunicated with SIS' financial office. As a result, Mills did not receive his research funding until Mills' planned travel date. The airfare and hotel price skyrocketed by then, which prevented the trip. Mills asked Atzili why SIS students are receiving money late, without mentioning race. Atzili flipped out. Atzili insisted that Mills was making unfounded accusations and insinuating a racial conspiracy as he always does, adding that the financial office does not know "the color of your skin."

Relatedly, Atzili does not believe that racism is real. When discussing SIS institutional racism with Mills, Atzili asserted that if a person discriminates, he or she only discriminate based on skin color rather than ethnicity. For example, Atzili said, a person who discriminate against Black people will definitely also discriminate against Nigerians. That is, there is only colorism; there is not anti-Blackness based on historical and cultural prejudice, according to Atzili.

Atzili also subscribes to other common excuses for institutional anti-Black racism. In the same conversation, Mills proposed to do a focus group to understand why Black Ph.D. students inevitably fail to graduate from SIS. Atzili refused and explained that there are not one but two other Black students at SIS; that SIS is trying its best to recruit qualified Black candidates, but SIS cannot admit Black candidates who are under qualified just because they are Black; that while Black students are not well-represented in the program, "our numbers are pretty good" if counting "people from India and stuff like that[.]"

To object Mills' plan for researching SIS institutional racism, Atzili exhibited the following discriminatory beliefs: myth of meritocracy, tokenism, reverse racism, racial sameness, assumption about competence, and equating Black citizens with foreigners.

Gallaher is a key proponent of SWATTING Mills. She is the second-in-command at SIS, in charge of handling discrimination complaints in SIS. In the morning of 8/28/2019, Gallaher urged Office of Campus Life to take action on Mills'. She described it as an "emergency situation" and that threatened faculty members' "personal safety". She instructed faculty members to turn over their communications with Mills, which she then gave to Office of Campus Life in an attempt to bolster her case for SWATTING. She pressured faculty members to file care reports about Mills to bolster. These faculty members otherwise would not have done so.

Knowing that Mills detected foul play, especially from Atzili, Gallaher concealed her key role in the SWATTING. Immediately after the SWATTING, Gallaher volunteered to stand in for Atzili as Program Director for Mills, taking advantage of her prior amicable working relationship with Mills. In personal meetings with Mills, she told intricate stories to conceal her role in advocating for SWATTING. She flat out refused to address Mills' complaint of racism within SIS, even though it is her job. Instead, she "advised" Mills to voluntarily leave the program a dozen times.

With a plausible deniability, Gallaher utilized her new power as the Program Director of Mills to rid SIS of Mills. She immediately downgraded Mills' academic

progress to "unsatisfactory", a prelude for Mills' dismissal in a year. Gallaher cited two reasons.

First, Gallaher blamed Mills for not being able to finish a class and produce a prospectus according to a normal timeline. Gallaher ordered Mills be dismissed if he cannot defend his prospectus in the academic year. Gallaher disregarded and refused to discuss the impact of discrimination on Mills academic progress. Gallaher concealed her key role in the SWATTING, which escalated the hostile environment for Mills. Gallaher calculated that, if she and her co-conspirators perpetuates Mills' hostile environment, Mills would not be able to produce a prospectus in one year. Gallaher was correct.

Second, Gallaher accuses Mills of corruption, that Mills pocketed his 2019 summer research funding instead of doing research according to his funding proposal. This is a continuation of Atzili's false accusation against Mills prior to the SWATTING. [cite Atzili section] Gallaher refused to correct herself when Mills presented her with evidence. Gallaher took advantage of an anti-Black stereotype to frame Mills for stealing department money.

Gallaher made the feeble corruption accusation to ensure that Mills will be dismissed for not producing a prospectus in a year. For SIS Ph.D. students, the summer research funding pays for independent research which is essential to developing their prospectus. As Mills' Program Director, Gallaher and Atzili read Mills' funding proposal. Mills proposed to research Bolivian mining industry's

cultural context. Essential to his research method is scoping - "making contacts in-country with government agencies, mining unions, and civil society groups active in mining issues". Mills planned to utilize snowball sampling - interview one subject and recruit additional interview subjects from among the subject's acquaintances. It would be impossible for Mills to conduct such research over the Internet. As scientists, Atzili and Gallaher knew that.

Atzili and Gallaher also knew that a Ph.D. prospectus is a tremendous undertaking. It would be impossible for Mills to come up with another prospectus project in one year, without a summer of funded independent research, especially if they perpetuate a hostile environment. When Mills asked for an extension for defending prospectus on the ground that SIS prevented Mills' planned research, Gallaher denied that traveling to Bolivia is essential for Mills' prospectus and maintained that Mills stole from SIS.

Gallaher intimidated, insulted and humiliated Mills with the corruption charge until Mills was dismissed from the Ph.D. program for unable to produce a prospectus.

# # damages # #

As a direct result of AU invading his home, Mills was diagnosed with PTSD by an AU physician. The physician said the symptoms were "significantly interfering

with his academic functioning". As a result of AU's intimidation, insult and ridicule, he never tried to speak about SIS institutional racism at SIS again. Mills learned his lesson.

Mills' efforts to democratically address institutional racism in AU and SIS was thwarted. Those who perpetuate institution racism in SIS saw nothing wrong with manipulating the police to intimidate Mills. In their eyes, Mills is outside of the equal protection of the law.

Mills therefore turned to his First Amendment and FERPA rights to fight for his Fourth and Fourteenth Amendment rights. Under FERPA, he requested care reports that instigated his SWATTING. He shared his story with Inside Higher Ed., an industry journal. The journal published "When Perceptions Clash" which SIS students and faculty widely read. The article asked whether the welfare check was "a show of concern or a show of force[.]"

It was another publicity disaster for AU. AU had long been troubled with negative publicity due to racial incidents on campus. In a 2016 survey, 71 percent of white students agreed with the sentence "I feel included on campus," while only 33 percent of African American students agreed. In 2017, a black student was elected to the student government; she found banana hanging from nooses in her dorm. In 2019, a viral video showed a student using the N-word in the classroom. Months later, another viral video showed AUPD dragging a black student from her

apartment and committed her to a hospital. AU had just widely publicized its
$121 million investment in diversity effort.

When the article about Mills came out, AU and various AU employees were in full
damage control mode. AU said that under-representation of Black students in
Ph.D. programs are a nation-wide problem. AU said its welfare check policy is
functional. AU refused to comment about Mills specifically. Atzili and Weiner also
refused to comment.

To reassert control, Atzili turned to a forum where he was in control. He emailed
all SIS Ph.D. students that the story is untrue, that him, Atzili, and Esser never
discriminated against any student, that he did not know that reporting someone
as suicidal would lead to police action and that he is not aware of any student
complaining about discrimination other than Mills. To top it off, Atzili not-so-
subtly implied that Mills' academic problem originated from Mills not being able
to handle "academic rigor" and that Mills made his academic problem about race.

Shortly after the SWATTING, SIS Dean Chin, Gallaher, Fanta Aw, discussed filing
conduct charges against Mills for his emails to Weiner and Atzili. They also made
a plan to meet with all SIS Ph.D. students to whitewash the SWATTING. By
information and belief, during the meetings, it was implied to the students that
Mills had mental health issues that privacy rules forbid AU from explaining. It was
explicitly stated that the students were to maintain confidentiality about the

meeting. Ph.D. students were helping Mills to figure out why the police came. They stopped thereafter.

After the article came out, Dean Chin redoubled her retaliation effort. She sent an open email to all SIS students. She again cited mental health privacy for not commenting. She said, as "a person of color", she believed that SIS' institutional racism is at most similar to what troubles other Ph.D. programs.

AU, Atzili, Chin, Gallaher, and Callandrillo made one thing abundantly clear to Ph.D. students: the official line is that Mills did not experience discrimination; that Mills' perception of discrimination came from him not able to handle academic rigor; that Mills then blamed the problem on nonexistent SIS institutional racism; that Mills mental health issues developed mental health issues; that administrators and professor was trying to help Mills by sending police to his home; and that anyone who sees institutional racism in SIS like Mills should volunteer their identity. But, why would they?

Ph.D. students apprised Mills of Atzili and Chin retaliation. Mills formed a reasonable belief that AU and SIS leadership was determined to thwart his effort for civil rights. It was desperation, when his school intricately took away his civil rights and stopped his peers from helping him. The school wanted to get rid of him so much so that it would break the law. What would working on a prospectus change? His days at SIS were numbered.

It all began with Esser.

Esser was content with the Leff Report because it covered up his discrimination.

A key issue during the 2018 investigation of Mills' complaint was whether Esser should have informed Mills when Esser let Mills' classmates submit non-policy analysis papers instead; and why Esser did not tell Mills. Mills pressed the point that Esser had communicate every other minute syllabus change in writing, yet Esser did not notify Mills of the most important change of all. Together with multiple clear mistakes Esser made on Mills' grading and multiple racial microaggressions, confirming the syllabus mistake would leave the Office of the Provost no choice but to hold that Esser violated the AU Discrimination Policy.

For whatever reason, perhaps Weiner's intervention, or the fact that Esser is a tenured professor who brings significant funding to the program, the Office of the Provost covered up the mistake. The Leff Report read that the syllabus did not require a policy analysis paper to begin with. It cleared Esser of discrimination.

Esser knew that the syllabus did require a policy analysis paper. Esser never tried to rectify the mistake in Leff Report because it benefited him. However, the cover-up is so blatant that any college student could have seen through it.

Leff Report cleared Esser, but Esser is not safe. Soon after the Leff Report came out, Mills wrote Esser that he intends to go public about the detrimental effect Esser's discrimination had on Mills, that it almost drove Mills to withdraw from the program.

Mills was free to go public. According to AU Discrimination Policy, only AU has the responsibility to maintain confidentiality of information shared during the complaint process. After the complaint process ended, AU Discrimination Policy allows Mills to share what he learned during the process, the results, and any documents generated during the complaint process. AU Freedom of Expression Policy allows Mills to publicly disagree with the complaint process and the result, as long as he does not lie. AU never advised Mills that he needed to maintain confidentiality after the complaint process ended.

Esser immediately reported Mills email about going public as a student code of conduct violation. The Provost's Office receive the report but did not contact Mills about the Facebook post.

Mills went public on AU Black Student Union's Facebook page. Mills wrote that he has been discriminated by "a biased professor" and administrators who actively covered it up and that he saw it as a problem of institutional racism. Mills asked other students to confidentially share discrimination incidents so that there could be a class action lawsuit that addresses AU's institutional racism in the future.

AU has a pattern and practice of monitoring the online speech of students who disagree with the Provost's Office's decision about a discrimination complaint, or students who complain of institutional racism. Within AU, Office of Campus Life carries out this pattern and practice. Office of Campus Life staff are instructed to monitor student social media and report such speech via care reports. The

leadership of the office then disciplines the student-speaker or refer the case to another office for disciplining.

Mills experienced this pattern and practice. Two Black staff members monitored the Black Student Union's Facebook page and saw Mills' post. Brown instructed one staff member to file a care report and to flag Mills' speech as bias incident. The other staff member made a care report and flagged it as a high sensitivity bias incident on his own. Callandrillo and Michelle Espinosa decided to refer Mills' post to Crawford. Espinosa asked Crawford how Crawford was "typically informed of these types of [care] reports[.]" Callandrillo noted to Espinosa and Williams that similar incidents may have happened in the year before, and that the Office of Campus Life should handle Mills' incident with "consistency[.]"

AU's pattern and practice deters a reasonable student and indeed Mills from engaging in protected activity. AU insists that AU collects care reports for the benefits of the student in concern. It is unclear how KGB-esque secretive intelligence gathering on such student-speakers furthers their interest. By information and belief, and in Mills' case, care reports serve solely to ultimately discipline student-speakers on civil rights. Office of Campus Life and the Provost's Office never contacted Mills about why Mills disagree with the Leff Report, why does Mills believe AU perpetrates institutional racism, or how AU can assist Mills in addressing institutional racism.

Whether or not a student can fend off such retaliation, the very prospect of being monitored, investigated and disciplined chills protected speech.

The Provost's Office did not contact Mills about the Facebook post. Esser failed in retaliating against Mills.

Weiner gave Esser another opportunity at retaliating against Mills. [cite SWATTING] In their phone conversation, Weiner may have told him that Mills is a violent threat. Alternatively, Weiner may have told him that Mills intended to go public about his discrimination; and Esser may have invented that Mills is a violent threat. Or, Weiner and Esser discussed how Mills intended to go public about the discrimination, and both decided to portray Mills as a violent threat.

In any event, Esser cited Weiner's information and credibility and obtained unarmed AUPD escorts in the SIS building in fall 2019. AUPD also provided Esser with the Rave Guardian mobile app. Its functions include sending anonymous tips of crime to the police, automatically alarming the police of an emergency if the user does not arrive at their destination on time, a panic button and other corporate crisis functions. SIS students and professors saw Esser with the safety escorts. Esser either intentionally or was content with fueling Weiner, Chin and Atzili's discriminatory narrative that Mills is a violent threat to campus safety.

Alternatively, Esser genuinely cannot distinguish free speech and violent assault from a Black person.

When Inside Higher Ed. invited Esser to comment on his role in Mills' discrimination, Esser again requested AUPD escorts. AUPD complied. AUPD reminded Esser that if he really care about his safety he should update his information in Rave Guardian.

Esser retained Bean kinney & Korman, P.C.'s Maureen E. Carr, Esq. to threaten Mills with defamation litigation for speaking about Esser's discrimination. It was apparent from the lawyer letter that Esser obtained from Weiner FERPA protected information about Mills. That Esser and Weiner would break the law intimidated Mills.

After Inside Higher Ed. published the story, Esser recruited several SIS students with close relationship to him, Weiner and Atzili for informational warfare against Mills. Esser fed the students with false information. The students then widely circulated a self-styled "counter-narrative" in the Ph.D. program.

Along the line of Atzili and Chin's concurrent open letter to SIS students, the "counter-narrative" argues that, as women,  they believe that institutional racism in SIS is at most similar to what troubles other Ph.D. programs. "Doctoral programs are inherently exclusive" and that poor people are under-represented in all Ph.D. programs.

Along the line of Atzili and Esser, the "counter-narrative" argues that Esser (who was not named) did not discriminate against Mills. Rather, Mills could not handle Esser's "rigorous academic standards"; and that Mills could not tolerate Esser respectfully challenging Mills' views. These statements are false. It begs the question: how did the authors came to their conclusion? The authors and Mills never studied in the same classes, certainly not Esser's class. Mills had talked with each of the authors for at most 30 minutes total, in his lifetime.

As a professorial teaching assistant, Mills received stellar reviews from his students. On a 1-7 Likert scale, 1 being the best, Mills consistently scored 2. The major themes of textual reviews are: extremely knowledgeable; great at inducing student discussion; listens to different opinions before presenting his take; thought-provoking; approachable; and thoroughly engaging ("BOMB powerpoints"). The student evaluation would have greatly aided Mills in securing a professorship, if he could graduate from the program.

The authors of the "counter-narrative" solicited signatures from other Ph.D. students. One of the authors told one of the very few Black female graduate of the Ph.D. program that "many are legitimately intimidated by [Mills] and don't want to speak out".

Two of the authors and Mills are professorial teaching assistants for different sections of the same class. Their secretive defamation, intimidation and ridicule of Mills as a dangerous Black man who does not tolerate different viewpoints and who blames his academic incompetence on discrimination materially altered Mills' working condition.

The African-American graduate replied that she does not know why the authors would think that she would be interested in joining the "counter-narrative". $block quote$ "I experienced and witnessed racism and sexism at AU from SIS [Ph.D. program] faculty. I believe it was a substantial problem while I was at SIS and that it is extremely unlikely that these problems - either related to specific individuals or systemic problems -- have been addressed. Neither institutionalized racism and sexism nor particular faculty practicing racism and sexism are a question of lack of 'inclusivity and greater representation of marginalized populations,' and just because they are a problem at other universities doesn't

mean that addressing them shouldn't be a priority of students, faculty, and
administration at AU and SIS, specifically."

Other students gave Mills the "counter-narrative". It was apparent that Esser,
Atzili and Weiner are connected to the authors and fed the authors their
narrative. Mills was reasonably insulted and ridiculed as an incompetent and poor
student and a violent person. Mills was reasonably intimidated by Esser, Atzili and
Weiner's retaliation.

AU Discrimination Policy and AU's pattern and practice in enforcing the policy are
that a single offensive phrase does not constitute discriminatory harassment as
long as the speaker can plausibly deny a discriminatory intent. Esser, Atzili,
Weiner, Chin and the counter-narrative authors have all made multiple offensive
statements to Mills or about Mills. AU and the Provost's Office were notified of
those statements, or should have been notified of those statements. AU and the
Provost's Office either took no action or found that such behavior does not violate
AU Discrimination Policy.

Esser has said that a student is lazy because the student is Greek. Esser has also
called a group of Jewish students "yids". He then claimed that he said "yinz",
which is a reference to a group of people in western Pennsylvania dialect.

According to Esser's CV, he never lived in Pennsylvania. He then badgered the students over a semester to apologize.

Under such circumstances, Mills reasonably perceived that he too can state a single offensive phrase as long as he can plausibly deny discriminatory intent without violate AU Discrimination Policy. One distinction is that Mills was engaging in protected activity. He failed to consider that AU, in enforcing its disciplinary policy, discriminates against Black people and people who engage in protected activities.

Mills wrote Esser an email. Mills demanded that Esser stop retaliating against him via the authors; stop violating his FERPA rights; and stop harassing him with lawyers, which was triggering his PTSD that Esser caused. Mills added, "Fuck off back to Nazi Germany you piece of shit fucking shit."

Mills plausibly denies that his reference to Nazi Germany is related to Esser's country of origin or ethnicity. He merely stated that Esser is an oppressive and racist person - a Nazi, which is a common usage in the U.S. Esser cannot remove himself to Nazi Germany, because that is an imaginary place in 2020. Mills did not say that all Germans are Nazi, merely that Esser is a Nazi, or an oppressive racist.

"[P]iece of shit fucking shit" is a reference to Esser's discriminatory in-class statement that all German are enthusiastic about scatology.

Esser did not appreciate being on the receiving end of the single offensive phrase. His lawyer threatened to sue AU under Title VII of the Civil Rights Act. He demanded that AU conduct another threat assessment on Mills. He wrote to Daniel Myers, Chin, Gallaher, Rose Shinko, Aaron Boesenecker, Gina Lambright and AUPD Police Chief Morse that he refuses to work on campus unless AUPD assign an armed officer to escort him everywhere.

To bolster his claim that Mills was a violent threat, he utilized his scientific expertise. Esser wrote to the above persons: given that Mills said that Esser was triggering his PTSD (which Esser caused during SWATTING),

$block quote$ according to the Journal of Psychiatric Research, According to a recent study published in the Journal of Psychiatric Research, "childhood and adult trauma and PTSD burden were highly associated with being a perpetrator of interpersonal violence." [Gillikin, C. et al. (2016). "Trauma Exposure and PTSD Symptoms Associate with Violence in Inner City Civilians." Journal of Psychiatric Research, 83: 1–7. DOI: 10.1016/j.jpsychires.2016.07.027] [I do not] know anything about his symptoms, co-conditions such as alcohol or drug abuse (which have been shown to significantly increase violent behavior by individuals with

post-traumatic stress disorder), or his medical prognosis, I am acutely concerned that Mr. Mills could resort to physical violence. I am unclear about how an unarmed AUPD officer would be able to protect me in this case.

Mills is not from the "Inner City." Not all Black people live in the "Inner City." Other than Esser, no one who has an extensive conversation with Mills would conclude that Mills is from the "Inner City."

It is offensive and unscientific to preemptively criminalize people who live in the "Inner City." [add unscientific reasons].

Esser knew or should have known that it was unscientific to extrapolate from Mills' race and ethnicity that Mills would commit a violent crime. Esser is a scientist and utilize statistics in every one of his published papers. The population sample's characteristics in the "Inner City Violence" paper is categorically different than Mills' characteristics in terms of education, [age, etc.]

Esser knew or should have known that, if Esser and his armed escort were to run into Mills in the SIS building, it would create a physically threatening situation for Mills - an actual hostile environment. Esser had fed AUPD false information that Mills has acute mental conditions and could not control his behavior. As a result, AUPD monitored Mills on campus.

By information and belief, subsequent to the SWATTING, AUPD dispatched officers to monitor Mills on his campus in response to near-in-time calls of concern by unidentified parties. On one occasion, when Mills was sitting outside of his classroom, an officer stood two feet away behind Mills and observed him over his shoulder. Mills was then still a professorial teaching assistant. His undergraduate students all noticed that the officer was monitoring Mills' behavior within his personal space. On another occasion, an AUPD officer stood outside of Mills' classroom. The officer stared at Mills for a whole minute through a floor-to-ceiling glass wall.

Being monitored at work under the suspicion and rumor of being a lunatic or a violent criminal intimidated and insulted Mills. The police monitoring changed Mills' students' perception of Mills. It materially altered Mills' condition of work.

Esser also filed a complaint with the Dean of Students, accusing Mills was motivated by bias and endangering his safety, harassment, misrepresentation, possessing or using false information, disorderly conduct, and retaliation.

At the same time, Mills filed official complaints about Esser, Atzili and Weiner regarding discrimination, retaliation and other violation of AU policies.

AU's interest is highly aligned with Esser's in getting rid of and de-legitimatizing Mills. Esser had threatened to sue AU and retained legal counsel. Mills had informed AU that he could not afford legal counsel. 2 months prior, Mills exposed

AU to a publicity disaster. Mills consistently engaged in protected activity and held firm that he would not leave the school voluntarily. AU's interest is therefore aligned with Esser's in defeating Mills' retaliation claim against Esser.

To safely get rid of Mills, AU needed to create an appearance of due process while ensuring the desired outcome: Mills was guilty; Esser, Atzili and Weiner was not guilty. AU and its agents employed multiple tactics to realize its plan. The following are the most egregious examples.

On the legal side, AU and its agents needed to bend AU Discrimination Policy and the pattern and practice of its enforcement. Consistent with laws in the jurisdiction, AU Discrimination Policy reads: "the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment." Mills "Nazi Germany" reference would not be a violation under the policy and the pattern and practice of its enforcement. AU deviated from its Discriminatory Policy and its custom and practice in enforcing the policy. AU had refused to investigate Esser's prior complaints until Mills' "Nazi Germany" reference. AU now selectively enforce the policy on Mills because of the Inside Higher Ed. publicity disaster.

AU and its agents also completely disregarded the concept of protected activity.

To further the alliance with Esser, AU prevented key evidence from reaching the outside investigators. There were several pieces of evidence that could tank AU's case. Most notably, Esser had written emails insisting that Mills is from the "Inner City" and that's why Esser needed armed AUPD escorts. This evidence conclusively establish that Esser is a racist, and that Mills did not make it up. Worse still, multiple top-level AU employees have the "Inner City" emails. AU policies mandate that they report Esser's discrimination and submit the "Inner City" emails to the Provost's Office, which was investigating Mills' complaint about Esser's retaliation. It could be that the AU employees did not fulfill their mandatory reporting responsibility. Alternatively, the Provost's Office withheld the evidence from Mills and from the holding. Regardless, Mills did not know that the "Inner City" emails existed. The "Inner City" emails did not impact the investigation into Esser's and Mills' complaints.

Another key evidence is the Crawford Report. AU and its agents prevented Mills from know the existence of the Crawford Report. Mills asserted that the Leff Report was illegitimate; that he had a basis to call Esser a racist. Introducing the Crawford Report would have completely undermined the legitimacy of the Leff Report without which AU and its agents' case would have failed.

AU and its agents applied supposed German law in this jurisdiction. Esser supplied the German law. AU and its agents accepted Esser's representation without independent research. Esser's assertion that calling someone a Nazi in Germany is a jail-able offense is contradicted by German state media outlets.

AU and its agents rejected all of Mills' proposed questions as irrelevant. AU and its agents accepted all of Esser's witnesses. AU and its agents told Mills not to submit character witnesses. AU and its agents allowed character witnesses to testify on behalf of Esser.

David Reitman violated Mills' HIPPA privacy and AU policies by informing AU of Mills' statements during a medical visit.

Relief requested

Award all damages Mills is legally entitled to.

March 31, 2022

Zachariah Mills