U.S. District Court for the District of Columbia

| | |
|---|---|
| Zachariah Mills (pro se) | Case Number (1:22-cv-01001) |
| Plaintiff, | C.K.K |
| v. | JURY TRIAL DEMANDED |
| American University, et al. | |
| Defendants. | |

**Amended Complaint**

*Pro se* Plaintiff Zachariah Mills ("Mills"), for his Complaint against Defendant American University ("AU" or "University") and various parties listed in Part IV, alleges as follows:

## Part I.   INTRODUCTION

1.  Zachariah (Zach) Mills' life could be considered as a natural experiment of sorts that can answer the following question: if, one day, a 'white' American were to wake up as a 'Black' American, how would they fare in the face of racial harassment and discrimination in 21st century America?

2.  Consider this hypothetical situation: a person is raised by their 'white' mother, in a single-parent home located in a predominately 'white' middle-class neighborhood. All of the person's childhood friends were 'white' people from the same neighborhood. They live the first 27 years of their life within 'white' mainstream America. They are socially, culturally, and linguistically indistinguishable from the 'white' middle-class Americans they know.

3.   In this 'white' American environment, this person benefits from some of the 'advantages' that are often considered parts of 'white privilege'. They never think that they have been discriminated against because of their 'race'. This person has been at the receiving end of bigotry comments a handful of times, but these were one-off statements that happened in public places and were the product of youthful ignorance and limit-testing rather than the harmful actions of adults.

4.   They attend magnet schools throughout K-12 and earn a double-major, *magna cum laude*, from the tier-1 research university in their hometown. Their undergraduate mentor appraises them as someone possessing strong native intellect and a yeoman-like work ethic. Before they graduate from undergrad, their university selects them to take park in a highly selective year-long graduate school preparation program.

5.   A few months after successfully completing that rigorous preparation program and applying to several programs, they receive an offer for a prestigious position in an international relations doctoral program that is ranked in the top twenty nationally. They are promised a scholarship that covers four years of tuition a two-year research assistantship, and a two-year teaching assistantship (in a top-5 ranked undergraduate program), and a four-year stipend of roughly $25,000 per year.

6.   Unbeknownst to the student, no Black male students has ever graduated from the program, and very few Black female students have.

7.   During their first year as a Ph.D. student, they earn an A- average in a very challenging and rigorous program. At the end of the first year, they successfully pass the international relations comprehensive examination, which tests for a student's ability to critically engage with theoretical material and whether the student has mastered the roughly 10,000 pages of assigned and recommended international relations literature for first-year students. Upon passing the comprehensive exam, Ph.D. students are professionally qualified to teach international relations courses at the undergraduate level.

8.  During their second year as a Ph.D. student, they would come to find out what happens when a 'white' person wakes up as a 'black' person.

9.  It is less than 30 minutes into the first class-meeting of Policy Analysis. The professor is guiding the class through the syllabus. The professor suddenly singles them out as a hypothetical example of a student who does not turn in work on time. The professor stops, looks at them oddly for many seconds, and then begins his hypothetical example again, this time changing to a white student as an example.

10. As the semester goes on, the professor continues to make comments that sound like remarks about their race. One day, the professor questions them as to whether they are using their mother's hospitalization as an excuse for not turning in coursework on time. The professor regularly tells the program director that the student is lazy, incompetent, dishonest, truant, and a waste of the professor's time since he does not believe that the student understands what a Ph.D. program entails.

11. The professor then makes numerous errors that almost cause the student to fail the course, such as privately allowing all their 'non-black' classmates to write an easier non-policy analysis final paper but not telling the student.

12. Some of the student's classmates tell them that the professor is holding them to a double standard, such as telling them that their policy analysis paper proposal is unscientific and instructing them to proposing another policy analysis paper when no one else is writing one.

13. In view of the professor's racial comments, the student cannot believe all the professor's errors are a simple coincidence. Studying under a biased harassing professor becomes more and more destressing and begins causing the student depression. They consult the program director as to whether the professor's behaviors were abnormal. She says they are—that a professor should not do or say those things. She

refers them to the university's civil rights office. The student eventually files a racial discrimination complaint against the tenured professor.

14.    After one interview, the civil rights office suddenly stops all communication with the student, even after the student asks the President's office to get in touch with the civil rights office.

15.   Then, out of the blue, the office gives the student a report that finds the professor did not violate the Discrimination Policy.

16.   In the report, the student's original allegations are misconstrued beyond recognition; the report misconstrued the school's own Discrimination Policy. Maybe the strangest conclusion is that the syllabus of the policy analysis course always allowed for non-policy final paper, so the professor did not need to tell the student anything.

17.   It feels like a brazen cover-up, and only the student alone seem to care. The student asks the new program director to read the syllabus. The program director says the syllabus cannot be read to allow non-policy analysis paper. But, the director refuses to raise the issue with the civil rights office.

18.   As an intelligent person, the student become offended that the civil rights office seems to assume the student would not notice a cover-up or challenge the office because the student relies on the school for funding and graduation.

19.   For whatever reason—maybe because they were raised as a 'white' American—the student has too much dignity and pride to accept the erroneous decision and to stand idly by while the school strips away their civil rights.

20.   The President tries to convince them that every part of the investigation was conducted properly and that all procedures were followed. The school then tries to buy their silence with a membership on some sort of diversity and inclusion task force. When they refuse and demand an appeal, the university tells them that no appeal process exists and refuse to talk about the errors in the investigation.

21.    Their 'white' upbringing and excellent education taught the student
       that their interpretation of social norms is as good as those of anyone
       else. They believe that America is, for the most part, a meritocracy
       where the best argument wins the day. They believe that their race
       does not limit what argument they can make. When the school refuses
       him a fair investigation and treatment, the student could not accept the
       reality and become depressed.

22.    The student keeps studying while depressed; they keep presenting
       arguments and evidence to high-level white administrators that they
       believe demonstrate the investigation decision was wrong. They would
       not debate with the student about the errors; they question why it
       matters to the student so much, and tell the student to focus on
       academics instead. The more the student attempt to discuss the issue,
       the more the student is perceived as a race-baiter who did not know
       their place or when to shut their mouth.

23.    The race-baiting accusation angers the student who faces a double
       injustice – his rights are violated, and when he asserts his rights, he is
       accused of perverting the law.

24.    The student's white upbringing instilled in them a belief in the fairness
       and omnipotence of written laws in America. By extension, when the
       law is violated, anger is an ethical and moral reaction.

       He who is not angry, when there is just cause for anger, is immoral.
       Why? Because anger looks to the good of justice. And if you can live
       amid injustice without anger, you are immoral as well as unjust.

                              -Thomas Aquinas

25.    James Baldwin framed the pervasiveness of Black rage. "To be a Negro
       in this country and to be relatively conscious, is to be in a rage almost
       all the time." *Black Rage* says, "Blacks bent double by oppression have
       stored energy which will be released in the form of rage — black rage,
       apocalyptic and final."

26.    When the student gets angry, they fall into a self-fulling prophecy. An
       angry Black person, according to the stereotype, is hyper-violent and

5

necessarily a danger to the society. It therefore becomes acceptable to discipline them, and the school soon will.

27. The student wants to tell the students how painful it is to be discriminated against and then accused of race-baiting. The student tells the university administrators that they will present their case at a doctoral student meeting.

28. Another Black person raised by Black parents would have told the student how dangerous making the case publicly is, that the student cannot assume that the school will actually allow them to make a public case simply because the law and school rules allow it.

29. Another Black person would have a Black parent who gave them "the talk" about racial inequality and injustices in America, a discussion reminiscent of *the birds and the bees talk* about puberty. "The talk" engenders in Black adolescents a sense of pride in the Black 'race' and in Black culture, while alerting them to the dangerous reality of living in a society with widespread racism:

> they will almost certainly be treated and judged differently than others, with no guarantee that their civil rights will be upheld;

> they should always be polite to and comply with white people, especially those who are or hold a position of authority;

> they should always deescalate because, otherwise, the situation can spiral out of control where white people can rely on law enforcement but not Black people;

> they should not appear too confident because overconfident Black people are labelled 'uppity negro' who do not know their place.[1]

30. The next day, right before a student meeting, the school sends its police officers, to the student's off-campus home, where they have no jurisdiction. These officers enter their home without consent, search for incriminating evidence, and try to detain him there.

---

[1] Uppity described a person who had assumed liberties beyond their social station in the 1800s; 'uppity' then came to be used almost exclusively to describe Black Americans who fail to demonstrate an appropriate level of deference to whites.

31. It is a show of force, and the message is clear—shut up, or else, the law and your constitutional rights be damned.

32. The student is soon diagnosed with PTSD, mood disorder, and a host of other disabilities that the school doctor says make it impossible for studying. The school would not give the student accommodations. The school wants the student to fail.

33. The student soon find out that the school they planned to protest is painting them as a Black Identity Extremist who poses a threat to faculty safety and campus safety, if not national security.

34. A Black person finally tells the student that, as a Black person, they cannot say things about racist people publicly in America. The student start to have a long-overdue identity crisis. In this society, do they have be a n-word who remember their place, or disciplined until they do? Must the student perform the 'house n-word' routine, censor themselves and hide the very real harms done to them, to have a possibility of success? What if they are not capable of that?

35. Perhaps because the student is raised white, they refuse to accept a relative deprivation of their rights that they had enjoyed since birth. The student rejects that false dichotomy of being only a n-word or white. Women do not accept sexual harassment as a condition to enter university and the workforce. Why would Black people need to give up their dignity to be attend school or participate in the workforce? Just because many 'Black' people have learned over the generations that it is just safer to defer to 'white' people, it does not mean that this servile mentality should continue to be (re)produced into the future. 'Black' people should not be expected to participate in the (re)production of 'Black' subjugation or 'white' privilege.

36. The student goes public about the school's racism problem in an investigative report read across the country. It is a publicity catastrophe for the university.

37. After such audacity, the university doubles down on its efforts to getting rid of the student. Professors and administrators pretend to

support the student to gain their trust, then manipulate the rules to damage the student where it matters the most. These people lie to the student about school policy, prevent them from getting accommodations, and pretend to investigate why the school officers invaded their home. They ask students under their control to spread rumors that the student is stupid, mentally ill, intimidating, and endangering everyone.

38. The policy analysis professor threatens the student with a bogus defamation suit. The student believes in self-defense. They return the favor and then some. The school then hires consultants for a hit job masquerading as fair investigation. They conclude that the student harassed the professor with reverse racism.

39. The school then dismisses the student for being unable to perform like a normal student, while denying the student accommodation for the disabilities the school caused. The school says its investigations did not find that he experienced any discrimination.

40. The student is the fool that think they will fare differently. They asked themself, what if I do not bow down to falsehoods and corruption? What if I choose to be moral and ethical? What if I make a stand for my values?  It is not that the student is self-less; rather, the student expected that an ascending society would reward moral and ethical choices.

41. Instead, reality teaches the student that the result of standing for moral and ethics in an immoral and unethical institution is unending harassment, indignity, injustice, and intimidation. They lose their degree, their career, become mired in debt and legal troubles. They fail to realize the true potential in themself and are now cut off from contributing to human knowledge and advancement.

42. The student went to the school to research how humanity can adapt to the unfolding climate crisis with dignity and equality. They leave with nothing but a story that shows America to be a fundamentally a racist society.

43. As to others, the unethical professors and administrators are emboldened. They have confirmed their omnipotence and that the law cannot regulate their tactics. They feel safe repeating what they did to the student.

44. The graduates from the university, the leaders and decisions makers of tomorrow, have learned that standing for the public good against the strong is a fool's errand. If this society is doomed, and it is doomed without moral and ethics, then the only rational course of action is to loot for themselves whatever they could before the end comes.

**Part II.   Jurisdiction and Venue**

45. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this suit asserts claims pursuant to the Civil Rights Act, American with Disabilities Act and the United States Constitution.

46. This court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this suit is between citizens of different states and the amount in controversy exceeds $75,000.

47. This court has supplemental jurisdiction over Mills' related claims asserted under the laws of Washington, D.C. pursuant to 28 U.S.C. § 1367.

48. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and because the events giving rise to the claims occurred in this district.

Table of Contents

Part I.    INTRODUCTION ...................................................................... 1

Part II.   Jurisdiction and Venue ................................................... 9

Part III.  Statement of Facts .................................................... 13

Chapter A.    Fall 2017 ............................................................. 13

Section 1.    SIS 808 Policy Analysis ..................................... 15

Section 2.    Conduct of Inquiry ............................................ 16

Section 3.    Third Meeting .................................................. 20

Section 4.    Too Many Coincidences .................................... 26

Chapter B.    Botched Investigation ........................................ 37

Section 1.    Unconscious Bias Explains Some Things, But Not Others... 40

Section 2.    It is a Coincidence ............................................ 42

Section 3.    No Harm, No Foul (After We Fix It) ................... 43

Section 4.    Investigator Make Mistakes............................... 43

Section 5.    Non-Policy Analysis Paper Has Always Been Acceptable. ... 44

Section 6.    Wrong Interpretations of Discrimination Policy ................ 45

Section 7.    A Cover-Up is an Insult. .................................... 45

Section 8.    Can't Appeal This............................................. 47

Chapter C.    Fall 2018 ~ Summer 2019 ................................. 50

Section 1.    It is Bigger Than Mills ...................................... 50

Section 2.    The Program Director Cares ............................. 53

Section 3.    Only Write Down That You Are Sick................... 61

Section 4.    You Need Help ................................................ 64

Section 5.    So You Think You Can Protest ........................... 73

Section 6.    Behind Enemy Lines ......................................... 74

Chapter D.    Fall 2019 ......................................................... 75

Section 1.    A helpful Dean ................................................. 75

Section 2.    Bureaucratic Disability .................................... 78

Section 3.    Long March for Evidence .................................. 81

Section 4.    An Academic Difference of Opinion ................... 83

Section 5.   No Way Out.............................................................. 94

Chapter E.   Spring 2020 ......................................................... 110

Section 1.   The Perpetual Victim ........................................... 110

Section 2.   Math Problem: What is the Likelihood that a Dog-Whistle is Motivated by Race? ......................................................... 118

Section 3.   Professor Outlaw .................................................. 122

Section 4.   Action and Reaction ............................................. 124

Section 5.   Internal Affairs .................................................... 128

Section 6.   Dog-Whistle Counter-Narrative .......................... 129

Section 7.   FERPA Violation ................................................... 130

Section 8.   Welfare Check ...................................................... 132

Section 9.   The Anatomy of SWATTING ................................. 135

Section 10.   Reverse-Racism Hit Job...................................... 142

Section 11.   Mills' Dismissal ................................................. 152

Chapter F.   Evidence AU Hid ................................................. 153

Section 1.   About the 2018 Botched Investigation................. 153

Chapter G.   Epilogue ............................................................. 167

Part IV.   Parties ..................................................................... 174

Part V.   Causes of Action ....................................................... 179

Count 1.   Breach of Contract Against American University ................. 179

Section 1.   SIS 808 ................................................................180

Section 2.   Botched 2018 Investigation..................................185

Count 2.   Breach of Contract and Wrongful Disciplinary Decisions Under DCHRA, Title 6 and Title 7 of the Civil Rights Act against American University. 187

Count 3.   Adverse Decision Discrimination and Retaliation Under DCHRA, Title 6 and Title 7 of the Civil Rights Act, and ADA against American University ............................................................. 187

Count 4.   Denial of Reasonable Disability Accommodation under ADA and DCHRA against American University. ............................................... 191

Count 5.     Unlawful Entry, Illegal Search and Seizure, Trespass Under the Color of State Law in Violation of 1st, 4th and 14th Amendment of the United States Constitution and 43 U.S.C. 1983. ...................................... 191

Count 6.     Hostile Environment under DCHRA, Title 6 and Title 7 of the Civil Rights Act, and ADA against American University .......................... 192

Count 7.     Breach of Contract Against Individual AU Employees and Students   192

Count 8.     Failure to Train or Supervise, Retaliation, Breach of Contract, Breaches of Doctor-Patient Confidentiality; Breach of HIPPA Against American University and David Reitman ................................................ 193

Count 9.     Civil Rights Conspiracy Under the KKK Act Against AU and Related Individuals ............................................................................ 194

Count 10.   Failure to Render Aid Under the KKK Act Against Related Individuals 194

**Part III.    Statement of Facts**[2]

**Chapter A.   Fall 2017**

49. Mills has an extraordinary undergraduate record. Mills transfers from a community college to University of Arizona. There, he graduates *magna cum laude* on double majors: anthropology and political science with an emphasis on international relations. Mills receives only "A" in his junior and senior year.

50. Because of Mills' record, U of A selects Mills for its 1-year graduate school preparation program for minority students. Like the Department of Education's McNair Scholars Program, the U of A program is a diversity pipeline program that seeks to increase representation of historically underrepresented minority students in Ph.D. programs.

51. Historical minorities of the U.S. have been severely underrepresented in Ph.D. programs since their establishment. According to National Science Foundation, U.S. schools awarded 55,283 Ph.D. degrees in 2020. 62% of total degrees are awarded to American students. 5.6% of the total degrees are awarded to black students, 20% of the 5.6% are awarded to foreign black students who hold temporary visas or unknown citizenships. Domestic Black[3] students are awarded 4.4%, and Native Americans 0.18%, of the total degrees.

---

[2] Because there are too many individuals involved, to avoid confusion, this complaint refers to all individuals by their job titles, except Mills. Chapter IV Parties is at the end of the complaint, after Statement of Facts.

[3] We will refer to Mills' ethnic group as Black, which consists of descendants of those who survived U.S. slavery and subsequent racial segregation. We are capitalizing the ethnic group "Black" for three reasons. First, for the purpose of remedying historical injustices in the U.S., a critical question is whether a given harm flows from the U.S. government's illegal acts. The U.S. government did promise and then reneged on its promise to provide the freed slaves each at least forty acres of farmland, and whatever available and necessary materials, tools, labor and expertise the freed slaves needed to secure their economic independence, adequate housing, and physical and legal protection in consideration for their loyalty and as reparation for its past illegal enforcement of slavery. On the other hand, the U.S. government is not responsible for Belgium's

52. In the international relations and international affairs fields of study, 131 Ph.D. degrees are awarded in 2020. 20% are awarded to foreigners. Black American students are awarded 3.8% of total degree, or 5.6% of the degrees awarded to Americans; Asian American and Hispanic students 5.3% respectively of total degree, or 7.2% of American; Native American students 0.76%; white students 55.7%.

53. Minority students are disproportionally first-generation college students. Mills' program tries to level the playing field by introducing minority students to the study of theory.

54. Theories, such as evolution, free market, and relativity, are a higher order of knowledge than known facts. A theory identifies which known facts are relevant. A theory explains how one fact caused another. By extension, a theory reveals where to look for the unknown. For example, scientists predicted Pluto's location before it was discovered in 1930s. A theory enables us to plan for the unknowable, such as the future and causation. Theories guides all research. A Ph.D. is a scholar who specializes in theoretical innovation.

55. The importance of theory cannot be overstated. A nation that is ignorant of theory cannot lead the world. Theories of republican democracy, private property, and minimal government in the Federalist Papers gave birth to the United States.

56. In his letter of recommendation, Mills' undergraduate mentor appraises that Mills has the "native abilities" for Ph.D. level learning. The mentor also praises Mills' "seriousness of purpose", "yeoman-like work ethic", and "[determination] to fulfill all commitments" during his undergraduate studies. "The bottom line is that I see Zach as an

---

genocide of the Congo's from 1885 to 1908. Second, in historical and common usage, "black" usually refers to the black race, which include Black people, and foreign black immigrants who or whose ancestors chose to immigrate to the U.S. under legal government programs established because of the Civil Rights Movement. Third, foreign black immigrants mostly retain their ethnic identities such as Nigerian. Only American Black people refer to themselves as Black, because their ancestors had lost their African ethnic identity during slavery.

intellectually gifted and capable person" who should be seriously considered for Ph.D. candidacy, the mentor wrote.

57.   American University's School of International Services (AU SIS) admits Mills as a Ph.D. student in 2017. According to an SIS professor familiar with Mills' application, Mills' prior academic records are of the same caliber as his cohort members' and do not need affirmative action. All other students in the cohort have had one or more Master's degree. Almost all others are wealthier. The program director predicts that Mills would be the first person in his cohort to land a tenured-track professorship.

58.   In his first year at SIS, Mills takes six mandatory Ph.D. level courses and averages above A-. He passes the qualifying comprehensive exam which tests for a student's aptitude in theoretical research. About one third of Ph.D. students fail and are dismissed.

Section 1.     SIS 808 Policy Analysis

59.   In the second year, Mills' cohort enroll in SIS-808 Policy Analysis in the fall, which teaches how to write policy analysis papers. It is a highly specialized and sought-after skill.

60.   In 808, the syllabus requires all students to write a policy analysis paper. Although the syllabus does not say so, the professor says that students' paper topics must be approved by him first. Students are to submit an abstract, a literature review, theoretical contributions and other components of the final paper according to the schedule in the syllabus.

61.   Mills' proposal builds on his prior semester paper about climate-induced migration. His proposal says hundreds of millions of people will likely need to migrate before 2100, and government policy are necessary tools to ensure the humankind adapt in peace and with dignity. Mills wants to compare the climate migration policies of three countries: government-directed migration in China, government-incentivized migration in Louisiana, and self-initiated migration in

Sahel, Africa. Mills chooses the three country-cases because climate migrations are happening there and because a wealth of information exists on the three cases.

62. The professor refuses to approve Mills' proposal. The professor says that the prediction of massive immigration is hyperbolic, that comparing dissimilar country-cases is not a valid form of inquiry, and choosing cases based on data availability is laughable. The professor says Mills' paper cannot be improved to an acceptable level. The professor asks Mills to start over.

63. As a new entrant to the field, Mills accepts the professor's rationale.

Section 2.    Conduct of Inquiry

64. While Mills is revising his research design, he reads the *Conduct of Inquiry*.[4] It is an introduction to philosophy of science within the field of international relations ("IR"). SIS curriculum does not include this content.

65. As background, the books observes that most IR scholars understand research *methods*, such as statistics and interview, but overlooks the more fundamental concept of *methodologies*, or why and how a research uses various methods.

66. The book's central criticism is that the neopositivist methodology dominates IR. It criticizes neopositivist scholars for drawing on the rhetorical power of "science" to discipline other methodologies. Moreover, the book criticizes IR scholars who state their research methods but leave their methodology unstated. The silence is not neutrality; rather, it comes from an assumption that their methodology's status as the real science is beyond reproach. The silence is also a convenient tactic to avoid uncomfortable debates.

---

[4] Jackson, Patrick Thaddeus. The Conduct of Inquiry in International Relations: Philosophy of Science and Its Implications for the Study of World Politics. United Kingdom, Taylor & Francis, 2016. Patrick Thaddeus Jackson was then SIS Associate Dean for Undergraduate Education and a Professor of International Relations.

67. To distinguish less popular methodologies from neopositivism, the book categorizes various IR methodologies according to their positions on two core philosophical wagers.

68. The first wage is whether the researcher's mind is independent from the real world.

69. Researchers such as Renene Decartes believe mind-world dualism: that knowledge exists in our subjective mind, which is cut off from the objective world. They believe that the act of observation does not alter the world. By implication, we create knowledge when we compare our subjective and imperfect knowledge of the world to our observation of the objective world. This is commonly done through hypothesis testing.

70. Researcher such as Max Weber believe in mind-world monism: that the knowledge in our mind is a part of the world. They believe that, as our mind conceptualizes the world, the world also changes. For example, they would argue that the U.S. Constitution changed the real world by reconceptualizing the relationship between the government and the individual. Another example is Heisenberg's Uncertainty Principle in quantum mechanics: our measurement of a particle disturbs the particle, such that the more accurately we measure its position, its momentum escapes our measurement. For these researchers, hypothesis testing is nonsensical because the result of a test cannot be compared to the untested world that no longer exists. Instead, they believe, we create knowledge by

71. The second wager is whether researchers can have knowledge of in-principle unobservable objects such as causation, spirits, and dark matter.

72. Researchers such as David Hume and Immanuel Kant believe in phenomenalism: that we can only know what we can observe, and nothing more. We know that when a string vibrates, a sound follows, but we cannot know why. What we can know is, after observing the same phenomenon many times, that whenever a string vibrates, a sound will follow in a way that is related to how the string vibrated. In

phenomenalism, what we call causation is but repeated observations generating in us an instinctive prediction that A and B will happen together - a covariation.

73. Researchers such as Wendt believe in transfactualism: what we cannot observe are exercising control over the part of the world that we can observe.

74. A scientific argument's commitment on each wager is a position on philosophical ontology[5] (in what ways researchers can create knowledge), and epistemology (what distinguishes science from opinion). Because a position on the two wagers is a matter of faith rather than empirics or rationality, it makes no sense to assert that one such position is better than another position.

75. The argument's position on ontology and epistemology is concomitant of why and how the argument employs various research methods to establish its claim of knowledge, or, in short, its methodology. Because no positions of ontology and epistemology is better than another, no methodology is better than another.

76. The book divides all IR methodologies into four camps according to their position on the two wagers. Each camp has its unique view on knowledge (what is knowledge and how do we evaluate a claim), causation (what is causation and how do we explain causation) and multi-case comparison (why and how do we compare cases). Each camp therefore has its unique research design. By implication, it is impossible to evaluate the outcome of one methodology by the research design of another methodology.

77. Neopositivists combine mind-world dualism with phenomenalism.

78. Their view of knowledge decides their research design. Because our knowledge consists of unrefuted hypothesis, neopositivists propose hypothesis and design a procedure for testing hypothesis.

---

[5] Note, that different authors have different definitions of such terms. *Conduct of Inquiry* is not an exception.

79. As to causation, they reject that an unobservable dispositional quality exists or impacts us. They believe that we can only derive general laws from our observations. For observations, natural scientists enviably can create control and experimental groups. As a proxy, neopositivist social scientists compare many naturally occurring cases to detect which covariations are determinant to the outcome and which ones can be safely ignored. Context of each case is subsumed under the general law.

80. Modern neopositivism uses several case comparison methods John Stuard Mills proposed. Method of Difference isolates and measures the effect of the factor we intend to observe. For example, we observe the effect of democracy by comparing ten countries that are extremely similar except one is democratic. Method of Agreement, instead, compares cases extremely dissimilar except in the quality of interest. Method of Concomitant Variation observes associated changes in two factors across multiple cases.

81. Critical realists believe in mind-world dualism and transfactualism; that is, they believe that our observation does not change the world and that unobservable objects exercise control over the observable world. Therefore, they see neopositivists' effort to derive a general law from covariation of many cases as futile, because the context of each case interferes with our observation of dispositional qualities. Instead, to generate knowledge, the critical realists engage in a dialecticism between knowledge and the real word. They engage in abductive inferences – from data of an observable historical case, propose a set of causal conjectures that produced the observed outcome. Each conjecture is an individual factor that are Insufficient and Non-redundant components of the set of conjectures that collectively is Unnecessary but Sufficient for bring about the observed outcome – an INUS model. To test the quality of the model, instead of laboratory testing, the model is applied to other observable cases. Such contrast between cases unearths the interaction among many identical factors

19

in another context, which provides data for refining the model to better approximate the real world.

82. Discussion of Analyticism will be supplemented.

83. Discussion of Reflexivisity will be supplemented.

84. Suffice to say, the validity of the research design Mills proposed is a matter of unsettled difference of opinion. Mills' proposal - to choose cases based on availability of data, to compare the policies of three dissimilar countries, to not use covariation analysis, and to propose a hypothesis during data analysis rather than before - is a methodology of policy analysis well-accepted by many of academics. Of course, it is criticized by others, including the professor.

85. When a professor and a student have a difference of opinion, the professor should have every right to personally disagree – it is academic freedom. But in exchange for academic freedom, a professor has the responsibility to inform student that his view is but one view and point student to sources of alternative views. This is the ethical practice and customs in contemporary higher education, as summarized by the American Association of University Professors in their policy statements. For example, when Mills reviewed a classmate's work, even though Mills do not subscribe to the classmate's methodology, Mills nevertheless assumed its validity which allowed him to make constructive comments.

86. Yet, in their two meetings during the semester, the professor told Mills that his methodology and research design are indisputably invalid in the scientific community, that it cannot be improved to an acceptable academic level, and instructed Mills to propose another policy analysis paper.

87. Because Mills had not read *Conduct of Inquiry*, Mills could not recognize that the professor was leaving unstated his assumptions of methodology, ontology, and epistemology. Mills did not know that the professor's conclusive rejection was based on a difference of opinion.

Section 3.    Third Meeting

88. After the professor instructs Mills to start over, Mills cannot realistically finish the paper by the end of the semester. Consistent with AU Graduate Academic Regulations regarding Incomplete, Mills requested to extend the paper deadline beyond the semester. The professor agreed and told Mills that he can submit the paper before he defends his prospectus, which is at least 18 months away.

89. Since Mills has at least 18 months, he deprioritizes the policy analysis paper and enjoys the winter break.

90. Once the spring semester begins, Mills meets with the professor. It is their third meeting about the paper. What follows are vignettes of the conversation.

--Actual Deadline--

91.   ZM:   The registrar just told me that I only have until this May to finish the final paper. You told me I have 18 months. I am shocked.

92.   P:   I did not know either. I would not be holding you to 3.5 months. Unfortunately, the school is, and it is outside of my control. Workload wise, the paper is equivalent to adding one course to your spring scheduling - three courses plus a comprehensive exam. You better work hard in the next 3.5 months then.

93.   ZM:   Registrar says I can finish the paper in the summer.

94.   P:   I am not under contract in the summer.[6]

--Fairness to Other Students--

95.   P:   Remember, I am not OK if for you to just write the paper. I want you to go through the sequence in the syllabus – such as peer review, video summary – or it would not be fair to

---

[6] Because the professor hoists on Mills extra workload prior to the second comprehensive exam, and because the professor refuses to work in the summer, Mills had to apply for an exception to extend the Incomplete deadline to fall 2018. Mills worried for months whether the exception will be granted.

other students. It would not be easy. Stating the obvious, you need to start.

96.   ZM:   My biggest hurdle is a research design. You did not like the ones I turned in last semester.

97.   P:   It is not about me not liking it. I do not think it will allow you to write a good paper. If I had approved it, you would base your whole paper on that. Why would it suddenly get better from there? That is why I rejected it. Let's come up with something else. It would not be fair if I tell you in April "honestly, your paper is not coming together." That is also why I am asking you to send me each deliverable in the sequence. Once I approve a deliverable, then work on the next one. It is in your best interest. I do not want to be surprised by your deliverables, even if there is nothing inherently wrong about it.

--Non-Policy Analysis Paper--

98.   P:   Let's come up with another topic. Do you have a topic you are interested in?

99.   ZM:   I have a question before choosing a topic. I realized that other students were not writing policy analysis paper at all last semester. My biggest hurdle was identifying a policy to analyze. Nobody else did.

100.   P:   The same applies to you.

101.   ZM:   It would have really helped me if I notice the alternative a few months ago.

102.   P:   You would know if you had hung in there. I mean, it's not that they knew, and you didn't. Uh, it's… it's, you know, it was a process. The more they got into their projects, the more I was finding myself in a situation that I said, what I'm reading here is good. It's not really a policy analysis paper. So, I had to make a decision how… how firmly am I holding them to the policy analysis focus? Even though what they

are doing is actually good because it's going to help them and make it published, which is the thing that I wanted to do. And that's where I basically say just go.

103. ZM: I wish you would have told me that. You are so insistent that I follow the syllabus – you were just telling me that it would be unfair to other students if I do not go through every step they did. ¶91. But it looks like nobody else followed the syllabus.

104. P: Quite honestly, well, I did not know at the time when you made the decision. Nobody had anything written then.

105. ZM: I read other students' papers. They are not policy analysis papers.

106. P: I would say that only one student's [John Doe, White Male] paper has a component of policy analysis.

### --Are You Treating Me Fairly--

107. ZM: I get the sense that you do not like me and treats me unfairly.

108. P: Instead of worrying if I like you, you should focus on your paper.

### --New Proposal--

109. ZM: What if I write about climate migration in Louisiana? They have lost land the size of Delaware; they are investing $60 billion in new oil infrastructure where it will be under water in 15 years. They have a policy of town relocation. There is a ton of current information. The Economist had an article. In D.C., I can probably interview members of Congress from there.

110. P: Practicality is not going to convince anyone. At your dissertation defense, if you say that you selected your cases for practical reasons, everyone is going to barf into their jacket.

111.        Also, I am not entirely comfortable with having a domestic focus. Is this the kind of paper you want in your portfolio as your first publication?

112.   ZM:   What if I go back to writing about China?

113.   P:   Yeah.

114.   ZM:   So, why don't you like that? You are telling me no, without explaining why. That's not helpful for coming up with ideas.

115.   P:   First, I have not said no.

116.   ZM:   But you are shaking your head in a negative way.

117.   P:   If your first paper is on Louisiana, yet your Ph.D. degree will be in IR. I am concerned that people will refuse to hire you because your first paper is on Louisiana. People will ask, are you committed to IR? Other students are writing on countries and interest that they will ultimately work in. Well, except one student. She did not want to limit herself to one country, so we worked around that. In an interview, you want to build a narrative that is not necessarily truthful but a narrative that get smart people to hire you.

118.   ZM:   My research interest is climate change relocation. There are very few ongoing cases other than China, Louisiana, Tuvalu, Kiribati. Plus, if I have an IR Ph.D., are you telling me I can only work in IR? Not Anthropology, public policy, political science, development studies where a domestic focus is OK?

119.   P:   No. You can. You can do whatever you want to be in IR. I just do not want you to do something you will regret. Then again, you have not told me your rationale for choosing the four cases. A rationale based only on occurrence is not OK. Why would each of your countries be a case?

120.   ZM:   My rationale for studying China's case is that the migration is more government forced, compared to other country-cases.

121.   P:   I do not think it is a rationale. It sounds like a description of what's happening, without theorization. Well, ethnographers are under no pressure to explain why they're studying what they're studying, if they're studying it well. But then you are boxing yourself in, branding wise.

122.   ZM:   Maybe I am an anthropologist. I do not know what I will find before I begin. It is hard for me. I do not think that works for me. I fully expect to find extraordinary results once I am on the ground.

123.   P:   This is probably where we part ways in terms of our epistemology. How about we bring another professor in your camp into this process?  You would have to reach out to them because if I do, they may feel coerced.

*--Conduct of Inquiry--*

124.   ZM:   Have you ever read Patrick Jackson's book, *Conduct of Inquiry*? I am reading it now. It is quite interesting.

125.   P:   Yes, I did. It is rather difficult to say how it would resonate with you. I would not advise you to have him on your committee, unless you want to focus on IR.

*--Stand Your Ground If You Want To Graduate--*

126.   ZM:   I will need to think about the topic even more then.

127.   P:   I think so. You said I was not really explaining why I rejected your topic. But, you did not really fight me for your topic. I am trying to show you how you can defend your prospectus. If I start poking holes in your paper in your prospectus defense, and you say, "Yeah, you are right," I'd fail you. If I am right, you are wrong. Then why should you graduate?

I've been on a committee. The student kept asking us how the dissertation can be improved. We wrote pages of feedbacks, which the student incorporated. After seven

rounds, we just dismissed all of it. Being a Ph.D. is all about speaking authoritatively on an issue.

128. Prior to this meeting, the professor has never told Mills that his pedagogical approach is to play the devil's advocate. When he assessed Mills' proposal as unscientific, he presented his personal opinion as unquestionably true in the scientific community. He asked Mills to adopt his correct methodology and propose a new paper, instead of asking Mills to read why Mills' methodology can be supported and then debate him.

129. The professor did not adopt the same approach with two white female students. They told Mills so. Like Mills', their paper proposal also employed a different methodology than that of the professor. The professor did not raise any objection to their methodology and approved their proposal without in-person discussion.

130. Mills found out that, of the papers the professor served as the first author, the most cited paper uses data availability as case selection rationale.

### Section 4.    Too Many Coincidences

131. After the third meeting, Mills began to put everything that happened that semester together.

132. On the first day of the semester, the professor used Mills as an example of a student who does not turn in work on time and therefore cannot receive credit. Halfway through, the professor stopped himself for 15 second and then seamlessly switched to using a white student as the example. Save for one East Asian foreign student, all Mills' classmates are white. The students kept their poker faces, but it was an uncomfortable moment for everyone present.

133. During the class break, the professor apologized to Mills alone for an appearance of racism: it could look like the professor was calling Mills a bad student due to the common anti-Black trope of Black people being lazy and unintelligent; because Mills is Black, the professor said he

decided to switch to the white student. The professor said he does not want Mills to think that he thinks Black students are lazy. Mills assured the professor that he was not one to take offense at every perceived slight.

134. In a lecture about policymakers' bias impacting policymaking, the professor revealed that he has biases that he tries to keep in check. The professor also said that he expected every student to have biases.

135. In a lecture, Mills refuted a classmate's point by reciting reading material from memory. The professor would not believe that Mills accurately represented the material until a white student gave the professor the material.

136. Early in the semester, Mills' mother was hospitalized in Arizona. As her only child and the only member of the family with scientific training, Mills flew home to take care of her and make medical decisions. By then, she had lost 20% of weight and could not recognize who he was. Mills was upset that her doctor was about to put her on stomach tube even though she could not give valid consent. Mills looked up a meta-study. It shows that 50% of the patients with similar her conditions would die in 18 months. Mills stayed with her for two weeks until she stabilized.

137. When Mills informed his professors that he was taking care of his hospitalized mother in Arizona, Mills' other professors were very understanding. The professor, on the other hand, asked Mills for overdue assignments. Mills had told the professor that he could not bring his laptop into his mother's quarantine room and that he was staying in the hospital except while sleeping. When Mills did not respond to the professor's email about submitting assignments ASAP, he complained to the program director that Mills was absent, even though Mills attended every session via videoconferencing.

138. As soon as Mills flew back on 10/12 for the midterm, the professor wanted to know Mills' progress on the paper. When Mills again explained that taking care of his mother in a hospital was interfering

with writing the paper, the professor laughed in disbelief, that he is still using the same excuse. Being laughed at for a real family emergency felt unreal. Mills could not tell whether the professor was saying he invented the family emergency, or that a family emergency should not distract a Ph.D. student for so long.

139. When Mills later sprained his right index finger and could not type, Mills did not want the legitimacy of the injury questioned and did not mention it to the professor.

140. The professor told Mills to not worry about submitting paperwork to establish the family emergency. However, the professor announced in class that Mills as very much behind on his paper.

141. After returning, Mills first tried to make up the work he missed in Arizona. He summitted assignment 1 – the abstract – 21 days after the original deadline. In the abstract, Mills proposed a paper based on the reflexivism methodology. According to *Conduct of Inquiry*, it is as legitimate as neopositivism. What follows are excerpts of Mills' abstract and the professor's comment.

142. ZM:   The paper examines the effects of state-led (Ningxia, China) and individual-driven (Sahel, Africa) climate induced migrations.

143. P:   This part led me to believe that the paper will only describe two different processes of migration. You did not provide a rationale for choosing these country-cases.

144. ZM:   The paper will deal with methodological considerations of how to categorize and define a phenomenon.

145. P:   These are merely conceptual considerations[7]. Why would your paper discuss these?

---

[7] The professor is incorrect. Ontology is concerned with the structure and manner with which human knowledge categorizes and defines entities. As *Conduct of Inquiry* argues, ontology is concomitant of methodology; both of which are matters of opinion. Calling an methodology a concept is to claim that it is a matter of fact, rather than a matter of opinion. I.a.i.1.a.i.1.a.66

146.   ZM:   The paper will identify normative standards, qualities of interest, points of comparison, performance indicators of climate migration.

147.   P:   You did not have specific definitions of them.[8] You also did not identify theoretical literature[9].

148.   ZM:   The paper will be important because hundreds of million people will need to migrate because of climate change in this century; policy solutions are imperative to maintain international order and security and human dignity.

149.   P:   Your motivation is speculative and hyperbolic. Please delete these. "A policy on climate migration is imperative to international order and security?" Says who?

150.   P:   I do not think the idea you proposed is up to standard, analytically.

151.   To discuss the negative feedback, and to catch up on the paper, Mills signed up for the professor's office hour.

152.   Although the professor had a stated policy that each student can only sign up for one block of 20-minutes per day, Mills saw that three other students had signed up for two continuous blocks that semester, and many students did in prior semesters, and that the professor allowed it. Mills did the same.

153.   Soon, the professor emailed the whole class that he cannot commit to two continuous blocks, and shortened Mills' appointments.

154.   Their first meeting about the paper was on 10/25. The professor refuses to approve Mills' proposal without giving much explanation. Mills also had a distinct sense that the professor did not want to

---

[8] In some methodologies other than neopositivism, it is perfectly acceptable to identify define specific criteria after interacting with data. Neopositivism believes this approach would taint the neutrality of the criteria. Dialecticism, for example, explicitly contemplates moving between applying a model to data and refining model.

[9] It is rare for a scholarly article to identify theoretical literature in the abstract.

discuss more. He said Mills' research design, including the comparison of dissimilar country-cases, is not a valid form of scientific inquiry. ¶ 58. The professor asked Mills to start over because the abstract cannot be improved to an acceptable level. In the new proposal, the professor wanted to see a hypothesis and how he will test the hypothesis, with dependent variables and independent variable.

155. The professor almost convinced Mills that his proposal was unscientific. Mills had not read *Conduct of Inquiry* at the time. He did not have enough knowledge to understand that the professor was disagreeing with his methodology, or that adopting the professor's suggestions was equivalent to revamping the entire research design.

156. In assignment 2 and 3, methodology reflection and literature review, Mills tried to conform with what the professor demanded.

157. Instead of arguing that that the design of a climate migration policy must consider non-environmental drivers such as security and livelihood, Mills loaded the same argument into a testable hypothesis: that not including non-environmental drivers in a climate migration policy will create gap in the policy.

158. Instead of arguing that climate migration, environmental degradation, loss of livelihoods, rate of urbanization, and inequality are intrinsically interconnected, Mills named climate migration as dependent variable and the rest independent variable.

159. Where the professor had not specifically instructed Mills to adopt neopositivism, Mills identified a theoretical significance in the difference between how 1) policymakers; 2) implementers; and 3) people affected by policy view international climate-induced migration policies. That is, Mills recognized that the knowledge represented in such policies were produced by upper-class well-educated Western people, who live in vastly different social conditions than people who implement or people who are affected by such policies do. Mills intended to research the role of the social conditions have on such policies, and, in turn, how such policies cause a change in social

conditions of the three groups. Neopositivism denies that knowledge is a force in the real world, and would reject Mills' research design.

160. Mills submitted assignment 2 (methodology) and 3 (literature review) one day after assignment's original due date. He had almost caught up with the class.

161. When they met on 10/30 for the second time about the paper, the professor rejected Mills' proposal again.

162. The professor said that many of Mills' arguments are flawed, such as a) transnational climate migration is mainly a problem of inequality and development and b) an effective policy that prevent transnational climate migration must consider non-environmental drivers.

163. On the other hand, the professor approved of components of Mills' work on the side of neopositivism, such as a) Neumayer's use of multivariate regression analysis to demonstrate which non-environmental drivers are important;[10] b) Piquet's inquiry into whether existing model of environmental variable truly capture climate change instead of variability of natural disaster; and whether aggregated data reflect individual level data[11].

164. Mills acknowledged the strength of ethnographic study in a non-neopositivist context, and set his goal to develop a more holistic theory of climate induced migration. The professor rejected both on the ground that Mills would not have time to do either in the remaining 5 weeks in the semester.

165. In reality, had the professor allowed it, Mills could have done individual-level ethnographic study in five weeks. Instead of interviewing people himself, Mills could have analyzed their recorded statements in Internet videos and documentaries in five weeks. His policy analysis paper could have served as preliminary research that he

[10] Neumayer, E. (2005). Bogus Refugees? The Determinants of Asylum Migration to Western Europe. International Studies Quarterly, 49, 389-409.
[11] Piguet, E. (2010). Linking Climate Change, Environmental Degradation, and Migration: A Methodological Overview. Climate Change, 1(4), 517-524.

can later expand into a prospectus or a dissertation. This approach is encouraged by SIS curriculum.

166. The professor instructed Mills to propose a new policy analysis paper. He instructed Mills to redo his literature review with 20 "substantive sources" in a week.

167. At this point, Mills felt insulted by the professor's accusation that he was using his family emergency as an excuse, or he invented a family emergency. Mills was uncomfortable with the professor completely rejecting his research design as unscientific and could not even be fixed. Mills felt uncomfortable being in the same room as the professor.

168. Mills stopped going to the lectures. It was a calculated risk for Mills. Mills found the professor's lectures failed to teach him anything about writing the policy analysis paper. Deduction for absences was limited to 5% of final grade.

169. Two weeks later, it became clear to Mills that he could not possibly finish the paper by the end of the semester, given that family emergency had delayed his progress by a month, and that the professor kept asking him to start over. Designing new research is not as easy as switching to another brand of dog food.

170. Mills also learned that the professor had under-counted his attendance by 60%. Mills had to join two class sessions virtually from Arizona; the professor told Mills not to submit paperwork of the family emergency yet did not credit his attendance.

171. Before the third meeting with the professor, a classmate told Mills that the professor had let everyone else off the hook - the professor was accepting non-policy analysis paper for credit. Mills was surprised. The professor had twice rejected Mills' proposal for a policy analysis paper. The professor had not mention anything about an easier alternative. When he heard of the alternative, Mills was still scratching his head for a new policy analysis paper that the professor would approve. [internal cite]

172. Mills has doubt that the professor did not know that all works under an Incomplete must be finished during the next semester. ¶87-90. The professor has been at AU since 2009. At that time, and since 1980, the same rule applied. The professor would know if he ever supervised an Incomplete.

173. Regarding the easier alternative of non-policy analysis paper, Mills recalls that the professor did not volunteer the alternative. The professor only acknowledged that Mills could also do the alternative after Mills had said he heard it from other students. [internal cite]

174. Mills also recalls that, when confronted with question why he did not inform Mills months earlier, the professor first words were, "you would know if you had hung in there". [internal cite] It sounded like the professor had taken as slights Mills' absences from the November lectures and his request for Incomplete.

175. It is also dubious that the professor then immediately switched to an inconsistent story. The professor said, "it's not that [other students] knew, and you didn't[;]" rather, as he was reviewing other students' work, he realized that they were good paper but not policy analysis papers. He then organically decided to accept these non-policy analysis papers.

176. First, this is exactly a situation of "[other students] knew, and [Mills] didn't". It also strikes Mills as strange and unfair why the professor would allow a proposal of non-conforming paper in the first place.

177. As to when this organic change took place, the professor first said the change took place after he read parts of student papers. When Mills questioned whether that was fair to him, the professor said the change took place before anyone had anything written. [internal cite]

178. When would this organic change have taken place? The professor would not say clearly. The two white female students proposal of a non-policy analysis paper was accepted at the end of September when Mills was traveling. [internal cite] If the change took place before 10/30, their second meeting, why did the professor not tell him then? If

it took place after 10/30, if the students had not written anything at that point and if the professor did not accept late work, according to the due dates in the syllabus, they would have lost 25% of their total grade. Yet, six out of eight passed.

179. Mills also recalls that, around 10/30, many students had written a substantial portion of their paper.

180. Regardless, after their 10/30 meeting, Mills was operating under the professor's instruction to propose another policy analysis paper, until the professor confirmed non-policy analysis paper was acceptable during their third meeting on 1/26.

181. Regardless of when the change took place, it seems uncharacteristic for the professor to not inform Mills of the biggest change to the syllabus. The professor had made a dozen of minute changes to the syllabus. The students did not read the 8-page syllabus a dozen times. The professor always either 1) wrote a separate email explaining the changes; 2) told the student the page number of the syllabus containing any changes; and/or 3) highlighted the changes. The professor would always email about a change even if every student was present.

182. Mills begins discussing his concerns about the professor with his classmates.

183. Mills realizes that one of the research designs that he had proposed was similar to two white female students' research design, in terms of a) methodology, b) methods, c) a case selection rationale based on occurrence and d) the inclusion of a domestic case.

184. The two white female students proposed exclusively using scholar Dvora Yanow's method of discourse analysis on two discourses on rural experience: one originating from rural people and the other originating from nationalists.

185. Mills also proposed to use Dvora Yanow's method of discourse analysis on two discourses on global climate migration policy: one originating from people affected by the policy and one originating from the policy's makers.

34

186. As a case selection rationale, the two white female students selected the U.S. and France because the phenomenon is occurring there.

187. Mills selected Louisiana, China and Sahel, Africa as country-cases for the same reason.

188. The professor problematized Mills selecting Louisiana and China. The professor problematized Mills using occurrence as a case selection rationale.

189. The professor did not problematize the two white students' proposal at all. He approved their proposal without meeting them. They passed the class on time. They presented the paper at an academic conference and then publish the paper on a non-policy analysis journal.

190. By comparison, the professor rejected Mills' proposal as unscientific.

191. The professor also insisted on micro-managing Mills, such as redoing a literature review, without micro-managing other students of other ethnicity, sex or methodology.

192. A white classmate shares a rumor that the professor had casually mentioned to some classmates over lunch that his family members were members of the German Nazi party.

193. A white classmate tells Mills that a female faculty member accused the professor of sexual harassment, and, thereafter, the professor spread rumors that the female faculty member was mentally unstable. Mills hears that the female faculty member's famous mentor had to fly in to save her tenure.

194. It becomes impossible for Mills to trust the professor is assessing Mills and his work on the merits. Natural selection frowns on organisms that do not perceive risk and adapt to the environment. For Black people, when evidence of racial bias accumulates and when the bias impacts their lives, it becomes unintelligent to not perceive a risk.

195. James Baldwin said the following about Black people's perceiving racism as a mortal risk on the Dick Cavett Show, aired on 5/16/69, available at https://youtu.be/hzH5IDnLaBA

I left this country for one reason only. I didn't care where I went...I ended up on the streets of Paris with $40 in my pocket on the theory that nothing worse could happen to me there than what had already happened to me here. You talk about making it as a writer by yourself, you had to be able then to turn off all the antenna with which you live because once you turn your back on this society, you may die. You may die.

It's very hard to sit at a typewriter and concentrate on that if you're afraid of the world around you. The years I lived in Paris did one thing for me. They released me from that particular social terror, which was not the paranoia of my own mind, but a real social danger visible in the face of every cop, every boss, everybody.

I don't know what most white people in this country feel, but I can only conclude what they feel from the state of their institutions. I don't know whether white Christians hate negros or not, but I know that there is a Christian church which is white and a Christian church which is Black. The most segregated hour in American life is high noon on Sunday. That says a great deal for me about a Christian nation. It means I can't afford to trust most white Christians and certainly cannot trust the Christian Church.

I don't know whether the labor unions and their bosses really hate me. That doesn't matter. But I know I'm not in their unions. I don't know if the real estate lobby has anything against black people, but I know the real estate lobby is keeping me in the ghetto. I don't know if the board of education hates black people, but I know the textbooks they give my children to read, and the schools that we have to go to.

This is the evidence! You want me to make an act of faith risking myself, my wife, my woman, my sister, my children on some idealism which you assure me exists in America which I have never seen.

196. Mills is in Baldwin's shoes. Mills could no longer take the professor's will for the deed.

197. It seems to Mills the most probable explanation for the apparent irregularities is that the professor had preconceived notions about Mills.

198. [internal cite 126-132] (singling Mills out as a hypothetical bad student; accusing Mills of using family emergency as an excuse)

199. When Mills made up lost time for family emergency and proposed a paper, the professor refused to meet him for more than 20 minutes at a

time; [cite] he casted categorically more doubt on Mills' work than he did similar work from the two white female students.

200. During their first two meetings, the professor knew but did not explain that his criticism was based on his personal opinion, as if Mills cannot understand that a disagreement over methodology is a difference of opinion.

201. The professor did not find it necessary to inform Mills that he had accepted proposals for non-policy analysis paper. [cite] There are three plausible reasons. First, the professor perceived that Mills had not accorded him enough respect. Second, the professor did not believe Mills could finish the paper even with that reduction in difficulty. Third, the professor did not think Mills could have found out about the difference in treatment, just as he did not think Mills would realize he was telling contradicting stories about when the change took place. [cite]

202. Mills is particularly concerned that the professor seems comfortable letting his personal preferences override academic considerations, in overseeing a student's career. [cite] (the professor proudly recalling dismissing a student for an excessively subjective reason - that the student tried to incorporate the professor's criticism instead of rejecting and fighting the criticism, in an attempt to convince Mills that his covertly playing the devil's advocate was in Mills' benefit – to build some sort of habit of confrontation that is required of Ph.D. students.)

### Chapter B.   Botched Investigation

203. Since the fall 2017 semester, Mills gradually becomes depressed. The thought of having to keep interacting with, and evaluated by an apparently biased and disrespectful professor weighs heavily on Mills. Mills starts taking medications.

204. In spring 2018, between depression, Mills cannot study much for his second comprehensive exam in May 2018. No student who passes the first comprehensive exam fails the second one. Mills fails.

205. Mills shares with the Program Director that he expected to fail because he disengaged with schoolwork. He recounts the paranoia about the professor. [Internal cite] singling him out; announcing he is biased twice; wrong Incomplete due date, withholding that non-policy analysis paper is acceptable.

206. Mills shares that seeing other professors giving a white female cohort member who also had a family emergency as much support and extension as she needed to finish her papers made him feel that his family emergency was somehow less legitimate. He says he is relieved that professors who graded his second comprehensive exam say they see great potential in him. However, he says he does not feel equipped to deal with all the bias events as the only domestic minority student in the program.

207. The Program Director says that the professor should not have said what he said. She says she will take over the professor's role in grading the unfinished paper. She sets up an appointment for Mills to speak with the Dean of Academic Affairs, who AU designates to resolve faculty discrimination cases.

208. Mills recounts his experience to the Dean. The Dean would acknowledge Mills have said something, but does not otherwise comment.

209. Mills also shares his fear of retaliation, given the vivid and detailed rumor that the professor told his colleagues that the female professor was accusing him of sexual harassment because she was mentally unstable. [internal cite] The Dean would not say whether the school did anything to protect the professor, instead the Dean keeps repeating a boilerplate answer: that AU's policy prohibits retaliation.

210. The Dean finally asks Mills, whether Mills wants to formally file a complaint. If not, the Dean would not investigate.

211. Mills is bewildered. The Program Director and Mills has both reported the professor's discrimination to the Dean. AU Discrimination Policy says that AU will thoroughly investigate any report of discrimination,

regardless of whether the subject requests an investigation. Even when the subject asks AU not to investigate, the Policy says AU may nevertheless investigate because a non-discriminatory campus is so paramount to AU.

212. The Dean's odd response gives Mills a sense of dread - that getting some justice and dignity is out of reach. Mills does not formally request an investigation at the meeting.

213. Mills ponders for seven weeks. He would never mess with someone's life, reputation, and livelihood haphazardly and vindictively. However, he realizes that he himself almost bought into the professor's view that he is a terrible student. Another student may too, unless the school establishes what happened.

214. After rethinking what happened chronologically, Mills is confident that the strange, repeated occurrences cannot simply be benign mistakes or oversights, but something nefarious. Had he not realized that the professor is untrustworthy, he might still believe that his research is invalid, and rewrite it over and over until he fails the mandatory course and cannot graduate.

215. Mills decides to formally request an investigation.

216. When Mills informs the Dean, she has been promoted to Deputy Provost. She asks Mills to contact her successor instead. Also, the Program Director retires from the administrative position, and another Program Director succeeds her.

217. AU Discrimination Policy says that the Dean of Academic Affairs will conduct a thorough investigation. The Acting Dean asks Mills to interview with her teammate - the Faculty Relations Investigator.

218. At the end of the first interview, the Investigator promises to interview Mills again. The Investigator also promises to call Mills if any question emerges, but that the investigation will move forward whether Mills participates or not.

219. Mills waits for three weeks. The Investigator never contacts Mills to ask for the second interview, or more evidence, or ask any questions or

clarification. Even though recalling trauma is exhausting and detracts from his study, he submits a detailed timeline and more evidence.

220. Mills' incoming Program Director then tells Mills that the Dean told him that the investigation could not begin until Mills submit more evidence. Mills is perplexed. Why did the Investigator tell him that the investigation would begin whether or not he submits more evidence? Why does the Investigator not contact him if more evidence is necessary? What would have happened if Mills never submit more evidence?

221. Mills writes to the Dean and the Investigator to demand transparency on these issues, not the least because AU Discrimination Policy designates the Dean to be available to answer student questions about the Policy. The Dean and the Investigator did not respond for three weeks.

222. Mills calls the President's office to check whether the Dean and the Investigator are avoiding him. Mills also wrote to Vice President for Campus Life and Inclusive Excellence, and Deputy Provost. They cannot get the Dean and the Investigator in touch with Mills either.

223. The Dean finally breaks radio silence after three weeks, although she acts as if she did not disappear. She informs Mills that the investigation is finished. Five days later, the Dean writes to Mills with a Report - that the professor did not violate AU discrimination policy.

Section 1.    Unconscious Bias Explains Some Things, But Not Others

224. Dean Report (Ex. A) seems fishy to Mills. The Dean and the Investigator have avoided him for weeks. Its factual findings are full of obvious mistakes. The way the Report applied Discrimination Policy to the facts does not make sense. To top it off, the Report's interpretation of the Discrimination Policy does not comport with the Policy.

225. To begin with, the Report only credits Mills' statement if there were witnesses. For example, the Report credits Mills' report of two racial microaggressions in the classroom. First, when the professor singled

Mills out as a hypothetical example of a bad student, the Report concludes, the professor "expressed unconscious bias….once he became conscious of his unconscious bias," he apologized. Second, the Report finds that the professor had said that he has "biases" that he "tries to keep in check" in the classroom.

226. Unconscious bias is popularly understood as a person's biased thoughts that they were not immediately aware of. Absent truth serum, how did the Report find out what the professor was thinking when he singled Mills out? It did not come from Mills. Mills had reported that the professor only apologized to him about an appearance of bias. [cite] The professor did not tell Mills that he selected Mills as an example because he actually thought Mills was a bad student due to Mills being Black.

227. Nevertheless, the professor's apology felt cringeworthy, in hindsight. The professor first assumed that Mills was offended because Mills is Black; he then assumed that a white classmate would not be offended as the hypothetical example. It would be better had the professor avoided using real students as hypothetical examples all together. Second, the professor wanted to ensure Mills know that he is not a racist. He seemed more interested in not being perceived as racist than making Mills comfortable.

228. To Mills, the only logical explanation why the Report holds that the professor exhibited "unconscious bias", is that the professor admitted to it during the investigation.

229. However, the Report concludes that the two racial microaggressions were not "adverse decision" and were not severe enough to violate Discrimination Policy, especially because the professor apologized.

230. That a cringeworthy apology erases a violation does not sit right with Mills. Mills did not make much of the two racial microaggressions and the uncomfortable apology at first. However, when the professor disbelieved that his paper was delayed by his family emergency, and made strange errors about his grade, his research design and final

paper, the microaggressions and subsequent events made Mills anxious that the professor has out-of-control racial bias. So much so, that Mills minimized face time with the professor. Mills could no longer trust or work with the professor whether or not the professor had apologized. Mills could not finish the course that semester, which delayed Mills' academic progress by at least one year. This seems to fit AU's definition of discriminatory harassment, which does not depend on malic.

231. Although the Report finds the professor's unconscious bias about Black people caused the racial microaggressions, Report says other instances of the professor perceiving Mills as a bad student were unrelated to that unconscious bias.

232. The Report says it cannot corroborate the incident where the professor laughed and disbelieved Mills' family emergency delayed writing the paper, which only Mills and the professor saw. Mills is livid. The professor had laughed about Mills' integrity, competence, and diligence to his face. Now, the professor denies it ever happened, just because no one saw it. What about circumstantial evidence? Perhaps the professor had told another professor that Mills was lying about his family emergency? The Report either did not find such evidence or does not find it relevant.

Section 2.    It is a Coincidence

233. The Report says, when the professor announced in class that Mills was behind everyone, the professor was accurate and it was OK. But, normally, a professor do not tell other students that a student is not performing well.

234. Regarding when the professor kept insisting in class that Mills was wrong about a topic until a white student interceded, the Report says it is a common mistake any professor would make. Mills was alleging a pattern that other students could have noticed. Although Mills requested the Investigator to interview the classmates, and although

the Report says all requested witnesses were interviewed, several classmates tell Mills no one had contacted them.

235. Regarding when the professor gave Mills the wrong due date for the Incomplete, the Report says it is another common mistake any professor would make. It does not make sense that the professor did not know that Incomplete needs to be finished by the next semester, unless the professor had never been trained, or unless he had never granted Incompletes before. Yet, the Report does not discuss these explanations.

Section 3.    No Harm, No Foul (After We Fix It)

236. The Report says the professor did not intentionally discounted Mills' virtual attendance. Rather, the professor transposed Mills' attendance wrong. But, the Report does not say it reviewed the attendance record.

237. Report says the professor made a mistake on Mills' participation grade. But, what mistake could the professor have made about a single subjective letter grade?

238. Report also notes that these grading mistakes have been fixed. But, can fixing the grade substitute finding a violation? That does not strike Mills as how disciplinary actions work. For an adverse decision discrimination, the AU Discrimination Policy does not say that reversing the adverse decision would absolve the wrongdoing.

Section 4.    Investigator Make Mistakes

239. The Report contains several factual and legal mistakes.

240. The Report finds that the professor's emails to Mills are consistently courteous and professional. This is a strange conclusion because Mills pointed out that a contrast: the professor was respectful in emails but rude in person.

241. The Report does not discuss the professor canceling Mills' office hour appointments.

242. The Report also finds the rumor that the professor casually said his family has a Nazi history was false. Mills told the Investigator that it is

a rumor. The Dean and the Investigator never asked Mills whom the rumor came from. Yet, the Report implies that Mills originated the rumor.

243. Report says the professor could not have graded Mills with bias because the professor gave Mills at least the average grade for a Ph.D. class - B. What if Mills should have received an A?

244. With this many mistakes, it seems that the Dean and the Investigator were very incompetent. One mistake, however, strikes Mills as intentional.

Section 5.   Non-Policy Analysis Paper Has Always Been Acceptable.

245. Regarding why the professor did not inform Mills that he accepted non-policy analysis paper, the Report writes

[the Professor] clarified in class what the syllabus already indicated about the final paper (i.e. that it does not have to be a policy analysis). This was not a change to the syllabus and so an email updating the syllabus was not necessary.

246. Mills cannot believe his eyes. He immediately finds the syllabus. It reads: "All students produce article - length manuscripts, each providing an analysis of a specific policy or set of policies." It is impossible to interpret this sentence to mean a non-policy analysis paper is acceptable.

247. Moreover, the professor had told him an inconsistent story, which Mills could have shared with the Investigator and the Dean if they have asked Mills about the syllabus instead of dodging him.

248. A white female classmate tells Mills that the alternative of non-policy analysis is never reflected in the syllabus. Did the professor lie to the Dean?

249. Taking the Dean Report at its words, it says that when a syllabus changes, a professor should notify the students of the change in writing. However, assuming the syllabus never changed but the

professor had to clarify it in class, the professor did not need to do so in writing as well?

250. Mills is incensed. The professor withholding from him that non-policy analysis paper delayed his academic progress by a year and destroyed his trust in the professor. Now, the Report says that Mills should just read the syllabus again? Why would the Dean tell a Ph.D. student that he cannot read a syllabus?

Section 6.    Wrong Interpretations of Discrimination Policy

251. Mills also notices that the Dean Report is not interpreting the Discrimination Policy correctly.

252. First, the Policy forbids discriminatory harassment: the actor's discriminatory conducts are subjectively offensive to the subject, and objectively offensive, and have materially changed the subject's educational condition, regardless of the actor's intention.

253. While the Dean Report says it has adjudicated Mills' complaint about discriminatory harassment, it does not apply this standard to evaluate the facts. Rather, other than racial microaggressions, the Report seems to excuse all of the professor's errors on the ground that he did not intend it.

254. Once is happenstance. Twice is coincidence. Three times is enemy action.

255. All of the Report's obvious errors remind Mills, why did the Investigator promise to follow up but then dodge him for three weeks? So that Mills cannot react to these obvious mistakes? Are the glaring misinterpretations of Discrimination Policy merely negligent? Did the Dean fix the grades as a substitute for finding the violation?

Section 7.    A Cover-Up is an Insult.

256. Mills cannot cope with being lied to in such a glaring and official way.

257. Mills feels the Report ridicules and insults him. As an example, the Report says that, as a Ph.D. student, Mills cannot read a syllabus right; that after going to class for months and proposing several policy

analysis paper topics, Mills persisted in a mistaken belief that the course did require a policy analysis paper, until the Dean read the syllabus.

258. It would have been easier to accept a cover-up if one does not know it is a cover-up. However, once one knows, accepting an obvious cover-up becomes moral objectionable and humiliating.

259. On one hand, if the Dean assumes that Mills lacks the intelligence to see through an obvious cover-up from the array of irregularities, that is downright insulting and indicative of a belief in scientific racism.

260. On the other hand, if the Dean assumes that Mills cannot afford to litigate even an obvious cover-up, that is intimidating and discriminatory, in part because the Dean hit the nail on the head. A civil rights suit costs $400,000. The national average Black family net worth is under $200,000. When he came to SIS, Mills and his family did not budget for a civil rights lawsuit as a part of essential educational expense. Mills' mother is a retired public-school teacher; she cannot support him. Mills' tuition comes from SIS; his living expense comes from student loans.

261. Mills' first instinct is to escape AU. Two hours after receiving the Report, Mills sends an email from his university account to his personal account. He backs up his hard work over the last two years - his reading notes, prospectus ideas and comprehensive exam preparations. He writes a note to himself: "I hate the Unamerican University of White Supremacy."

262. Very soon, Mills faces the reality that he has to stay. He could transfer to another Ph.D. program if he is from a rich family like most students in the program. All Ph.D. programs only accept one year of transfer credit, so Mills would lose half of the two years of credits he has. But, he has almost reach the lifetime maximum for federal student loan. He sees no other choice but to continue at AU. On the same day, he returns to the school that is either incompetent or treat civil rights law as race

management law. Everyone at the class can see how despondent and distracted he is.

Section 8.    Can't Appeal This

263. Mills must stay, but he thinks that he can graduate while getting to the bottom of the botched investigation. His faith in justice, equal rights and free speech comes from his white upbringing. He has not forgotten that.

264. So, Mills requests a direct meeting with the President to discuss the cracker jack attempt at a cover-up. Mills notes the Dean Report is factually inaccurate in several instances, omits critical facts, confuses events, invents facts, includes a couple of complete lies about the investigation process, and exhibits deeply flawed logic in fact-finding.

265. Here is the President's reply.

> [My secretary] shared your email inquiry with me and has kept me posted on your communications with her this summer.[12] I am very sorry for the frustration and anxiety you experienced while your complaint was being investigated. In response to your note, I have confirmed that the university followed its normal processes in investigating and resolving your complaint and that the matter was fully investigated.
>
> I understand that you are frustrated, and as a University, I want us to continue to learn and grow. I have asked Seth Grossman, my Chief of Staff, and Fanta Aw, Vice President for Campus Life and Inclusive Excellence[13], to meet with you about your concerns regarding the handling of your complaint.  They will reach out to you directly to find some time that might work for you.
>
> Thank you again for your note.  I recognize that it has been a difficult year for you....
>
> SMB

---

[12] The President is referring to Mills' trying to get the President to help with the Dean and the Investigator dodging him during the investigation.

[13] Vice President for Campus Life and Inclusive Excellence job description includes the power to intervene in all university offices' internal process as it relates to diversity and inclusion.

266. Mills agrees to the meeting to discuss the handling of the botched investigation. A week later, the Chief of Staff clarifies for Mills that, the Diversity VP and he would not talk to Mills about remedying errors, because the Dean Report is final under AU policies. The topic would be limited to improving the investigation process going forward and AU racial climate generally.

267. The President teaches Mills the sociological term of emotional labor – white workplaces require minorities to manage their feelings and expressions to stay. AU first conducts a cover-up so feeble that the Dean and the Investigator had to dodge Mills and bend rules. The President then confirms that she has personally ensured that it is not a cover-up and invites him to contribute to AU's racial climate. The President does not even respect Mills enough to tell him honestly that the prerequisite to contributing to campus racial climate is to not talk about the cover-up. The school wants Mills to stop talking about the cover-up but would not even accord Mills the respect of telling him that it is a cover-up or offer him compensation for delaying his academic progress for years. As an IR paper says, partial hypocrisy can lend to building consensus, but complete hypocrisy is a demand for unconditional submission.

268. Here is a summary of Mills reply:

What is there to improve at AU if nothing is wrong with my complaint investigation outcome?

I now know that Black students only serve two purposes on campus -- to create the illusion of diversity, and to serve as the punching bags of elitist and racist white people. Do you all realize that it would be cheaper for you to diversify the campus rather than try to cover up the rampant racism and pretend like everything is great?

A primary research goal of the AU Anti-racist Center is the prevention of Black students from entering critical policy areas as a form of White Supremacy.

Black students are scared. You are all no different than the white supremacist Dylann Roof, except that your weapon of systemic

discrimination is much more sophisticated and dangerous to Black people. At least he did not hide the intentions of his actions.

How do you wander around campus crying[14] when racist incidents occur and pretend like you support Black students when you could care less about their well-being and long-term success? I am a person who deserves dignity. I deserve to have civil rights.

I will expose the feeble cover up and its tacit support for white supremacist ideology for what it is. I will excel at my mission of ensuring that all future and current Black students know what really goes on at unAU. I cannot wait to inform Black parents that their children are not safe at unAU and their children's interests are not represented by anyone on campus.

I, as a Black man, do in fact have the capability of reading and understanding the law. I cannot wait to expose your systematic racism through a lawsuit -- I will discover at a minimum the last decade's worth of AU mishandling discrimination investigations, which creates a heightened risk of racial discrimination throughout the student body. See *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, No. 6:16-CV-173-RP, 2017 WL 1628994 (W.D. Tex. May 1, 2017). I will prove that AU's deliberate indifference to my complaint of discriminatory harassment violates Title VI of the Civil Rights Act.

As a lawyer, [President's Chief of Staff], you should know that AU is violating the Civil Rights Act. The same goes for [Deputy Provost], who has been covering up my complaint since the beginning. I question your and her ethics as officers of the court.

If you're not part of the solution, you're part of the problem. [Deputy Provost, Dean of Academic Affairs, Investigator] are part of the racism problem at unAU. You [President's Chief of Staff, Vice President for Campus Life and Inclusive Excellence and] SMB (whoever this is) are part of the racism problem at unAU. You should feel deep deep shame in your actions.

Unapologetically,

Zach Mills (not your negro)

Ph.D. student, School of International Service

The Unamerican University

The Only Black American in the SIS PhD Program

---

[14] President SMB did. [internal citation]

The only visible historically oppressed American Minority in the SIS
PhD program

269. No one, including the Dean of Academic Affairs, tried to explain Mills
that the Dean Report was correct thereafter.

270. AU gives Mills no hint that the investigation generated a pile of
evidence that contradicts with the Dean Report. Mills only find out
about the other evidence when it was too late. *See* Chapter F, Section 1.

### Chapter C.   Fall 2018 ~ Summer 2019

#### Section 1.     It is Bigger Than Mills

271. Mills realizes that his experience is far from unique.

272. First, if the Dean of Academic Affairs interprets AU Discrimination
Policy wrong in his case, presumably she does the same for all other
cases.

273. After hearing about Mills' story, other minority and white students
share their story. Invariably, when a student experienced racism in the
classroom or from peers, AU would discourage them from filing a
complaint; those who do file a complaint get a cover-up. It explains
that only 33% Black students feel welcomed at AU, according to its
2017 Campus Climate Survey.

274. Mills witnesses several racist incidents himself.

275. As a part of the SIS Ph.D. admissions committee, Mills sees a white
professor insisting on rejecting a Black female disabled applicant with
distinguished academic record because she is not a "good fit" for some
reasons. Nobody defends her, except Mills. Mills fights for his
admission. Then, when she visits SIS, no student nor faculty shows up
to welcome her except Mills. Everyone else happens to forget that day.
Mills treats her to a dinner on behalf of SIS, as is customary for white
admitted students touring SIS.

276. Soon after the investigation, Mills realizes that it is not such a
confidential process as the Discrimination Policy promises. Faculty
members not involved in the investigation somehow know of what

happened. One day, he runs into a professor with whom he had a friendly connection. She greets Mills and says "You are very famous now. Yes, you are." Mills: "According to who?" She says, "Me. Me. I will catch up with you again." She never contacts Mills again. Several other faculty members seem distant and reluctant when Mills approaches them about doing research together. Even before he filed the complaint, Mills had a distinct feeling during a meeting that his academic advisor perceived him as a lazy Black person, perhaps because the 808 professor said something.

277. One aspect of White Supremacy is the "white is right" discourse - the leap to "cultural" / racial explanations for non-existent problems of people of color. Mills overhears a watercooler conversation about an administrator's trip to Egypt. She problematizes the Egyptian family that hospitalized her giving their children traditional sweet tea, which made the children stay up till 1 AM. One comments the Egyptians are giving crack to their children. Another comments that early rising is the responsible behavior. They are liberals, but they do not discuss Americans are fatter, statistically, or some people do not want to sleep early. Mills concludes that, unless the historically dominant racial group gives up the myths of its racial supremacy, equality will not materialize.

278. Minority students nevertheless stay at AU and try to cope with institutional racism, because a degree makes the difference between a life in the middle-class or in poverty. A Black graduate writes in the student newspaper that he does not regret putting up with racism for the economic benefit he obtained; he says Black students just need to know the deal they are signing up for. Mills does not know he signed up for trading his dignity for a degree.

279. Mills attends an AU NAACP student-only meeting about racism in AU classrooms and how AU allows it to thrive. Before it even begins, the event has to relocate from the assigned room because a professor who

did not officially reserve the room insisted that they have priority. The students say that clubs of color are often so displaced.

280. Minority students share many racial incidents in classrooms:

A professor said colonization was the best thing that happened to Africa because African rulers were doing the same thing; when a Black student said many academics oppose the view, the professor said the student did not have the academic statute to question their view and that the student was biased because they are Black.

A professor read the N-word in reading material out because they had to.

A professor called Muslims "terrorists" and solicited Black students' opinion on criminal justice when they did not volunteer.

A student asked a professor for referral to a minority professor for their thesis on mass incarceration; the professor joked that no minority professor studies mass incarceration at AU because they are all mass-incarcerated.

281. Students also share their disappointment in how AU respond to racism. They agree that the civil rights office's mailbox is blackhole. Black student leaders complain that AU President did not consult Black student group on her strategic plan for campus diversity. They are perplexed why AU has invested in an Anti-Racism Center and broadcasted it as an achievement when Black students have not felt any impact.

282. Mills shares that a professor had declared that he is biased, accuse Mills of lying about family emergency and try to make Mills fail. Mills shared that AU covered it up by not giving him an opportunity to respond to faulty investigation and playing the definition game.

283. In the hope of mobilize other students to address AU institutional racism, Mills posts on AU Black Student Union's Facebook group:

My name is Zach Mills and I'm a third year PhD student at AU in SIS. I've recently experienced some serious discrimination and

harassment at AU from a biased professor and the administrators who actively took part in covering it up.

Several mostly Black minority students, and a few white students, have reached out to me after hearing of my situation to inform me that discrimination within classrooms is rampant on American University's campus. I have come to believe that there is a systematic attempt underway to discourage minority students, especially Black Americans, from entering positions in critical foreign policy areas. The goal is to keep America's government as white as possible.

I am no longer interested in getting justice solely for myself by holding the professor who discriminated against me responsible. I am now interested in ensuring that ALL of my fellow minority students get a fair chance at a great education untainted by the harassment of racist professors and staff.

To that end, I am currently compiling a list of race-related discrimination incidents from both current and former students. I am most interested in incidents or episodes of racism and discrimination from professors and other university faculty/staff which targets Black students and other minority students. These incidents do not need to be overt examples of racism but rather anything you perceive as discriminatory to yourself or other minority students. The racism that goes on at AU is highly sophisticated and hard to pin down. If you suspect something is not right, it probably isn't. Please say something.

If you or anyone you know has experienced racism or discrimination at AU by anyone employed by the university, I ask you to reach out to me and share your story. Do not let white supremacists silence you no matter how long and hard they try. Your confidently is guaranteed if you talk with me, and I will not share specifics of any incidents unless I have your explicit permission.

At a later date, I believe that between myself and several other former black PhD students, there is ample evidence to file a class action lawsuit against American University for systemic racism that specifically targets Black students. It would be great to add names to that lawsuit in the hopes of forcing AU to treat it's Black and other minority students with the respect we deserve.

Zach Mills

Section 2.    The Program Director Cares

284. The new Program Director reads one of Mills' posts. He invites Mills to a meeting to discuss his concern for Mills' academic future. Over the next year, Mills and the Program Director discusses what happened to Mills and its continuing impact on him. What follows are vignettes of those conversations.

--Where Does Racism Hurt?--

285.   PD:   Help me understand why one professor's action can cause so much distress.

286.   ZM:   I have researched this question because I want to understand too. I will send you a few psychology papers on racial microaggressions' distress on high functioning Black students.[15]

287.   PD:   I am not surprised.

288.   ZM:   I am only surprised that, given our good understanding of its mechanism and harm, that it still happens all the time.

289.   PD:   Yes. But addressing it is very complicated, whether the actor is conscious or not. It is very hard for the U.S. to immediately evolve from a completely racist society to an ideally color-blind society.

290.   ZM:   Only when no prejudice exists anymore. To be blind while it is going on is dangerous.

--Why Not See a Therapists About Your Feelings?--

291.   PD:   I would encourage you to get help from AU's medical and support services. I think they are free.

292.   ZM:   I am getting counseling and medications from the services. They do help me cope. But, coping is not addressing the underlying issue - being treated as a second class citizen first by the professor and then by AU. It is just not right to require

---

[15] We will supplement discussion of these papers.

the person subjected to unacceptable behaviors to function as if nothing happened.

--How Should Minorities React to Racism?--

293.   PD:   I am sorry to hear that it is so stressful. When I first moved from Israel to the U.S., a professor picked on me because I could not speak English well. I thought to myself, if that professor has a problem with me, I should just work with professors who appreciate me. That helped me graduate.

294.   ZM:   It is discouraging, right?

295.   PD:   I never thought of it as discrimination. I thought, I don't want to deal with you, and I'll work with professors that appreciate me.

296.   ZM:   I understand. Many people told me to stop talking about it, which would only make the faculty think I am a troublemaker; the best thing I can do is to stay and succeed to prove that I am not a racist stereotype like the professor says.

I feel differently, perhaps because I am the person in the situation. I do not believe they realize what they are suggesting. AU has cover-ed it up. To participate in hiding it is asking me to surrender my integrity. I want a Ph.D. but I not sure that I can respect myself if that is the condition. Besides me, what about all the other Black students that will go through the same thing? Judging from how AU handled my case, it is not unreasonable to think that there are other professors like him at AU.

297.   PD:   AU is well aware of the lack of support for minority students. We made significant stride in recruiting minority students, but not in their retention or their perception of AU.

298.   ZM:   AU minority students have complied lists of years of racist incidents in the classroom. The consensus is that racists

incidents are omnipresent. Something is seriously wrong. You are right. It is not everyone. But the few bad professors or students are destroying Black students' ability to deal with life here. It is not OK.

299.   PD:   If it is not intentional, then you need to change awareness.

300.   ZM:   I just do not believe the professor is unaware. One remark can be, but not a course of conduct over six months.

--an Investigation ≠ a Conspiracy--

301.   PD:   Regardless of what I think about the investigation or the professor's behavior, I cannot intervene in the investigation under AU rules.

302.   PD:   I know you think nothing has been done. I have not spoken to the professor. But, I know from others that the investigation has been extremely humiliating for him. He probably will think twice before doing the same thing to a student because of color or anything else. I can assure you that I will make sure to report any instance of racism that I know.

303.   About your case, I do want to share my perspective from an institutional level. You think that AU is racist to the core. I think there are people within AU with good intentions but they are a part of a society that was stacked against black people for centuries. It is very difficult to change an institution.

304.   ZM:   Haha. What about punctuated equilibrium?

305.   PD:   From my perspective, the people who are investigating your case are trying to do the right thing. You are taking a lot of things as conspiracy against you.

306.   Let me give you two examples. When you first raised a concern about the professor, we let the last Program Director took over grading from the professor so you did not have to interact with him.

56

307.      During the investigation, three weeks before your comprehensive exam, we noticed that you were not studying. You did not want an extension. You knew the program would have to dismiss you if you failed. We delayed it for 2 months for you.

308.      Yet, you think we were conspiring against you in both cases.

309.   ZM:   I think it is suspicious that AU saw a necessity in delaying the exam so I would not fail, but AU did not think that the professor's conduct was severe enough for finding a violation.

310.      I also think it is suspicious that the Dean Report does not evaluate whether his racial microaggressions constituted discriminatory harassment, even though they fit the definition, and I stopped attending the class as a result.

311.      Instead, the Report only evaluated the case under adverse decision discrimination. Yet, the Report revises what it calls wrong grades so that there is no lasting adverse decision, and no violation of Discrimination Policy.

312.   PD:   We did not make exceptions for you.

313.      An investigator saw that a student that was obviously hurt, intentionally or otherwise; the institution was trying to help the student not fail a major academic milestone. It is not an admission that Discrimination Policy was violated.

314.      Even if the student is not hurt, when the student accuses a professor who will grade the student's paper, the institution has to first remove the grading responsibility.

315.      No one is denying that you were hurt. Based on the investigation and discussion with all sides, the people working on your case are not convinced beyond reasonable doubt that the professor was intentional.

316.   PD:   You also think that the process being slow was an attempt to wait and defuse the situation. I do not think so. They

interviewed a lot of people. A thorough investigation takes time.

317.  ZM:  But I asked some of the witnesses I submitted. They said they were not interviewed, contrary to what the Report says. When I first reported it, the last Dean (now Deputy Provost) was quite dismissive of my complaint and my concern for retaliation. Then, they did not do a thing for about 2 months. The Discrimination Policy says the Dean's office should have investigated as soon as the former Program Director referred it. So, I do not think workload caused the delay.

318.  PD:  It is not an excuse, but you need to remember the Deputy Provost is in charge of thousands of students and hundreds of faculty and staff; hiring and firing faculty. She is the captain of the ship; President is the representative. Deputy Provost is also responsible for the direction of the institution, research, curriculum, etc.

### --Is it Just Me?--

319.  ZM:  I heard that almost no Black students has ever graduate from our Ph.D. program. That tells me that I am not the deciding factor here. Black students before me have fallen through the same crack. If we assume that Black students do not have inferior genes or culture, what else could have caused them to fail?

320.  PD:  There is one black student who is more advanced than you, John Doe.

321.  ZM:  I think he is African.

322.  PD:  We are talking about whether our student body is diverse. It depends on how you define "black." We have people of color.

323.  ZM:  Yes, definitions are arbitrary. But, for historical justice reasons, I think it is important to distinguish people who

come from Africa as foreigners, and descendants of slaves who lived in a system of oppression for three hundred years.

324. PD: I agree completely. Nevertheless, when people discriminate, they discriminate based on skin color. If they discriminate against an African-American they would also discriminate against a Nigerian.

325. ZM: I do not 100% agree.

It would be fascinating to do a focus group of Black students who failed SIS before. Ask them: did you fail because you were not interested or could not learn? Or because someone treated you in a way that discouraged you from studying? I do not think everyone is racist. It could be just one person doing it covertly, which would be hard to detect.

326. PD: You'd have to include the successful ones as well.

327. ZM: Of course. Otherwise, the research would be biased.

328. PD: Nevertheless, I cannot talk about individual students for privacy reasons. I can tell you that we are trying. Our goal is to recruit students who can pass the comprehensive exams. There are applicants who are not qualified to do so. We cannot admit them just because they are people of color, right?

329. ZM: I am not saying you should.

330. PD: I think if we include people from India and stuff like that, then our admissions numbers are reasonable. But, yes, in terms of domestic minority, the numbers are small and not representative.

331. ZM: I believe, not having domestic minority is a form of injustice. It is also a disservice to students. For example, a Ph.D. student is a teaching assistant. An African student asked them whether the tribes in Africa are the same as tribes in the U.S. The teaching assistant said they did not know that

there are tribes in the U.S. This deficit in world view hurts white students.

332.   PD:   From our program's point of view, admitting minority students is a risk. AU students used to be mostly from the upper-middle class. Minority students are more likely to fail the comprehensive exam because they are often first-generation student and of lower socio-economic status. The student body is more diverse now, but students from lower socio-economic classes do not have the same support system.

333.   ZM:   I think there are other factors that contribute to minority students failing. For example, in my first semester here, no one wanted study with me until I made white friends. Research shows that this dynamic alone can have a huge impact on minority student success.

--Get Back To Work!--

334.   PD:   I know you are considering withdrawing. Whether you are staying or leaving, you need to make the decision soon. I heard from faculty members that you have not been studying for weeks. Your comprehensive exam is in a few weeks.

335.         I see three options for you. First, withdraw. Second, resume studying and take the comprehensive exam as scheduled. Third, if you think what happened before is preventing you from studying, you can take a medical leave.

336.         I can tell you, to a Ph.D. admissions officer, withdrawing before the comprehensive exam will look better than failing and being dismissed. Failing raises questions.

337.         If you continue not to study, I will have to conclude you are not making satisfactory academic progress under AU academic regulation, which will eventually result in dismissal.

338.   ZM:   I do want a Ph.D. But, what the professor, the Dean and the President did makes me anxious and depressed. I cannot study like I used to. I first noticed the decline in the professor's class. It only became extremely bad after the Dean and the President decided to gaslight me as if I have the IQ of a 5-year-old.

339.   I feel humiliated since Dean Report makes it appear as if the professor did nothing wrong, which in turn makes it appear as if I was not being truthful.

340.   I have evidence that shows Dean Report is wrong. Students at the AU NAACP meeting agree that their complaints of discrimination, when they do make them in spite of fear of retaliation, never seem to be adequately addressed. This is a major problem that needs to be addressed because the Dean's office are unwilling or unable to.

341.   On top of that, not completing that policy analysis course on time has disrupted the program of study that SIS approved. I am now one year behind my cohort. I would have been a teaching assistant by now like them. I cannot stand hearing them going on about how exciting being a teaching assistant is. It is all I have ever wanted. Being reminded why I cannot teach has been a daily punch to the gut.

342.   I am not randomly depressed; therapy or medicine will not cure the underlying cause - being treated like a second-class citizen. If that treatment does not depress me, it would actually mean there is something wrong with me.

343.   PD:   Therapy will indeed not cure underlying conditions, but it may help you cope with it better, so that you can function and succeed despite everything.

   Section 3.    Only Write Down That You Are Sick

344. Mills needs to retake to second comprehensive exam that he failed. The Program Director has extended it once. [internal cite] He tells him that the retake must be within six months of the first attempt.

345. Five days before the scheduled retake, Mills writes to the Program Director to ask for an extension of two months. Here is a summary.

> I am reacting well after my psychiatrist changed my medications. Now that I am functional, I have read the Graduate Academic Regulations. One clause says that a student can request an exception to the six months limit based on a compelling rationale.

> I plan to argue that the investigation gaslighting me about the professor and the President gaslighting me about the investigation caused a prolonged mental inability to study. I could not study effectively for more than three or four weeks in the last six months. I did not write any practice essays or discuss with faculty about the comprehensive exam.

346. This is a summary of the Program Director's reply.

> I did not tell you about the exception because I did not think you have medical records, which is necessary. I will support the petition but I recommend that the petition only say that you suffer from mental health issues and had recent medication changes. Including all details may complicate things and that a decision may come after the exam date.

347. Hours later, the Program Director writes with a slight correction: do not cite mental health reasons, just health reasons. He says there is no need to specify.

348. Mills is suspicious about why he should not cite the real reason for needing an exception. He does not reply that day.

349. The next day, at 8 AM on a Saturday, the Program Director writes, "We can talk by phone today if you want to go over possible scenarios with the comps." He provides his personal cellphone number.

350. Mills replies at 1 PM. He asks, why does he need to show the Dean of Students mental health records but should not mention mental health issues in the petition?

351. The Program Director sends Mills three successive emails in half an hour requesting Mills call him instead of write, because email does not allow for an actual conversation.

352. Mills is in a store and does not immediately respond. Two hours later, the Program Director writes Mills. To summarize:

> You have the right to write whatever rationale you want. I cannot help you if you do not want my help. Unless I hear the petition is approved before the scheduled time, I will hold the exam as scheduled. If you feel that you cannot pass, you can withdraw before.

353. Mills calls the Program Director and his academic advisor that day. They explain that if Mills' petition cites the faults of the professor and the investigation, the petition will likely not be approved, certainly not before the scheduled exam. Mills decides to follow their advice, because it sounds like he cannot both write down racism in his educational records and graduate.

354. Mills tells them that AU health providers have a policy, practice and custom of not documenting medical conditions for his purpose, that they can only verify that Mills have seen the providers. They suggest that Mills submit old and new medicine bottles and statements from his friends about his inability to study. They say the statement should only mention a general health problem and not the causes of Mills' problem.

355. The next day, Mills sends them a draft petition and offers to make any changes that will help the petition get timely approval.

356. The petition reads oddly:

> Over the past 13 months, I experienced a great decline in health due to a series of events which resulted in a dramatic diminishment in my ability to engage with academic work.

357. Mills asks his friends to write statements along the same line. The friends write that Mills tried but could not study and could not handle activities of daily living due to depression, anxiety, and panic attacks. As instructed, they omit what they know - that Mills was depressed due to the professor and the investigation.

358. On Monday morning, the Program Director writes Mills that he has contacted the decision makers, who will review the petition as soon as Mills send it. He asks Mills to copy the petition to the academic advisor and him. Mills petition is approved in less than 24 hours.

359. Mills studies for two months and passes the second comprehensive exam.

360. Mills wants to advocate that SIS remove the professor's teaching privileges and remove him from the SIS Ph.D. Committee which determines the program's curriculum. Mills asks the Program Director about the procedure for doing so.

361. The Program Director agrees to tell Mills about the process in person. The meeting turns out very different from what Mills expected.

362. The Program Director accuses Mills of retaliating against the 808 professor. He insinuates that Mills had made up confidential sources about the professor's racism and sexism. When Mills complains that other professors are distancing themselves from Mills, likely because the professor called Mills a race-baiter, he equates Mills so complaining with the professor talking about Mills.

363. After the meeting, Mills sees that the PD has retweeted an article by the director of AU Anti-Racism Center that contains an apt quote, "silence is the heartbeat of racism." Mills tags the PD's Twitter account with the quote and without commenting. The PD is incensed. He writes Mills misinterpreted him about racism and therefore will never talk to Mills about anything other than academic progress in the future.

Section 4.    You Need Help

364. Just before the fall 2019 semester, Mills and the PD get into an email argument.

365. Mills needs money to pay rent in a week, but SIS is behind on releasing his student loan that pays for his living expenses.

366. Moreover, SIS' delay in disbursement has made Mills' plan to do two weeks of field research in Bolivia impossible.

367. In spring 2019, Mills had written a proposal for SIS summer research grant, which is designed to help Ph.D. students develop their prospectus. Normally, Mills cohort should defend their prospectus by spring 2019, the end of their third academic year. The policy analysis course and the investigation delayed his progress. His plan is to defend by the end of the fall 2019.

368. The research trip was essential for Mills to develop a prospectus. Building on months of preliminary research he did for Bolivia's Coca planting policy, Mills proposed to research the cultural context that led to Bolivian's joint venture with Germany to mine lithium. The term of the joint venture was remarkably more equitable than typical terms for resource extraction in the Third World. To research a foreign cultural context, Mills proposed that it is essential to do scoping (make contacts in-country with government agencies, mining unions, and civil society groups active in mining issues) and snowball sampling (interviewing one subject and recruiting additional interview subjects from among the subject's acquaintances). It would be impossible to conduct this research over the Internet.

369. Mills was awarded 60% of what Mills needed. Yet, despite following up with the PD twice, SIS only disbursed the money in late July. It was as if SIS money did not move digitally. Mills included in the proposal that he plan to travel in late July. When he received the money, Mills could not afford to book airfare and hotel that always rises in the last minute. He could not delay the trip without missing the fall semester.

370. Mills does not feel safe when he does not have rent for the next month. He asks the PD to address it. The discussion then expanded to registration for the next semester, academics plans and more. Here are vignettes of their email exchange around the time the fall semester starts.

### --Where is My Money?--

371.      ZM:   I have not received my living expense.

372.    PD:   You must register before funding is released.

373.    ZM:   I registered two weeks ago.

374.    PD:   No, my assistant told me you did not.

375.    ZM:   I did register two weeks ago. I need the money to pay rent in a week. The recurring delay in disbursement is concerning. I do not know of any other students' summer research funding was delayed. SIS had not given any explanation for a six-week delay, which is disrespectful.

376.    PD:   Your research grant was delayed because we had miscommunications with SIS financial office. Several other students' grants are also delayed. Did you ask everyone before making unfounded accusation of racism? The financial office does not know the color of your skin. Not everything is a conspiracy against you.

377.    ZM:   I did not insinuate the delay in disbursement is racist or a conspiracy. I wonder why you perceive I did.

378.    PD:   The grant was to help you advance towards the prospectus this summer. Did you go to Bolivia to do the preliminary research as stated in your proposal? I hope you did.

379.    ZM:   I received the grant after I was supposed to be in Bolivia. How could I have gone to Bolivia?

          --Did You Fail Again? Because of Racism?--

380.    PD:   Under normal academic regulations, you used all your quota for independent studies.[16] Regardless, I assume you the mandatory 809 Advanced Research Design course[17] in the spring. I do not know your GPA but you need to perform well and get your GPA to an acceptable level in the fall.

---

[16] 898 Independent Studies is a course designed to give Ph.D. students time to develop a prospectus with a professor.

[17] 809 Advanced Research Design is a mandatory course that teaches Ph.D. students preparing their prospectus and dissertation.

381.   Mills:   I am offended that you assume that I failed the course and that I do not have an acceptable GPA. My 3.4+ GPA is well above the 3.0 threshold required by AU policy and my funding letter.

382.   Yes, I did fail the course. I want to put it in the context. I could not studying while coping with peer harassment and continued impact from the policy analysis course and the investigation.

383.   First, a classmate in the course told me in a Starbucks that I should go to another school to research racism if my strange perception of racism bothers me so much. I call this the go-back-to-Wakonda incident.

384.   Second, a white student was spewing the N-word just to prove that he has the freedom to. A minority student of mine taped a video of that. She told me that AU was completely uninterested in the myriad death threats she was receiving as a result. Three white students were constantly scowling at her hijab and whispering about her. She was depressed and stopped coming to classes. All of her professors are white. None of them offered support. I did. I call this incident the NNN-Political-Correctness-Rebellion.

385.   Third, a cohort member inserted himself into a conversation I was having in the Ph.D. lounge. He ranted about how Prof. Malini Ranganathan's work and my interest in critical theory took away his agency as a white man. He slammed the door and left. He then came back to threaten me not to report him like how I supposedly always do. I call this the White-People-Are-Not-Free incident.

386.   No one at SIS thought these behaviors are inappropriate. SIS never did anything. That tells me that SIS does not welcome Black students, and we have no recourse for harassment.

387.        I do not appreciate that you imply that I failed because I am somehow not committed to studying and not because of racism. I did not get into SIS by being an under-achiever.

388.        You told me the President told you that she does not know of my situation with the investigation. I showed you the email where she says she does. Did you find that problematic? If I have tenure and institutional power like you do, I would get to the bottom of these shenanigans.

389.        I can only handle so much racism. Every day, I wake up and realize I have to go somewhere where I am treated like a liar, an idiot, a N-Word, and as if I'm doomed to fail. It gives me racial trauma. It does not go away when you demand it. I will not take a medical leave because I see it as a "you break it you buy it" situation. I will not leave the program because I would be impoverished.

390.        I used my independent studies quota to complete the policy analysis course and retake the comprehensive exam necessitated by the professor and the investigation. I need more independent studies to develop a prospectus.

391.        I hope SIS will acknowledge that racism is real here and has impacted my study. You could have told me that no Black student graduates here when you told me I was admitted.

392.        SIS has broken me, severely indebted me, and now wants to get rid of me as if I'm a disposable subhuman who deserves nothing more. A decade of my hard work and determination goes to ruins. This proves to me this country hates Black people and that AU hates Black people.

393.   PD:  I am well aware of the trauma you may have suffered from the policy analysis class and the investigation. We have given you every possible extension, retakes and independent studies under normal rules. But, in all of the independent

studies, you keep missing deadlines and not communicating with your faculty. You are wasting their time.

394.   PD:   The normal expectation is that you should have defended your prospectus by the end of this summer.

395.   Going forward, I see four options. First, stay, but you must put maximum effort on your academics. Second, if you think your mental station is holding you back for whatever reason, you need to get accommodation from the Dean of Students, not me. Third, take a semester or two of medical leave; few Ph.D. students can graduate without being excited and deeply committed to their research; this time-out could allow you to think it through. Fourth, if you cannot commit to the program or research, staying in the program is a waste of time; I cannot promise anything, but we can look into whether we can give you a Master's degree.

*--Sorry For Wasting Your Time Because Racism Made Me Depressed--*

396. Because the PD tells Mills that he has wasted his professor's time, Mills emails the professors that have agreed to serve on his dissertation committee. Here is a summary, spelling mistakes original.

The PD told me I am a terrible person for not working with you over the past summer. I guess he does not care that I was suicidal and that the culmination off two years of racist harassment by professors and peers at at AU left me unable to function.

[discuss go-back-to-Wakonda incident; NNN-Political-Correctness-Rebellion; White-People-Are-Not-Free] [internal cites]

I won't be appologing to anyone for the PD, who enjoys telling me that, when I tell him about the policy analysis professor's problems that the civil rights office found, I was retaliating against the professor.

Lots of people ask why I don't leave AU. Well, I have no choice but to finish my PhD at AU since I'm a poor person and have paid for all my undergrad university with student loans. I was taking some here to make up for the poverty wage we make as TAs. Baking the lifetime Linus so couldn't even afford a master's degree from a state college.

I'm also not going anywhere because I refuse to let some poor mental health and a menagerie of our of control White Supremacists on AUs campus get in the way of my final goal. It's really sad none of you met me the first year I was year before the racist people broke me. I was very fun and normal. People even thought I was smart where I'm from.

If you still have some interest in being on my dissertation committee please reply to this email so I can try to set up a time for us to meet as a group. Just keep in mind I'll probably be depressive any time I'm in DC and AU, so if that's a deal breaker I'm completely ok with that. Good news, I'm going to a skrink who specializes race-based PTSD which is what they think is actually wrong with me.

397. One of the professors, Randolph Persaud, replies soon:

Hello Zach,

I received your email and ready it carefully. I have taken full cognizance of the contents and assure you of both my understanding and our willingness to provide any and all assistance you deem necessary. It would be tremendously helpful if you provide a detailed work plan, including progress on a dissertation topic. If the dissertation topic is already being written as a prospectus, then it would great to receive it. After going over what you send, we can then proceed to a meeting and take it from there. I am confident that Malini and Marcelo share the key points in this email.

398. Professor Ranganathan replies.

Dear Zach,

Apologies for the delay in responding to your email; it's been a busy start to the new semester. I think I speak for everyone when I say we are very concerned about your email. We want to make sure we are moving forward in a supportive way and that you are getting the help you need. You should know that as professors, we are best qualified to advise you on your intellectual and professional trajectory. Like Randy, therefore, I would want to get a sense of where you are in the PhD process, and how soon you can deliver a draft prospectus to us. We can then meet to discuss your ideas and your timeline. You are also always welcome to sign up for my office hours at the link below.

399. Professor Bohrt also replies.

I too read your email carefully and with much concern. I echo Randy's and Malini's words, and reassure you of our willingness to support you in developing your dissertation prospectus.  As noted in the earlier messages, let us know your work plan for this semester, so we can discuss your ideas and timeline together.

400. Mills also sends a similar email to the Advanced Research Design professor:

[The PD told me I am a terrible person for not working with you over the past summer.]

I won't apologize for not doing anything for school this summer, since I was extremely suicidal at several points and, you know, trying to keep yourself alive is probably more important than answering email.

Where I'm from, we take debt very seriously. Please send me a bill detailing how much monetary compensation you feel you are entitled to for doing the two independent studies with me. I'll send a check to your AU mail ASAP.

Sorry for being a complete waste of your time and a general disruption. I see now demanding full constitutional rights isn't popular.

401. On August 27, Tuesday, Mills and the PD continue to argue over email.

402.     PD:   I have referred your report of new harassment incidents to SIS Associate Dean. I know you will tell me you do not want to file a complaint because AU is racist, but I do not have the authority to investigate or act on the basis of your complaints.

403.     ZM:   Would it be rational for me to file a complaint after the cover-up? [Recounting four apparent errors with the investigation: not interviewing Mills' witnesses; President falsely tell the PD that she does not know about the botched investigation; failure to collect evidence; interpretation of syllabus;] [internal citations]

404.     You still cannot understand what happened to me and how it has affected me. I have been very poor this summer. Sorry racism had me suicidal half the summer and got in the way of meeting your reasonable demands.

405.     Where does the academic regulations address racial trauma? I was very excited about climate migration until the 808 professor told me my ideas are terrible, that my research design was not science and people would barf in their jackets.

406.     I am not withdrawing or taking a time-out like five-years old in face of racist treatment. You call it wasting time. I call it allowing everyone in SIS to study the detrimental effects of racism on a Black PhD student up close. Plan on me shuffling around all semester in despair. I have a right to be someone who doesn't look happy or enthusiastic.

407.     I have so far only told a few people about the professor's name or details about his discrimination, the cover-up and SIS leadership refusing to intervene. Now, I will make sure it become common knowledge in AU.

408.     You keep saying you are only doing your job within given parameters. That is the Nuremberg defense. I have brought our dispute to the attention of the SIS Associate Dean.

409.     People only react that way you have when something hits too close to home. Hence, I see you as untrustworthy to act as my program director since you are unable or unwilling to understand US racism. I will be asking my fellow PhD students to take part in a symbolic vote of no confidence against you to or an end to this impunity. I believe they this will be a year of transformational of justice in SIS.

410. The PD then disengages from the argument about the institutional racism. He tells Mills what he needs to tell Mills about course registration and tuition. He tells Mills "[your academic advisor] was

about to discuss [registration] with you that in the scheduled meeting today for which you did not show up." Mills had fallen asleep on medication.

### Section 5.    So You Think You Can Protest

411. On Tuesday 8/27, Mills tells the PD that he will hold a vote-of-no-confidence against him. [internal cite]

412. For SIS Ph.D. students, Wednesdays afternoons are "Ph.D. Time." In half of the weeks, students and faculty present their research; in the other half of the week, it is a community forum.

413. Everyone in SIS will be at the Ph.D. time this week. The PD has announced a week before that their union representative and AU representative will discuss the new graduate student union at 2:30 PM. Attendance is required for student employees, which include most students in the program, including Mills.

414. Just when Mills is getting dressing for the meeting, MPD knocks on his door. MPD officers tells Mills someone has request them to do a welfare check on him.

415. Mills invites them into his apartment. According to MPD Officer Adam Sotelo, although he is a certified crisis intervention officer who regularly perform welfare checks, he thinks this particular request was peculiar. He therefore rushes over. The other MPD officer waits in the hallway as is customary practice for welfare checks.

416. Mills and Sotelo sit in Mills' living room and talk. Things are going fine — it is a normal, friendly conversation for at least ten minutes -- until two officers from AUPD show up.

417. The AUPD officers first meet the MPD officer in the hallway. The AUPD officers then enter Mills' apartment without Mills' consent, along with the MPD officer in the hallway. The AUPD officers are aggressive and threatening. They kick Mills' dog. They walk through the foyer and observe whether there are weapons or other contrabands in Mills' bathroom, kitchen and bedroom.

418. Then, the AUPD officers yell at Mills and repeatedly demand to see his university-issued identification card. Mills is confused about why the AUPD officers are in his off-campus home.

419. Despite some panic and chaos, Mills sits calmly with his hands in his lap. He asks the AUPD officers to leave his apartment several times. The AUPD officers ignore Mills' repeated requests until Officer Sotelo shouts at the top of his lung for the AUPD officers to shut up. Officer Sotelo says that things are under control and that they can leave. The AUPD officers then leave.

Section 6.    Behind Enemy Lines

420. After the officer leave, Mills connects the dot - the AUPD officers came because he told the PDs about his plan to protest racism in SIS.

421. No one from SIS contacts Mills to explain what has led to the supposed welfare check - certainly not the people who supposedly are concerned for Mills' welfare. No one explains why the supposed welfare check coincide with a public gathering, after Mills announces his plan to blow the whistle on racism in SIS. The silence is deafening.

422. The anonymous show of force sends a clear message to Mills - he is not to speak publicly about racism at school, or else.

423. That SIS can call on AUPD officers under false pretense terrifies Mills. As an insurance policy for if AU takes more extreme measures, Mills wants everyone to know what led to it. He emails all Ph.D. students that AUPD officers came to his apartment under suspicious circumstances and that the visit is connected to his complaints of racism in SIS and the PD.

424. He can no longer trust any administrator or professors in SIS. He hopes that the students will come to his aid.

425.  Several students immediately come to make sure Mills is OK. Some students visit SIS Dean to ask for an explanation. Mills does not know exactly what SIS Dean said, but students stop talking to Mills about the welfare check after the meeting.

74

426. Instead of an explanation for the welfare check, AU's first messages to Mills contain a warning - that his email to SIS students violated the AU mass communication policy and that he may be disciplined if he tries that again.

427. A helpful student points out that the policy only regulates listserve emails. Because Mills' email is addressed to individual students, it did not violate the policy. The student explains that if Mills violated the policy, so did the PD and many other students who regularly do the same. Mills relays the information to AU, and AU never Mills threatened about it again.

428. Nevertheless, for his safety, Mills never tries to speak about racism on AU campus or communicate publicly with SIS students again. Mills is now operating behind enemy lines.

### Chapter D.  Fall 2019

#### Section 1.    A helpful Dean

429. Prior to the welfare check, a helpful professor told Mills that the SIS Associate Dean is the supervisor of the PD and offered to alert her to the dispute between the PD and Mills.

430. Mills wrote the Associate Dean on Monday 8/26, asking her to intercede in his ongoing dispute with the PD as his supervisor. On 8/27, Mills and the PD copied the Associate Dean on the emails between them that led to the welfare check. Immediately after the welfare check, Mills wrote for the Associate Dean to ask what led to the welfare and whether the PD was involved.

431. The Associate Dean first replied late night 8/28. She profusely apologized for not replying earlier. She said she had been in back-to-back meetings during the last two working days and was very behind on reading emails.

432. After tense exchange with the PD and the welfare check, Mills felt relieved that the Associate Dean is friendly and understanding, especially because the Associate Dean is the PD's supervisor. When

Mills wrote that he is interested in her new book and talk, She sent Mills ☺. Mills would refuse to talk to her when she was driving and remind her of the risk.

433. After Mills' dispute with the PD, the Associate Dean tells Mills that the SIS leadership, ADOS, his academic advisor, her and some other people collectively decided that she will take over the PD's role to avoid a conflict of interest. She says she volunteered because she and Mills have an amicable working relationship and because more suitable professors are on leave. She says she does not know what caused Mills and the PD's relationship to break or the specifics of the welfare check.

434. Two weeks after the welfare check, on 9/9, she gives Mills a progress report. SIS Ph.D. Handbook says the PD will issue one progress report per year. This is the full text of the progress report.

Dear Zach,

I'm writing with two updates.  First, until a suitable replacement can be found, I will serve in the role of Director of the PhD program for you.

Second, I am updating your progress report for the PhD program.  In July, PhD Director wrote to say that you were making sufficient progress.  Two pieces of information require me to update your progress report.  The first is that you did not finish the incomplete for [809 Advanced] Research Design seminar. The second is that you did not use your SIS research award to travel to Bolivia to conduct research. In light of these findings, I revise your current status to unsatisfactory progress.

I very much want to see you succeed in our program.  And, to get back on track, I am stipulating what you need to do this academic year to receive a satisfactory progress report.  Failure to comply with these expectations will result in another unsatisfactory progress report and could be a reason for dismissal from the program.

Fall 2019

1. Assemble a dissertation committee and have it approved by the director [me in this case] and AU's dissertation council

2. Complete the language requirement

3. Complete Responsible Conduct of Research (RCR) online certificate

4. Fully participate in and complete the [mandatory 809] Research Design Seminar with a passing grade per graduate regulations

5. For your 898 [independent studies] credits you will make demonstrable progress on your prospectus.  You do not need to have completed your prospectus, but I would like to see that you have:

   a. Identified the topic you want to study

   b. Familiarized yourself with the relevant literature(s) and the gaps therein (e.g. through an annotated bibliography)

   c. Formulate a potential research question for your dissertation

   d. Give some thought to the best methods for answering it

Spring 2020 (if prospectus not completed)

1. Fully participate in and complete 3 courses with a passing grade per graduate regulations

2. Defend prospectus by end of spring semester

Please let me know if you have any concerns or questions.

435. Mills writes the Associate Dean about his concern.

Thanks for sending this report along. I have one issue with the wording on the new progress report in regard to the summer funding. I received over a month late while I was supposed to be in Bolivia, which prevented flight and hotel accommodations from being made in advance at price-points feasible to my proposal's funding.

Looking forward to getting back on track too... And coffee chats with you during the semester lol.

436. The Associate Dean replies.

I understand.  We can talk about how you can use the money going forward for next summer.

In the meantime, make sure to love on your dog, hang out with people who are good to/for you, and enjoy the fall!  We'll meet soon,

437. Even though she is the second-in-command at SIS, Mills feels comfortable sharing with the Associate Dean how the professor

discriminated against him and how the Dean botched the investigation. He shares that he is upset and believe that the welfare check was instigated maliciously to silence him. He says other Ph.D. students had harassed him, and nothing was done. The Associate Dean says she agrees with Audre Lorde that Black people such as Mills have a right to be angry about racism and that anger is constructive in this context.

438. Mills has a good relationship with the 809 professor, in large part because she is one of the very few SIS professors who say they believe Mills' account of racism in SIS.

439. However, ever since the welfare check, Mills feels the professor acts strange around him. The day after the welfare check, which is Thursday, Mills writes her that someone at AU had lied to instigate the welfare check. Mills also asks her whether the class will convene next week. She never replied.

Section 2.     Bureaucratic Disability

440. Three weeks after the welfare check, on 09/18, AU Student Health Center diagnoses Mills with acute PTSD, mood disorder, and anxiety disorder.

441. Here is an excerpt of his psychiatrist's disability assessment.

[diagnostic criteria and summary of observation]:

When Zach first presented for a psychiatric assessment, he was anxious, overwhelmed, tearful, sad, agitated, and fearful, with signs of fatigue due to poor sleep. He had a traumatic experience that caused him anxiety, insomnia, tearfulness, trembling and avoidance of campus, classes and police officers. He was not able to focus on classwork or while in class. His apartment was dirty, and he expressed confusion as to how his apartment became so messy and why he wasn't able to maintain cleanliness like he usually does. This was concerning to me as it indicated a lack of insight into his illness and recent behaviors. This was also in the context of ongoing anxiety and mood changes that have affected his cognitive functioning, decision-making and communication with AU staff and professors in general, in a way that has been very uncharacteristic of him. This has resulted in a marked behavioral change for Zach. Because of his complex presentation, his diagnosis is not clear at this time which

makes it harder to treat. There are numerous care reports filed by professors, AU staff and SHC regarding some concerning behaviors and how these are a marked change from his baseline last year.

[Diagnosis, date of onset, present symptoms, duration, severity, impact on major life function, anticipated fluctuation of symptoms over time]:

Diagnosis is PTSD, characterized by anger, agitation, insomnia, anxiety, moodiness, avoidance, re-experiencing through flashbacks and triggers. This directly related to his not attending classes due to avoidance of certain individuals who triggers his PTSD, makes him very anxious, causing panic attacks and high anxiety during which time he cannot focus or make decisions. This has also affected his self-care, his appetite, his personal hygiene and care of his apartment, caring for and connecting with his dog, and socially withdrawing from friends and others on campus so that he is now isolated socially. His symptoms will fluctuate based on stress level and triggers and significantly impact his academic functioning due to missed classes and assignments.

[Medical history relevant to current functioning]:

He had a traumatic experience that has cause post traumatic stress disorder, affecting his focus, concentration, sleep, mood, anxiety, ability to leave the house and come to campus.

[Treatment plan, medications, therapy, effects]:

Currently we are meeting monthly for medication management. He is taking as needed medication for anxiety, and we are discussing medication for PTSD, but he is hesitant due to poor tolerance of previous medication that he has tried. His medication choices may be limited by poor tolerance. He is in weekly therapy as well.

[symptoms' impact on major life functions in educational and/or residential environment]:

Social withdrawal, poor and at times conflictual interaction with others on campus, poor class attendance and assignments not being done, poor self-care resulting in poor diet and lack of sleep.

The rationale for recommended accommodation(s) that is logically related to the functional limitation(s), based on evidence from the clinical evaluation[:]

flexible attendance: PTSD can cause insomnia, making it difficult for him to attend classes due to fatigue and need for sleep during the day,

as well as sedating effects of medications. He is also unable to attend classes at times due to avoidance of triggering individuals.

extended deadlines: anxiety and mood changes can affect his ability to manage time for assignments and focus to get them done in time.

note taking assistance: he has impaired focus and attention in class due to poor sleep and anxiety and this could help him stay caught up in class which will reduce his anxiety.

Is the diagnosis chronic? If not, date of anticipated recovery: Yes, these are chronic, incurable illnesses.

Date provider suggests reevaluation: [blank].

442. AU refuses to explain to Mills what led to the welfare check. AU hid the evidence of its illegal welfare check and hostile educational environment since fall 2017. AU never asks what caused his disabilities. Mills knows AU is trying to cover-up the welfare check and other illegal actions.

443. On 10/1, Mills requests accommodation for his disabilities. He explained that his PTSD was preventing him from attending all classes and strictly follow assignment deadlines, especially in 809, which, like 808, has half a dozen deadlines for each part of the final paper. Moreover, he has failed 809 in spring 2019. If he fails again, AU Graduate Academic Regulations and SIS Ph.D. Handbook requires his dismissal. He requests the accommodations that his AU psychiatrist recommended. He reports social anxiety, public speaking anxiety, panic attacks that prevent him from attending classes, inability to concentrate on reading and writing. He reports that

People don't understand that I have been traumatized and expect me to function normally as if nothing has happened to me. It's super unfair and I'm very tired of it.

444. Mills does not write down the causes of his disabilities on the application, fearing that the disability service would as a result delay granting him accommodations that he needs as soon as possible. On 10/1, in 809, [fact check] [he has already missed assignment 1 and 2; and 5 out of 15 classes], which accounts for 22% of his grade for the

course. Every day he does not receive accommodation, he gets closer to losing 50% of the grade, which would disqualify him from applying for an Incomplete at the end of the semester.

445. This disability adviser first introduced herself on 10/24. She does not explain the delay. He replies.

> I think at this point in the semester, I have already failed the class I needed these accommodations for. Very unfortunate that I could not get the help I needed in a timely manner. The PTSD I have also is making it very upsetting to fill out these complicated documents.

446. The adviser replies on 10/29.

> I'm sorry to hear you're having a difficult time. While accommodations do not work retroactively, I would still welcome the opportunity to work with you for your courses going forward.

447. The Associate Dean told Mills that the accommodations are usually retroactive in her experience.

448. Mills thinks that the delay with the disability service is bureaucratic. However, one week, a student in Mills' class has a concussion early in the week. She receives accommodation for flexible attendance and extended deadlines within the same week, even though her is expect to recovery that week. Unlike Mills, she has not protested the school.

449. It becomes clear that he would not receive accommodations in time that would allow him to pass the 809 or even qualify for Incomplete.

450. 11/1 is the last day Mills can withdraw from 809 without receiving a Failure in the class.

Section 3.    Long March for Evidence

451. Mills is determined to find out who instigated the welfare check. The instigators would have alleged that he needed a welfare check through the Office of the Dean of Students, which would then order AUPD to conduct a welfare check at his home.

452. When Mills asks for documents, the Dean of Students (DOS) says the Assistant Dean of Students knows more about the welfare check than

he does. The Assistant DOS tells Mills that he is on a two-week vacation. After he comes back, he says he will only provide hard copies of the relevant Care Reports in person. Despite not feeling safe on campus, Mills really wants the reports and go on campus. It has been two months since the welfare check when Mills obtains the reports.

453. The Assistant DOS tells Mills that he initiated welfare check based on three care reports received on 8/27. He says he wants to meet in person to convince Mills that he was acting within his job duties and meant no harm to Mills. Then, he shows Mills the care reports.

454. All three reports are based solely on Mills' emails the day before the welfare check. The reporters did not submit those emails.

455. The PD reported as follows.

> I am Zach Mill's PhD Program director.
>
> In an emails to me today he mentioned that he is suicidal. Mostly referring to the near past but I'm not sure if that is not the case today.

456. The PD's report reads like he was not sure what he wanted to happen. Was Mills imminently suicidal or not? He did not mention Mills was trying to get his rent and plan his semester. He did not mention the dispute between them, or that Mills planned to protest him. Is this kind of selective reporting ethical at all?

457. The SIS 809 professor reported as follows.

> The student reported to me via email this morning that he was not in contact with me this summer because he was "extremely suicidal" at several points this summer, which is why he could not communicate with me about his independent study.

458. The 809 professor's report tries to be factual while withholding relevant information. She does not report that Mills was asking her about the course this upcoming semester. It is as if someone had demanded her to file something, but she did not want to be unethical.

459. The last report is from the former PD. It hurts Mills the most.

> Last night I received an email from a student (SIS PhD student). In the past this student has shared concerns with me about racism on

campus directed against him. This latest email contains a sense of rage an anger. He talks about being a failure and having no future. His email also contains grammar and spelling issues that are uncharacteristic of past communications. I am worried about him and that he might harm himself or create disturbances on campus. He accuses a couple of people of being white supremacists and states that he will publicly accuse them because everyone needs to know "the truth".

Section 4.    An Academic Difference of Opinion

460. The former PD had the job for many years. When she went on a sabbatical, she picked the current PD to serve in her place temporarily. She came back in Mills' first year; she then gave that role to the current PD a year later. She taught him during the first year and developed a close friendship.

461. The former PD is a liberal. After the election of former President Donald Trump, the former PD signed on an open letter to support Black students' right to free speech in all forms and to condemn all forms of discrimination and bigotry.

462. Whenever Mills discussed racism within AU, the former PD would encourage Mills to exhibit agency - to act on his beliefs. She would encourage Mills to prove how racist AU is to AU. Mills therefore opened up to her about his thoughts about institutional racism.

463. In 2017, there was a spate of anti-Black incidents on campus. The day after the first Black female student was elected as the student government president, three bananas were found hanging from nooses around campus marked with the name of her Black sorority, necessitating FBI investigation[18]; the year before, white male students threw a rotten banana at two Black female first-year students in their room[19]; someone put up ten confederate posters with cotton stalks stapled to them, after which SMB shed tears at a townhall, saying

---

[18] https://www.theatlantic.com/education/archive/2017/10/how-racism-could-affect-black-students-college-enrollment/543360/
[19] https://wtop.com/dc/2016/09/american-university-no-evidence-dorm-incident-bias-related/

"The perpetrators of such acts, they want to divide and define us, but we cannot let that happen."[20] AU did not treat the 2016 incident as bias-motivated. None of the 2017 suspects were found.

464. To eliminate a persisting problem, AU hired star scholar Dr. Ibram X. Kendi to establish an Anti-Racism Center for AU. AUPD Chief held a security briefing for SIS because the Anti-Racism Center will be housed in a glassroom next to the SIS Ph.D. lounge. The former PD had not left the role then. She asked SIS Ph.D. students to discuss their security concerns during Ph.D. Time.

465. While Mills was in Arizona for his family emergency, he shared his thoughts about the security concerns with the former PD.

> I mentioned to you during my first semester how disturbing I find these incidents. They are shocking, distracting, and demoralizing. I have witnessed more terrible incidents in a little over a year at AU than racist things that I experienced during my entire life. I would not be surprised if other Black students had similar experiences. I have tended to push these things to the back of my mind because they would monopolize my time.

> I read, in an email update on the confederate flag incident, that there were concerns over increasing the police presence on campus. To quote: "Kendi cautioned that more police presence on campus could come at a cost. He described the need for balance, enabling people to feel safe without potentially burdensome security. Vice President of Campus Life Fanta Aw also noted the downside to having law enforcement inundate every corner of campus."

> I completely disagree with this mentality because it seems to assume either: A) all minorities dislike police, B) minorities are fearful of police, or C) police are not good in general. I think unarmed police are the best solution since guns are where most anxieties about police stem from.

> To be clear, my belief in the positive benefits of increased security on AU's campus does not stem from fear. It stems from common sense — when there is a string of racist and terroristic incidents in one place in a 13 month period, there is an obvious problem. Standing together

---

[20] https://wamu.org/story/17/09/27/ten-confederate-flags-found-american-universitys-campus/

and denouncing racism during rallies will not fix what is clearly a lack of security on campus.

This is not directed at you, but I would suggest that anyone who is concerned over security with the new anti-racist center being located next to the Ph.D. lounge should have been concerned over a year ago when: A) Black students had bananas thrown at them in their dorm rooms, B) the N word was written on dorm room doors, C) swastikas were drawn on white boards in classrooms on campus, and D) bananas were hung from nooses. The Confederate flag posters were just the latest occurrence of an obvious pattern. Enough is enough, literally.

This problem is not particularly new and will almost certainly continue while impunity exists on campus. A visiting European Ph.D. student had asked me about all of this racist stuff after the banana-noose incident happened. I didn't say much except that it was sad to see and shocking. He he had researched AU before arriving and said he found several articles about race-based problems at AU. Now, if I would have done my due diligence like him, I am not sure that I would have picked AU. I'm guessing many other Black people and minorities would and do make that decision often when thinking about attending AU.

As you may have noticed, I call these incidents terrorism. I believe that these actions by perpetrators are politically motivated and seek to intimidate mainly Black students and Jewish students into becoming silent on campus. Maybe the aim is even to drive these minority groups out of American University and to discourage future applications from minority students. These are political aims, mainly because if no Black or Jewish students go to AU, the pipeline that supplies the government and private sector with young professionals will cease to be as diverse. Is this not the aim of white supremacy and institutional racism? What happened to the student government president was also political—the first black female in that position was severely intimidated in an attempt to silence her and remove her from what is technically a political position in the university. If I were her, I probably would have moved out of DC immediately because my life is very important to me. Maybe if the correct language, i.e. terrorism, was used to describe these incidents more proactive action would materialize.

These are just my thoughts and opinions. I have enjoyed my time in SIS, have never had any problems personally, and see myself sticking

it out until I have a PhD. I would ask that you not pass this email on to anyone since I wrote it to you specifically.

466. The former PD replied,

I'm very sorry to hear about the family emergency.  I hope everything resolves itself in the best possible way and will hold you and your family in my thoughts. Thank you as well for writingthis letter and writing it to me.  I will not share it but will share the concerns (unattributed) when the opportunity arises. I don't know how to respond to your letter. To say I share many of your concerns is trivial because I can't really share them. My race allows me a degree of safety that you cannot have. I will investigate what security changes have taken place and are in the works and will report back.

Once you return to SIS, can we talk when you are settled?  I need some more guidance from you on these matters and also on your own agency in the process.  Again, thanks for writing this to me. I'll also share with you a summary of the conversation that happenson Wednesday.

467. After Ph.D. Time, the former PD reported that,

Several people expressed concerns about security and especially added security for our area of the SIS building.  One suggestion that everyone seemed to like, and which I am pursuing, is to have the PhD suite door clearly market as the PhD program.  This is in the scheme of things a pretty trivial change.

I want to follow up with you on your thoughts.  But, of course, only when you have time and our prepared to do so.  I know you are concentrating on family right now.  If you find that your family responsibilities start to impact your performance in class, please let me know.  We have options that let you be there for your family and I'm happy to explain those to you.

468. Mills responded:

On my phone so must be brief. Last two days have been intense to say the least. I'm hoping I'll have a better idea of what the mid to long term plan is for my mom, and maybe at that point we may have to discuss those options. Last week was good with school,  but I have only been able to get 1 paper read this week which is bad. I'll respond in depth to your emails tomorrow after I Skype into class. Thanks for the replies!

469. The former PD replied.

> Contend with your mom and class.  I should be your last priority right now!

> Please return the Plan of Study to me before Oct. 15 or let me know if other circumstances are likely to get in your way.  Obviously, your family takes priority..  And if you want to chat about course selection, just email with a time that works for you.

470. Two weeks later, after his mother stabilized, Mills came back to D.C. and returned his Plan of Study for the next semester just in time.

471. The 808 professor had been complaining to the former PD that Mills did not reply to his 10/6 email since 10/6. The former PD told him that,

> I think he is currently struggling with multiple issues. Your email to him is quite clear. Give him a few more days and let's see if he responds.

472. The professor replied that,

> I, too, have the impression that this isn't only about his mother's health. I will let you know if and when I hear back from him.

473. After she was sure Mills had handled his family emergency, the former PD let Mills know of the professor's complaint.

> [The 808 professor] has also reached out to me because he is concerned about your absences from his class.[21]   Can you respond to his emails?

474. Mills replied:

> I wrote to [the 808 professor]. I stopped answering emails because it was really just too stressful. Just not possible to write papers and answer a ton of questions and emails while sitting in a hospital all day and having heart attack scares and taking care of my grandma's things since my mom does that normally.

> Also, I Skyped into one class so I only missed one.[22] I am behind on a paper we are writing but only an anstract and methodology section

---

[21] Mills did his best to videoconference into both 808 sessions while in Arizona.
[22] Mills meant that he did not virtually attend the paper workshop portion of one lecture, because he did not have anything written. He attended the other lecture.

has been due so far. I'm trying to catch up with everything this week while staying up to date with class reading for this week.

475. She responded:

Thanks for the update.  At some point, it would be great to know how you are.  You've been caring for other folks and piling on more stress to yourself.  I DON'T want to add to your list of things to do, but if you find you'd like lunch or coffee sometime, just let me know.

476. When they finally met for coffee, Mills told the former PD he considered the proposal to distinguish the Ph.D. lounge from the Anti-Racist Center to be unethical and racist – a NIMBY approach to a public nuisance. She disagreed. She later invited Mills to eat falafel. She confessed that she shared her and Mills' view with her husband, who vehemently criticized her and the students' view as racist.

477. The next semester, when Mills brought up his suspicions about the professor, she told Mills that the statements of the professor were inappropriate. She confessed to Mills that the professor was her friend, but he had said and did things such that she could no longer consider him a friend. She then referred Mills to the civil rights office. She volunteered to take over grading from the professor, to resolve a conflict of interest.

478. In February 2019, Mills shared with the former PD that he had a heated meeting with the current PD over finishing the policy analysis Incomplete. Mills complained that he has no idea how to write a policy analysis paper after taking the course. Mills complained that the PD did not think racism could have prevented Mills from studying.

479. The former PD replied:

It is incorrect that no one cares about you and that everyone thinks your "racism" problem is fake.  I have given you plenty of evidence that I care and plenty of evidence that I do not thinkyour problem is fake.

480. During the semester, Mills shared that a white peer had threw a public fit about Mills' interest in critical race theory. [internal cite] She

empathized with Mills. She said such events are likely to be repeated in in multiple forms for the rest of her life. She said she hopes there will be progress, that by the time her nieces and nephews are grown, such events will be extremely rare or non-existent.

481. In April 2019, Mills submitted his policy analysis paper to her. After the professor trashed his climate migration policy analysis as barf-inducing and unscientific, Mills switched to a different topic informed by his personal experience with White Supremacy. With critical race theory as the primary theoretical lens, Mills theorized White Supremacy Internationalism as an essential policy driver in international politics.

482. The former PD fundamentally disagreed with Mills' academic views.

483. As the starting point, Mills' paper argues that Maduro's government represents the interest of non-white population, and that the opposition party represents the interest of the white population. Mills therefore infers a theoretical significance that the late 2010s exodus of refugees from South American countries, such as Venezuela and Columbia, are mostly white.

484. The former PD disagreed. She commented that she would assume that a quasi-marxist government would produce flight from the rich classes. She would expect those classes to be overwhelmingly white.

485. Mills wrote that it is a problem that White Supremacy within majority-white societies is not being recognized as such. The former PD said she does not understand Mills' logic.

486. While the former PD conceded that the U.S. intervention in Venezuela internal politics is a violation of international law, she argued that the intervention is a continuation of Cold War realism behavior, rather than motivated by White Supremacy.

487. Beyond her written comments, the former PD invited Mills to discuss in person over lunch. She said she would give him an A if he could convince her right there.

488. The former PD said Mills' theoretical model captures a central dynamic of international politics. However, her core disagreement was with

how Mills named his model: White Supremacy Internationalism. She proposed several different names that do not refer to racism for the same dynamic. Mills insisted that racism is the theoretical foundation of the paper.

489. The former PD then criticized Mills' theory as making no innovation beyond Samuel Huntington's *Clash of Civilizations*. Mills explained that his main theoretical innovation was exactly that previous authors such as Huntington had deracialized and obscured the racial dynamic.

490. The former PD graded Mills' paper as C+, in marked contrast with Mills' grades in other courses, including hers. Mills respected her view. He realized that their ontological difference of opinion prevented them from agreeing on the issue.

491. Mills and the former PD did not speak for three months after their academic disagreement. Excluding group emails, she had written Mills 178 emails in the two years prior, or about 2.8 emails per academic week. After their academic disagreement surfaced, she wrote Mills a total of two in the last two years Mills was there.

492. In early morning of 8/27/2019, the day before the welfare check, Mills was upset about the PD's email. Mills wanted to chat with the former PD. These are original emails of their conversation around that time.

8/27 7:15 AM

[The PD said I wasted my professors' time this summer]

You said something like you don't recognize who wrote the policy paper you gave me a C or C- on. I don't either. I'm broken and have ruined my life. Going to work at McDonald's probably... Sorry to turn out to be such a failure. I really did try but I'm clearly too weak.

Anyways, to the matter at hand. Where I'm from, we take debt very seriously. Please send me a bill detailing how much monetary compensation you feel you are entitled to for doing the independent study with me. I'll send a check to your AU mail ASAP or the dog park.

493. The former PD soon replied.

8/27 8:27 AM

Hi, Zach.

First, with respect to compensation. Where I'm from we also take it seriously but that means recognizing that compensation comes in many forms. I learned from working with you. I can monetize that but instead let's just call it even. OK? I didn't do anything for free. Not only did I learn some thing from working with you I value that learning.

The much bigger issue is the second paragraph where you feel broken and that you've ruined your life. I care very much about that paragraph. Can I brainstorm with you about options for moving forward that don't include McDonald's and that help you reclaim a feeling of control?

494. Mills replies.

8/27 5:13 PM

I guess that's ok, but I don't think I have other options because I wanted a degree. I've only ruined my life by not being a hardcore anti racist at AU over the last two years in response to AUs poison racial climate. As a response I think I developed race-based PTSD with disassociation. I found a specialist who deals with it but only woke up 30min ago so didn't make an appointment.

After coming across the psych literature I've begged [the PD] to read several times, which he won't because he doesn't give a fuck about me or anti black racism, I see that the agency high functioning Black students can exert is to embrace a radical Black identity.

I'm currently going around detailing what [the 808 professor] did and said to me specifically (which sickens mosy people), how the provost covered it up and told me Daniel is an anti-blakc racist but Im illiterateso that's the end of it, and how [the PD] plays the scientific racism game with me after telling me [the 808 professor] tells everyone my accusations are baseless I'm a just a vindictive lazy Black person. I've already talked with staging a vote of no confidence for [the PD], symbolic obviously because he is an unacceptable violent program director.

White supremacists can do and do these things to me, but every PhD student, sis faculty member, Uber driver, and anyone on Twitter and Facebook will hear all about it daily. They can ignore me, but they can't stop the truth.

495. The former PD did not reply until the next morning.

8/28 9:48 AM

I am very concerned about you.  Have you tried to see a therapist to discuss these feelings?  Will you please do so?  I am worried about you.

496. Mills:

8/28 10:28 AM

Are you free now? Meet at the park to talk? You'll long my dog even though you say you aren't a dog person!

8/28 2:44 PM

I'm home if you are in the area. We could grab a coffee in the lobby of my building and chat in the park?

497. The former PD did not reply.

498. Soon, as Mills was getting dressed for the Ph.D. Time, DCPD officers and the AUPD officers conducted the welfare check. [internal cite]

499. The night of the welfare check, Mills wrote the former PD again:

Four cops just barged into my apartment... Interesting that the AUPD officers were extremely hostile and intimidating. So much so that the DCPD officers helped me remove them from my apartment. DCPD said they would testify to the suspiciousness of the report.

I'm now in fear of being murdered by white supremacist AU police officers. I'm not even safe from AU racism in my home.

Funny, I was replying to your email in detail when they started pounding on my door.

500. The former PD never wrote to Mills again.

501. Mills was honest with the former PD about his mental health, how he was addressing racism, and his academic opinion because he trusted her as a personal friend. He sent her emails without proof-reading because she was a friend and because he was walking his dog.

502. Mills feels betrayed that the former PD would make him out to be a threat to campus safety. She knew exactly what Mills meant by White Supremacy - she graded his research about White Supremacy

Internationalism. Yet, she painted Mills as a Black Identity Extremist[23] who should be monitored for talking about White Supremacy and "the truth". Even if the former PD hated his paper, that is not a reason for betraying his trust. It is beyond unethical to paint him as a violent criminal threat because he is angry about racism.

503. After the Assistant DOS gives Mills the care reports, Mills tries to tell the Assistant DOS that the reporters fabricated them to retaliate against him for trying to protest SIS.

504.    ZM:    These care reports are not based in reality. They are misrepresenting my emails.

505.    ADOS:    Here is what I really want you to understand. I heard you said these care reports were "filed against" you. Care reports cannot be filed against somebody. They do not reflect negatively about you.

506.    ZM:    "Rage and anger?" They are impugning my integrity and how I conduct himself - making me out to be some mass shooter threatening the campus. These reports are malicious. They want to manipulate DOS and AUPD to intimidate me from speaking about racism publicly.

507.    ADOS:    Hey, I would never problematize a Black person for being angry about racism.
A care report is only a conduit for faculty to alert DOS to a student who may need support.
A care report cannot be malicious even conceptually because it is not a complaint of student conduct code violation.

508.    ZM:    What would you say is a malicious report?

509.    ADOS:    A malicious report would be if someone accuses you of a crime you did not commit.

_____

[23] We disagree that the label "Black Identity Extremist" serves national unity and national security when applied to criminalize peaceful speech and academic research.

510.    ZM:    "I'm afraid he will create disturbances on campus"? Did you read my emails these reports are based on?

511.    ADOS:  Uh… No. I do not. I know you disagree with how the reporters interpreted your emails. But, I just want to tell you, as a Black person who almost died twice at the hand of the police, I would never try to harm another Black person by calling the police.

512.    ZM:    I don't know. I don't understand. Am I not being a good Black person?

513.    ADOS:  That is alarming to hear. I'd hate that you think that. How about we strategize about how you can graduate?

514.    ZM:    I am meeting with the SIS Associate Dean next.

515.    ADOS:  Great. Text her so she knows you are going. Really, tell her, that you think graduation is your top priority. I'll leave a question to think about: which is more productive for Mills, graduation or holding faculty accountable for racism. Now, you know you would need to work with faculty to graduate.

Section 5.    No Way Out

516. When ADOS gives Mills the Care Reports, Mills is shocked that the 809 professor made one of the reports, which says that Mills' email to her says he was "extremely suicidal" [internal cite]. Unlike the other two reports, her report did make clear that Mills said so to explain why he did not communicate about academics with her over the summer. However, she did not report that Mills also wanted to meet her to explain what happened during the summer and his plan to enroll in her class in the fall. She did not report that she believes Mills was troubled by racism at AU, nor that the apparent impetus of Mills' email was a dispute with the PD which would have given context to the PD's care report. She did not report that other people had influenced her decision to file the Care Report.

517. Mills has told the Associate Dean that the disability services' delay is preventing him from passing 809.

518. After obtaining the 809 professor's care report, Mills tells the SIS Associate Dean that he is extremely uncomfortable with taking 809 with the professor grading his work. However, only she teaches 809; she only teaches it in the fall; the next time she teaches 809 would be the fall of 2020.

519. Even if Mills can take the class, he needs to learn the content in the fall 2020 809 before he can develop a prospectus by spring 2020, as the Associate Dean's progress report requires.

520. Here is an excerpt from the 809 syllabus about the role 809 serves in the Ph.D. curriculum.

> The purpose of this class is to enable doctoral students from the School of International Service to develop and complete a well-written, well-designed, and methodologically sound research proposal. This research proposal will form the basis for students' dissertation prospectuses as well as funding proposals that most doctoral students submit during their tenure at SIS.

521. Mills asks the Associate Dean, given various AU regulations, is there a path that give him a chance at graduating. After all, she says she is the most suitable person to serve as program director for him.

522. What follows are vignettes of conversations and emails between Mills and The Associate Dean.

523.   CG:   I hope you are taking care of yourself.

524.   ZM:   I am. I tried but I just could not go to 809 Advanced Research Design. This morning, I saw a viral video on Twitter where AUPD dragged a Black female student out of her dorm with the Vice President for Campus Life and

Inclusive Excellence.[24] I had flashbacks of my incident. I sweated a lot.

525.    It reminds me, I had a run-in with one of the AUPD officers who came into my apartment. I was sitting in our building's atrium waiting for the class I teaches to begin. He came into my personal space from behind, stood there and stared at me for a whole minute. I am not sure if it is a coincidence, but I felt very threatened especially because DOS would not tell me the process for investigating my welfare check. I have been staying off campus as much as possible as a result.

526.    I read research that shows about 30% of people killed by the police have mental illness and that people with untreated mental illness are 16 times more likely to die in a police encounter. It really makes me think something terrible could have happened to me if the DC officers were not present - the AU officers were not there to help me.

527.    I know you probably cannot acknowledge what I said but I thought you should know.

528.  CG:  I wish I have a magic wand that can fix this stuff but I do not. I want to help you focused on your academics.

529.  ZM:  Please do not interpret this as evidence of me being "suicidal" or "depressed" or being "a danger".

530.    I am considering withdrawing from the program. I just cannot see how I can fulfill the academic requirement in a racially hostile environment. I have experienced intense dehumanization since the 808 professor's class. I have lost my confidence, dignity, health, and happiness. Since I can no

---

[24] The Dean of Students ordered AUPD to seize a Black female student who complains of racism and gave final instruction for AUPD forcibly commit her to a mental institution. AU and AUPD hid their intention from DCPD officers on-the-scene [cite to D.C. gov. affidavit and lawsuit]. The same could have happened to Mills if it were not for Officer Sotelo stopping the AUPD officers.

longer afford to go to another university, I will not even have a Master's degree at a different institution. The entry level job market for 30-year-olds with only a BA is very poor to say the least. I have essentially been economically enslaved for the rest of my life, because I made the mistake of attending AU as a Black American.

531.    You are asking me to fully participate in 809. Could you help me figure out how to do that given my PTSD, anxiety attacks, being followed on campus by AUPD, and AU disability service taking months to process my request for accommodation? My PTSD is only just getting better because I stayed off campus as much as possible. These are all issues that no one at AU acknowledges nor seems to be responsible for addressing. It is anti-Black impunity.

532.    Please do not take any of this personally. I value our professional relationship and wish we were interacting under more pleasant circumstances.

533.    CG:    A lot of the things you are talking about are beyond my control. I stand ready to talk through options. You need to withdraw from 809 in a week. You cannot miss more than 20% of the work and qualify for Incomplete. You failed 809 once. If you fail it again, you will be immediately dismissed under AU academic rules. But, if you withdraw from 809 by 11/1, you can take it again when it is offered next fall.

534.    ZM:    The disability service took 24 days to initiate contact for the accommodations I needed to pass 809. I found out that my student received the same accommodations within one week. I suspect that the delay is linked to my protests about AU's racism. Can the disability accommodations apply retroactively because the disability service caused the delay?

535.    CG:    Sorry, it is beyond my control.

536.       I know you are a good teacher. I know you are a good student. I was your professor in your first year and you handled it well. Maybe SIS is just not a good fit for you. You could withdraw and apply for another program. You want to research with critical theory. You do not want to use a positivist methodology or do international relations. If you will apply for another school, you should withdraw from SIS rather than be dismissed, because it looks better to admissions committees.

537.   ZM:   I do want to do international relations. I just want to use a non-positivist methodology. A senior SIS professor wrote *Conduct of Inquiry*, which says it is perfectly scientific to do just that.

538.   CG:   Scientifically, you are correct. But the majority of SIS faculty are positivist. My friend, for example, would hate it here.

539.   ZM:   That does not mean that I have to be positivist. After all, SIS advertises itself as multi-disciplinary compared to other IR programs.

540.   CG:   Here is an example. My Ph.D. training was not in positivism. It took me a decade to be accepted here. SIS is the most multi-disciplinary of schools in IR but it is not a good fit for your research interest.

541.   ZM:   If SIS is the most multi-disciplinary, which IR school can I transfer to?

542.   CG:   You can switch to another field.

543.   ZM:   Do people switch field four years into a Ph.D. degree?

544.   CG:   Yes, SIS admits such students.

545.   ZM:   But I will not have enough money. Unlike other students here, I do not have a six-digits college fund or a spouse paying for everything. I am already at the lifetime limit for student loans.

546.   CG:   You can move to a small city. You could go to a Mexican school too. Why not? I would write you a letter of recommendation wherever you want to go.

547.   ZM:   If I leave the program, I am never getting a degree again.

548.   CG:   Even if you get a Ph.D. degree, there is almost no tenure-track job available these days.

549.   ZM:   Anyways, my academic problem does not come from how SIS curriculum is designed, but from unending racism, from my PTSD and from the supposed welfare check. Where does AU and SIS regulation address these factors impacting my study progress?

550.   CG:   You will need to talk to the AU disability service. I cannot talk about the welfare check because I was not involved. I have never read the Care Reports. However, AU policy is that professors should liberally file Care Reports liberally even when they are not sure of the circumstances. AU faults professors if they fail to report something and yet harms result later.

551.   ZM:   But these Care Reports took my emails out of context. My emails said that I did not communicate over the summer because I was suicidal at some points, but I am ready to resume academic work now. Would you have filed a care report if a student told you something similar?

552.   CG:   I would have. I believe liberally filing care reports is the correct action. A psychologist told me I should, because I am not a mental health professional. In graduate school, I made care reports about a friend who is alcoholic. I often make care reports about my students. It is the right call.

553.   CG:    I can only discuss your academic progress with you.

554.           I have been told that civil rights complaints are not my concern. If a student comes to me with civil rights complaints, all I can do is to refer it upstairs if it is serious.

> If it is not serious, I ask the student what would satisfy
> them. Some of them ask me to fire the professor, and I have
> to say, I do not have that kind of power. The best I can do is
> to get the professor to apologize.

555. The Associate Dean does not have an answer for Mills about how he can possibly graduate. She still requires Mills to defend his prospectus by spring 2020, even though he cannot take 809 again to learn how to develop a prospectus, or at least not until fall 2020.

556. Mills does not give up. He keeps asking around. By luck, an anthropology professor alerts Mills that to two facts: The Associate Dean is correct that AU Graduate Academic Regulations only allow a student to attempt a course twice;[25] and that a student must take 809 to graduate. However, AU Graduate Academic Regulations also allows a student to substitute one course with another course that have similar content, with his program director's approval. Therefore, if the Associate Dean agrees, he can take a substitute class in spring 2020, which would teach Mills what he needs to defend the prospectus in the same semester. The professor says that every AU Ph.D. department has a similar Ph.D. research methods course that prepare students to defend a prospectus. The anthropology happens to have one in spring 2020.

557. When Mills tells the Associate Dean about this plan, the Associate Dean says she needs Mills to petition SIS Ph.D. Committee and justify why 809 is unsuitable.

558. The Regulations do not require either. The Regulations say that the program director makes that decision alone; no other input is necessary. Nor does the program director need to consider whether the original course is unsuitable. Also, 809 is unsuitable because AU

---

[25] Under AU Graduate Academic Rules, it counts as one attempt whether the student withdrew or failed.

Graduate Academic Regulations would not allow Mills to take 809 again.[26]

559. Because the disability service's delay prevented Mills from passing 809, Mills writes the 809 professor to withdraw from 809.

I am writing to inform you that I have withdrawn from your class. I'd feel rather uncomfortable interacting with you now after discovering that the AUPD "wellness check" I luckily managed to live through, the one where the AUPD gave me documented PTSD and assaulted my dog, was partially based on a care report you filed.

At least your care report was reflective of the email I sent you; [the PD and former PD] literally fabricated accusations about me being enraged, unwarrantedly angry, delusional about racism in SIS, and a danger to campus security. It's deeply painful, to say the least, to be characterized as the stereotypical dangerous/scary Black man. No wonder the AUPD responded in such a violent manner. I'm very happy to be alive now since it's so common for Black Americans to be murdered by police during "wellness checks." Those fabrications probably also explain why AUPD then followed me on campus multiple times.

Just to add, I do have a legitimate right to be upset about the anti-Black behavior of students and faculty in SIS that has been directed at me - behavior that is immoral, illegal, and the antithesis of the "liberal values" espoused by so many in SIS. However, according to some parties within SIS, it is not acceptable for me to be upset about my program director attempting to explain my academic downturn as the result of my Black father not raising me... as opposed the various racist incidents I have cited.

Please know I am not a dangerous person and harbor no ill feelings against you. I feel I must state that clearly in light of the fabrications that have been constructed to medicalize and criminalize me.

560. The 809 professor never replied. She never contacted Mills again.

---

[26] The Regulation allows a student to take same course more than twice, with approval from AU Vice Provost of Research and Dean of Graduate Studies. The SIS Associate Dean did not alert Mills to this route. If the Associate Dean allows Mills to defend his prospectus by fall 2020, Mills can retake 809 in fall 2020 and have a chance to graduate.

561. On 12/9, the disability adviser finally gives him an accommodation memo. The memo gives Mills two accommodations for notetaking: allowing him to use laptop in class and to record lectures on his own, both of which he already can do.[27]

562. Unlike other students who cannot attend class due to their disabilities, and despite the AU psychiatrist's recommendations, Mills is not immediately allowed the accommodation of flexible attendance, extended deadlines, and paid peer notetaker. The disability adviser tells Mills that he qualifies for flexible attendance and extended deadlines, but the disability service committee needs to meet and authorize the accommodations.

563. Mills gives the accommodation memo to the Associate Dean the next day.

> Attached is the preliminary accommodations letter. [The disability service] gave me flexible attendance and assignment due dates as well, but the [disability service] committee has to finalize the approval of that.

> I find it very unfortunate that it took all semester to receive accomodations that would have helped me pass [809 Advanced Research Design] this semester. It is highly questionable as to why it took so long and why they are not retroactive considering my medical condition was documented in September. I find this situation highly unfair and want to make that very clear.

564. Two days later, the Associate Dean replies. She does not answer Mills' question. Instead, she asks Mills to confirm that he has not fulfilled his progress report's requirement for the semester, including fully participate in and pass 809. If not, she that she will issue a progress report.

565. Mills replies.

---

[27] Recording lectures violates AU policy. However, it is rather impractical for AU to stop students from recording with their phone. This accommodation is meaningless.

All that sounds about right. I'm surprised to hear I won't be kicked out this semester.

566. On 12/17, the Associate Dean issues her progress report.

As you will recall, I advised you in late October that if you wanted to remain in the SIS PhD program you should consider dropping SIS 809 before the final deadline to drop a course.   The steps behind my reasoning were as follows.  First, the course professor was not obligated to give you an incomplete grade because you had not completed any assignments in the course.

Second, because AU's graduate regulations only allows students one opportunity to retake a course,  you would have no path to complete a required degree course and as such would be subject to automatic dismissal from the program.  During these discussions, you asked if you could petition to have the course replaced.  Petitions to replace required courses in SIS are exceedingly rare, so I consulted Michael Keynes, Associate Dean of Graduate Studies.  Dean Keynes approved your ability to petition for a replacement and I subsequently shared the process for putting together such a petition.

Given this context, I have revised the steps you must complete.  The first step must be completed before the start of the spring semester (January 13, 2020).

1.  Successfully petition for a substitute to the SIS Research Design course.

Given that AU is closed from December 21, 2019 through January 1, 2020, I urge you to submit this petition as soon as possible— preferably before the university closes on the 21st of December so that I can convene a committee to review the petition shortly after the university reopens on the 2nd of January.  Failure to complete this step before January 13th will result in automatic dismissal.

If your petition is accepted, you must complete the following steps before the end of the spring semester (May 8, 2020).

1.  Fully participate in and complete the replacement for SIS Research Design with a passing grade per graduate regulations.

2.  Fully participate in and complete 2 other courses with a passing grade per graduate regulations

3.  Assemble a dissertation committee and have it approved by the director [me in this case] and AU's dissertation council

4.  Successfully defend prospectus by end of spring semester (May 8, 2020).

> Failure to complete the four steps listed directly above by the end of the spring term (May 8, 2020) will result in automatic dismissal from the program.

> I truly want you to get back on academic track in our PhD program and I stand ready to assist you in any academic matters that arise.

567. It appears to Mills that, prior to the SIS Associate Dean consulting the Associate Dean of Graduate Studies on 10/31, the Associate Dean was advising Mills to withdraw from 809 [internal cite] under the thinking that, once Mills does so, Mills "would have no path to complete a required degree course" after having attempted the course twice and as such would be "subject to automatic dismissal from the program". If this was her thinking, she was trying to make Mills fail. Fortunately, Mills found out about the option of substitution – a "path to complete a required degree course" - two days before he withdrew from 809.

568. It is also possible that the Associate Dean assumed that Failure count as one attempt, and Withdraw does not count. If so, why was she advising Mills without referencing AU Graduate Academic Regulations, after telling Mills that she is the most suitable person for the role of program director for Mills? [Why did she not apologize for giving him bad advice?]

569. The SIS Associate Dean did let Mills know that if he withdraws from 809 before 11/1, he can still keep his health insurance and student loan disbursement until the end of the fall 2019 semester.

570. On 12/19, after the due date for every assignment and every lecture in the semester, two days after the SIS Associate Dean gave Mills two deadlines which, if missed, Mills would be automatically dismissed, the disability advisor writes

> I am writing to inform you that your request for the opportunity to discuss extended deadlines and flexible attendance with professors due to disability-related flare-ups has been provisionally approved for Spring 2020.

571. The same disability adviser approved the accommodation for Mills' student within the same week. For that student, the same disability

adviser personally persuaded Mills' supervising professor to grant the student extension of deadlines and flexible attendance without an accommodation memo. She asks Mills to persuade his professors.

572. Mills requested the accommodations of extended deadlines and flexible attendance on 10/1. Other than the meaningless laptop and recording accommodations given on 12/9, the disability service committee needed to deliberate on the meaningful accommodations for 9 days between 12/9 and 12/19. By coincidence, the SIS Associate Dean issued a progress report with tight deadlines that he cannot miss, two days before the accommodation allows him to ask her for extended deadlines.

573. Mills is very concerned about what role the Associate Dean will play in convening a committee to consider his substitution petition.

574. Mills writes to the Associate Dean.

> Does [the extended deadline accommodation I received] apply to the severe disruptions the current harassment I'm dealing with now? I refer to being threatened by a lawyer on behalf of [the 808 professor] and the already questionable provost office investigation of my FERPA violation[internal citation]? I had a PTSD attack on wed essay triggered by all this stress and thought I was having a heart attack. It's a very unhealthy situation for me.

> The burden of writing a petition to extract myself from the farce of institutionalized oppression is disgusting and I 100% object to this process. It's really messed up.

575. The Associate Dean never replies to this email.

576. Because the 808 professor has served on the Ph.D. Committee for years, Mills writes the SIS Associate Dean this email.

> I am worried there are other conflicted parties, but am not sure who they might be. It was suggested to me that [the 808 professor] goes around talking about me being a lazy vindictive Black person that makes things up because I can't cut it. So, anyone who was told that by him or anyone else probably shouldn't be making a decision for me.

577. The Associate Dean replies.

As best I can recall, no one on the committee has ever told me that Daniel said this about you to them.  But, when I email the committee I will ask folks to recuse themselves if they have a conflict of interest.

578. Mills is hardly assured. He remembers how the PD persuaded him to deracialize and decontextualize his petition last year. To a reader who does know the context, that petition read illogical and false, as if Mills was asking for special treatment because he claims he has a mysterious disease with no known cure that inexplicably made studying impossible. He decides to tell the truth in this petition. He wants to write a petition that an ethical person would not reject, because he would be dismissed if his petition fails.

579. What follows is a summary of his petition.

Before I delve into "official" points, I want to preface that I reject the legitimacy of the substitution process because AU and SIS regulations do not address the toxic racial environment that continues to impact my academics.

A legitimate process would consider multiple racists incidents I experienced in AU and SIS, and how they affected my study. It would consider how the toxic racial environment in SIS is exacerbating my diagnosed race-based PTSD.

The content of 809 is not at issue. I simply wish to have no further interaction with SIS, which has a culture of impunity for racist behaviors.

I do not have a problem with the 809 professor or think the substitute course is better, but I want a professor who I do not know.

809 Syllabus says that social science requires researchers to work with one another and offer each other constructive criticism. It is correct. However, constructive criticism is impossible without mutual respect. Some SIS peers have made it clear that they do not respect me. [internal cites to peer harassments] I also do not respect people who "support" me privately and share the injustices they see but will not take a stand for me. I am not comfortable with receiving "criticism" from them.

If my petition is denied because my discussion of racism is irrelevant, so be it. At least, I stood up for myself and did not help others to oppress me.

The two courses are substitutable since they both start by covering methodological considerations required to produce a defensible prospectus for a PhD level dissertation and then move into reviewing a variety of

appropriate corresponding methods. The anthropology course is also more consistent with my ontological views and expertise.

I would like to anticipate some counterarguments.

A counterargument is that the anthropology course would not teach me necessary international relations research design. It is a moot argument. I am no longer planning to seek tenure in an IR or political science department because of my experience with racism at SIS. If I had known that racism was endemic to the field of IR from the beginning,[28] I would have never considered a career in IR or attended SIS.

Not to disparate many decent people in SIS, I have a basis to believe that the average anthropologist and people of color is more culturally competent about race than people I have interacted in the past four years in SIS. Cultural competency is made a curriculum in anthropology. The AU anthropology department also employs more people of color. At the University of Arizona and its department of anthropology, the students, faculty and administrators never made my Blackness a problem. That is not true at AU and SIS.

My PTSD comes from racists acts committed by SIS student and faculty.  It exacerbates as I am forced to interact with them. Releasing me from SIS would be great for SIS too, since no one in SIS with any authority has an iota of interest in dealing with the inexcusable racism present here. No one will address a white student accusing me in SIS student lounge of robbing him of his white agency, because my academic interest in critical race theory, and threatening me not to report him. I find it comical that the very people who ignore his behavior makes me out to be mentally ill or a Black Identify Extremist. This is white supremacy - the subjugation of non-whites to another set of discriminatory social rules.

The racial toxic environment in SIS is most visibly through my loss of several international human rights, including the right to human dignity, the freedom from torture, and the freedom of thought and word.

A) Human Dignity

I am constantly made to defend myself from racist perceptions of me being dumb, lazy, and untruthful, and therefore unworthy of being in SIS. These are well established racist stereotypes of Black Americans that should not be deployed in the 21st century by people who claim to oppose racism.

---

[28] Vitalis, Robert. 2015. *White World Order, Black Power Politics: The Birth of American International Relations*.
Ithica: Cornell University Press.

For example, when I independently came up with least-similar case comparison, a professor told me it is not real science. I learned later that it is scientific and that several SIS professors used it. The professor was either parading their personal beliefs as reality or withholding knowledge from me; either way, the professor made me feel dumb for thinking and stunted my academic progress.

Another example is that I am asked to demonstrate why the substitute course is suitable as if I do not understand scientific methodology. I do. I read *Conduct of Inquiry* twice and probably understand ontology and methodology better than most of my peers.

B) Psychological Torture via Gaslighting and Welfare Check

SIS faculty members engages in gaslighting when they pretend that I imagine the racial incidents I have seen, heard or experienced. It is a well-documented form of psychological torture.

Because I planned a non-violent political action against the PD for his racist comments, two faculty members fabricated malicious lies that led AUPD officers to illegally enter my home under the guise of "welfare check". One of them maliciously utilized anti-Black tropes of anger and violence and cited my "imagination" of "the truth" about racism in SIS to portray me as a Black Identity Extremist that threatens campus safety.

I have zero recourse to oppose the AU internal security apparatus. The officers had no jurisdiction to operate in my off-campus home. No AU administrator is willing to discuss the incident with me, investigate or accept a formal complaint.

To reiterate a fact lost in SIS: it is not OK for white people fabricate to the police such lies based on racist stereotypes because of a difference of opinion; it is not OK to intimidate Black people into silence on racism; it is not OK for white people to portray Black people as criminal and insane to discredit their opposition to racism.

It is white terrorism to do so.

C) Right to Freedom of Thought and Word

The professor who discriminated against me just threatened me with frivolous legal action because I refuse to participate in my own oppression: to silence my thoughts about racism, to minimize he racism I experienced. The frivolous lawsuit depends on my being a poor Black American unable to afford fighting in the American legal system.

To conclude, I leave you with excerpts from a peer-reviewed paper on what predominantly white institutions demand and take from minorities here. I ask you to ponder what norm your decision is establishing.

People of color carry the burden of having to choose between tacitly participating in their marginalization or actively resisting racist ideologies with the possible consequence of institutional alienation, exclusion, or official reprimand. White institutional spaces inscribe white privilege and power in the very social institutions that people of color must actively engage in order to experience upward mobility—education and employment. As a result of the additional burden of emotion work for people of color in these racialized institutions, and the need for people of color to sometimes choose an emotional strategy to not engage or challenge racial oppression in order to succeed in these spaces, the racialized relations of power are reproduced.

While the strategic decision of people of color to disengage and not challenge micro-aggressions or structural racial inequities may facilitate this reproduction, these strategies also provide an important means for some people of color to successfully navigate white institutions and thereby benefit from the resources they offer.

Evans, L., & Moore, W. (2015). Impossible Burdens: White Institutions, Emotional Labor, and Micro-Resistance. *Social Problems, 62*(3), 439-454.

I am done with resisting the culture of impunity for racism in SIS and its blowback on me. You can deny the petition, which will result in me being dismissed for making "unsatisfactory" academic progress in a toxic racial environment. Or, you can let me go study in the anthropology department to learn in a peaceful and respectful environment.

If I am dismissed, I will never be able to afford a Masters or Ph.D. from another institution. I have worked here for four years without even a Masters degree to show for it. SIS admitted me without telling me about the toxic racial environment here. Please consider that education is a human right in your decision. I would like to think most of you oppose racism, so I see no reason for you to ignore the extreme injustice I am subjected to.

Be ethical and stop turning a blind eye.

Zachariah S. Mills

P.S. Please feel free to delay your decision until you read an upcoming investigative journal report of my experiences at AU if you do not believe me.

580. The Associate Dean informs Mills that she approves the petition. She does not say whether she submitted the petition to a committee.[29]

### Chapter E.   Spring 2020

#### Section 1.    The Perpetual Victim

581. Three months later, on 2/27, the disability advisor added one accommodation for Mills, a non-retroactive opportunity to discuss extended deadlines and flexible attendance which required faculty agreement.

582. After the botched investigation, Mills heard that the 808 professor was publicizing that Mills was an incompetent and lazy student, who was race-baiting for special academic treatment. Several professors refused to engage with him for no apparent reason. One of those professors told him he was famous but refused to explain. [internal citation] When Mills asked the PD whether the professor told the PD the same thing, the PD could not deny it to Mills' face.

583. Mills was very upset that the professor was portraying himself as the victim. It coincided with the rumor he heard about how the professor said he was the victim of an unstable woman's sexual harassment allegation. [internal citation]

584. Mills was especially upset that many people believed the professor. What special treatment did Mills get by making the complaint? The former PD had taken over grading responsibility before he filed the complaint. AU delayed his retake of the second comprehensive exam even though he did not ask for it. Dean Report fixed his grade because it said the grade was wrong. The only thing special, that nobody else received, was a botched investigation.

585. Nevertheless, Mills did not want to become a stereotype of angry Black man. He did not need to interact with the professor anymore. He did not name the professor when he discussed the botched investigation at

---

[29] Because the fact is unclear, we are pleading in the alternative, that the petition was submitted, and it was not submitted.

the AU NAACP meeting or on Facebook. Mills sent the professor one last email after the investigation and then avoided him like the plague.

586. Mills is more upset with the botched investigation and the welfare check than with the professor. There are plenty of openly racist people who have little power to endanger anyone. What is more dangerous are the professors and administrators who display Dr. Ibram X. Kendi's *How to Be an Anti-Racist* on their bookshelves while perverting legal process and manipulating the police. It is outrageous and disgusting. These people need to be exposed.

587. Once he has obtained the care reports, Mills shares the welfare check story with Inside Higher Ed., an industry journal.

588. The journal exercises exemplary standard of journalism.

589. To preserve professional relationship after publication, the journal let an intern journalist do all external contacts and signed on the story. She does an exemplary job. The journal thoroughly fact-checks the story for weeks. It asks to review far more documents - including emails that led to the Care Reports - than those that are ultimately published.

590. The journal asks Mills to waive his privacy rights so that the school, other students, and implicated individuals could comment. It then independently interviews many students from SIS.

591. Mills requests the journal to omit the 809 professor's name because she might have filed her care report in good-faith. The journal refuses. Otherwise, Mills gives the journal free reign. Mills has not reviewed the story prior to publication.

592. In January 2020, the journal publishes "When Perceptions Clash" on its front page. SIS students and faculty widely read the story. The article asks whether the welfare check was "a show of concern or a show of force[.]"

593. It is another publicity disaster for AU. AU has long been troubled with negative publicity due to racial incidents on campus. [convert to citation][In AU's 2016 survey, 71 percent of white students agreed that

"I feel included on campus," while only 33 percent of Black students agreed. In 2017, a Black student was elected to the student government; she found banana hanging from nooses in her dorm. AU soon hired popular scholar Ibram X. Kendi to head a new Anti-Racism Center, housed in SIS, and well publicized the hire on TV. In 2019, a viral video showed a student using the N-word in the classroom. Months later, another viral video showed AUPD dragging a black student from her apartment and committed her to a hospital.] AU has just widely publicized its $121 million investment in a much-publicized diversity strategic plan, which is President SMB's primary project at work. Curiously, most of that figure is the federal government's Pell Grants to poor students at AU, not AU's money.

594. AU is in full damage control mode. According to the article, AU refused to comment specifically about Mills, citing privacy law. Given that Mills had waived his privacy rights, AU must be citing the implicated individuals' privacy rights.

595. AU says its welfare check policy is functioning as intended. AU also comments that the under-representation of Black students in Ph.D. programs is a nation-wide problem.

596. The implicated professors do not respond to request for comment, except the 808 professor, who Mills did not think was involved in the welfare check.

597. The article is primarily about whether the welfare check is proper. Out of about 300 lines, 170 lines discusses Mills' welfare check, Mills' planned protest leading up to it and the welfare check's impact on Mills. 65 lines discusses the underrepresentation of minority students at AU.

598. The article discusses the professor's course as the origin of subsequent events. It has 20 lines on the professor's class, in which a classmate confirmed that the professor had subjected Mills to a different standard. It has 35 lines on the botched investigation, 9 lines on the

President justifying the investigation to Mills, and 16 lines on the professor's response.

599. The former PD made an insightful comment about the professor, that he is extremely concerned whenever he is accused of racism.

600. Prior to publication, when the journal asked the professor for comment, Esser retained Bean kinney & Korman, P.C.'s Maureen E. Carr, Esq. to threaten Mills with defamation litigation. The professor did not sue the journal for defamation.

601. The lawyer letter had a direct quote of Mills' email to the former PD the day before the welfare check [internal citation]. Mills discussed his mental health in that email. As such, the email is protected under FERPA. The professor has no legitimate educational interest in accessing that email, unless threatening a student with bogus SLAPP suit is an educational interest. The former PD had broken the law and gave the professor the email.

602. The professor is far from the only person doing damage control.

603. Instead of commenting for the journal, the PD turns to a forum where he is in control. After publication, he soon emails all SIS Ph.D. students, except Mills.

> As I told you before, and Dean Chin told you as well, because of the student's privacy we cannot fully respond and answer all of these allegations. I do want to share with you the following:
>
> I think it is within my rights to say that all the allegations against me personally in the article are untrue.
>
> I want to assure you that the SIS PhD faculty, including those mentioned in the article, [former PD, 809 professor, 808 professor], and myself, will continue to treat all students fairly and without discrimination, as we have been doing previously.
>
> In filing the CARE reports in this case, me and the other professors followed AU's protocol, and we did so properly and with the student's well-being in mind. We have no influence (and frankly, we had no knowledge prior to this incidents) of what action is taken based on these reports. We will continue to file CARE reports when needed. These are designed to help students in distress and the result of faculty being deterred from sending CARE reports when needed could

be detrimental to our students. I encourage those of you who are teaching to do the same.

Despite the picture presented in the article of a program riddled with discrimination, I am not aware of any specific complaints about discrimination in the program beside those related to Mr. Mills' complains. If you have any such knowledge, please share them with me or with the Dean's office. We take complaints of discrimination seriously and AU investigates these complaints, as the university did in this case.

Our program demands academic rigor and it is very challenging and often stressful, like many other PhD programs. Whenever students are facing difficulties, academic or otherwise, we are doing our best to help, to find solutions, and to support academic success. We will continue to do so for all of our students, without discrimination, and we will continue to work on improving all aspects of our program, diversity and inclusivity included. Any ideas that will help us do so are welcomed.

Director, Doctoral Studies Program

604. The SIS Dean sends an email to all SIS students, including Mills' undergraduate students.

Dear SIS,

An article in Inside Higher Ed was published today that casts our PhD program in a negative light. The article, while making clear that perceptions vary based on lived experience, reports allegations that faculty in the program have acted with racial bias and have fostered an environment that prohibits students of color from being successful. The article also includes accusations that mental wellness checks were used as retribution for a student's complaints. All of us should be thoughtful about drawing conclusions about complicated situations based on the information available in one article. I always want to address concerns openly; however, we do not disclose full details of incidents involving students because of privacy concerns. The university did work with the publication to make available all information that we were legally and ethically permitted to provide.

I want to emphasize that our PhD program's 57 students are all passionate about the theory and practice of international affairs and want to make contributions to the field and our understanding of it. As an alumna of the PhD program and a person of color who now leads the school, I am proud of the many accomplishments of our PhD

program's students and faculty. I also acknowledge that our program, like so many others in higher education, still has work to do to become more inclusive of those who have been historically underrepresented. This is a long-term effort that has been underway for years. Recent curricular changes within the PhD program are one small, but important, step. Our efforts also include ongoing trainings for faculty and staff as well as professional development opportunities with our PhD students, many of whom will join the next generation of academics and will benefit from a greater awareness of how their own implicit biases may show up in their work.

The goal of a diverse and inclusive intellectual community is worthy and, frankly, non-negotiable. In this endeavor, there is always work to be done and improvement to be made. Our commitment to building an inclusive and equitable community of learning remains strong, and we will continue our efforts to improve the climate in our school, including recruiting and retaining more faculty of color. We will all continue the hard work of building a community in which everyone can thrive.

Sincerely,

Dean, School of International Service

605. The Dean sends a separate email to SIS Ph.D. students.

I want to let you know that I am available to speak with any of you, individually or as a group, in more detail if you wish.

606. These are not the only emails SIS Ph.D. students receive about the article. Soon after publication, a student informs Mills that four SIS Ph.D. students are widely circulating a self-styled "counter-narrative" in the Ph.D. program. The following is an excerpt.

Throughout the article, ambiguous phrasing, such as "multiple students" or "[e]very student in the program interviewed," fueled the impression that the perception of SIS as an institution riddled with racial discrimination was widely shared among students. In this letter, we wish to challenge the notion that the narrative in the IHE article represents the prevailing consensus among doctoral students regarding the SIS PhD program and faculty.

This letter is not intended to antagonize Mr. Mills or diminish the mental health issues he raises in the article. On the contrary, many of

us can empathize with Mr. Mills having ourselves suffered through similar mental health issues in the past.

However, those of us who have taken courses with these faculty members, worked with them as research assistants, and/or have these professors in our committees do question the accusations against them on the basis that they do not reflect our experience of these professors' professionalism and dedication to students.

The IHE article depicts our PhD program as a cauldron of racial hostility, where discrimination is systemic and students are afraid to lodge complaints for fear of retaliation by SIS faculty. From our collective experience, this has simply not been the case. To counter this perception, we would like to draw attention to the diverse composition of cohorts, core course syllabi that defy Western male dominated theorizing found in traditional international relations programs, close faculty and student collaborative ties in improving and making the program more inclusive, and faculty's fostering of intellectually stimulating and friendly classroom environments that are conducive towards the free flow of ideas.

What is also lost in the IHE article is the compassion and commitment to our success that SIS faculty have shown us over the years. SIS faculty often go out of their way to write glowing letters of recommendation for us and in sharing their networks.

Although we concur with the IHE article that inclusivity and greater representation of marginalized populations remains a formidable challenge at the doctoral level – this is a structural problem that is not particular to our program. Doctoral programs are inherently exclusive and, unfortunately, the norm has been that those with more privileged socio-economic backgrounds tend to be overrepresented in PhD programs nationwide.

In short, we find it regrettable that the IHE article failed to incorporate a more balanced and representative view of the SIS PhD program and faculty. We hope that this event will not deter faculty from continuing to uphold rigorous academic standards, respectfully challenging our views on often controversial topics, and initiating wellness checks when they have reason to fear for our safety.

[names of 4 authors, plus 9 signers, and 9 anonymous signers]

607. Along the line of the PD's and the 808 professor's comment[internal cite to FERPA section], the "counter-narrative" authors not-so-subtly implies that SIS did not discriminate against Mills. Rather, Mills is

defaming SIS because he cannot handle "faculty [] uphold rigorous academic standards, respectfully challenging our views on often controversial topics, and initiating wellness checks when they have reason to fear for our safety." It is not that Mills became depressed because of discrimination, or has PTSD because of the welfare check, it is because Mills has "similar mental health issues" "ourselves suffered through … in the past."

608. For Mills, it begs the question: how did the authors come to their conclusions about the 808 professor's discrimination and the welfare check? The authors and Mills never studied in the same classes, certainly not the 808 course. Mills has talked with each of the authors for at most 30 minutes total, in his lifetime. Did they draw their conclusion from "core course syllabi that defy Western male dominated theorizing" "close faculty and student collaborative ties" and "faculty's fostering of intellectually stimulating and friendly classroom environments"? Or was it from having "these professors in our committees" "SIS faculty [] go out of their way to write glowing letters of recommendation for us and in sharing their networks"?

609. The authors solicit signatures from all other Ph.D. students with the same emails. Here is an excerpt.

> On January 7th, Zach Mills went public with very serious accusations of racial discrimination against [the former PD, the PD, the 808 professor and the 809 professor]. An article was published in an online higher education magazine. Here is the link in case you have not read it yet: [].

> As you might imagine, we are all in a state of shock and the implicated professors have been emotionally scarred by this incident. In general, faculty morale is really low and there is palpable tension in the PhD lounge. Many are legitimately intimidated by Zach and don't want to speak out. Others support Zach and believe the accusations he has leveled against faculty and administrators.

> Some students have been more pro-active than others. Several students have sent op-eds to the editorial board of the online publication. I am part of a group of female students that are organizing a collective response. We have drafted a letter providing a

counter-narrative and plan to send the letter to the SIS deans and faculty.

I am sharing the open letter we plan to send SIS faculty and administrators in confidence - please do not share or discuss the contents of this email. We are reaching out to students and former students who we think might endorse this message.

610. The authors send the "confidential" email template about "Mills intimidated many professors and students" to one of the very few Black female Ph.D. graduates. Here is her reply.

I am unfamiliar with the article that your letter mentions, and I'm also not sure why [an author], whom I don't think I know, suggested that I might be interested in joining your letter.

First, I am the kind of person who believes strongly in getting involved in "internal institutional affairs" if there is a problem with those affairs. I chose not to do so at SIS in favor of political struggles that are more meaningful to me.

Second, and most significantly, I experienced and witnessed racism and sexism at AU from SIS faculty. I believe it was a substantial problem while I was at SIS and that it is extremely unlikely that these problems - either related to specific individuals or systemic problems -- have been addressed.

Neither institutionalized racism and sexism nor particular faculty practicing racism and sexism are a question of lack of "inclusivity and greater representation of marginalized populations," and just because they are a problem at other universities doesn't mean that addressing them shouldn't be a priority of students, faculty, and administration at AU and SIS, specifically.

Each of us have our experiences.

Section 2.    Math Problem: What is the Likelihood that a Dog-Whistle is Motivated by Race?

611. What is the probability that the professors implicated by the article did not improperly influence the authors to cast the first stone?

612. The article implicated three professors: the PD, the former PD and the 808 professor. The former PD is on the dissertation committees of Authors A and B. The PD is on the dissertation committees of Authors B

and C.[30] The 808 professor is not on a committee. Author D is not yet eligible to assemble a dissertation committee.

613. Given AU's customs and practice of prohibiting the appearance of conflict of interest, it is improper for the implicated professors to allow Authors A, B and C from retaliating against Mills via a racist dog-whistle *Counter-Narrative*.

614. As the 808 professor proudly told Mills, dissertation committee members have the power to derail a student's graduation. A committee decide by consensus; therefore, any one member can impede the student. A student can only change committee membership with approvals from the program director and the University's Dissertation Council.

615. Setting the appearance of conflict of interest aside, how much does having an implicated professor on a student's dissertation committee increase the chance that the student "volunteering" to be an author?

616. We will take the authors at their words. The *Counter-Narrative* authors do not disclose that the implicated professors have spoken to them about the *Counter-Narrative*. We assume they did not.

617. The authors say they are volunteering for two reasons: (1) "those of us who have **taken courses** with these faculty members, worked with them as **research assistants**, and/or have these professors in our **[dissertation] committees** do question the accusations against them on the basis that they do not reflect **our experience** of these professors' professionalism and dedication to students." (2) "our collective experience" shows SIS is not "a cauldron of racial hostility, where

---

[30] Although they are program directors, they do not frequently serve on dissertation committees. Based on AU Electronic Thesis and Dissertation Collection, between 2012 and 2020, the former PD has served on three dissertation committees where the Ph.D. students graduated. In the same period, the former PD has served on five dissertation committees where the Ph.D. students graduated, including Author A's and a signer's. By comparison, the Associate Dean, who is not implicated in the article, served on ten successful committees in the same period, including Author A's.

discrimination is systemic and students are afraid to lodge complaints for fear of retaliation by SIS faculty."

618. Every Ph.D. students have the same opportunities to have "taken courses with these faculty members[.]" Each of the implicated professors teaches a mandatory course. Every Ph.D. student therefore needs to interact with each of them for one semester, before they can assemble a dissertation committee. That is enough interaction for students to form an opinion about each implicated professor.

619. Every Ph.D. student, except two domestic racial minorities including Mills, have the same opportunity to form a "collective experience" about whether racial "discrimination is systemic" in SIS.

620. We have no data on who the implicated professors successive research assistants are, except that Author B was the former PD's research assistant. We will disregard this factor for now.

621. We offer three alternative calculations and our assumptions.

We assume SIS admits 8 students per year. We assume, excluding 16 ineligible first and second year students and Mills who was mired in a hostile environment and did not assemble a committee, 40 students are eligible to assemble a dissertation committee. We assume the eligible students choose three random professors to serve on their committee immediately after they become eligible. Three professors are implicated in the IHE article. Based on May 2022 SIS website and SIS Ph.D. Handbook, we assume 77 full, associate and assistant professors are eligible to serve on a committee. We further assume an implicated professor serving on a student's committee has no causal impact on or correlation with the likelihood of the student volunteering to author the *Counter-Narrative*.

622. Averaging:

$$\frac{3 \; implicated \; professor}{40 \; students \; with \; committee} \times 3 \; random \; students$$
$$= 0.225 \; implicated \; professor \; on \; 3 \; random \; studens' \; committee$$

On average, three random students should have 0.225 implicated professors on their committees. The actual occurrence of implicated professors on the 3 authors' committees is 4, which is 4/0.025=17.78 times greater than the average.

623. Probability:

The probability of a student having at least one of the three implicated professors on the committee is one minus the probability of having none of the three professors on the dissertation committee.

$$1 - \left(\frac{74}{77} \times \frac{73}{76} \times \frac{72}{75}\right) = 11.38\%$$

The probability of three random students all having at least one of the three implicated professors on each of their committee is

$$11.38\%^3 = 0.147\%$$

624. Combination:

For a random student, the number of different possible combinations of the 3-professor dissertation committee is

$$C_{77}^3 = \frac{77!}{3! \cdot (77-3)!} = \frac{77 \cdot 76 \cdot 75}{6} = 73150 \text{ combinations}$$

For a random student with two implicated professors on their committee, such as Author B, the number of different possible combinations of the 3-professor dissertation committee is

$$C_{77-2}^{3-2} = \frac{75!}{1! \times 74!} = 75 \text{ combinations}$$

For a random student with one implicated professor on their committee, such as Authors A and C, the number of different possible combinations of the 3-professor dissertation committee is

$$C_{77-1}^{3-1} = \frac{74!}{2! \times 72!} = 2701 \text{ combinations}$$

The probability of three random students each have 2, 1 and 1 implicated professors on their respective committees is

$$\frac{75}{73150} \times \frac{2701}{73150} \times \frac{2701}{73150} = \frac{21886203}{15656799235000} = 0.000139787\%$$

To put it in perspective, the probability of being dealt a royal flush is 0.000153907%[31], slightly higher than the probability of the *Counter-Narrative* authors are taking the initiative because they are satisfied with

---

[31] Taylor, Courtney. "The Probability of Being Dealt a Royal Flush in Poker." ThoughtCo, Aug. 29, 2020, thoughtco.com/probability-of-being-dealt-a-royal-flush-3126173.

SIS curriculum and with their classroom interactions with the professors implicated in the article.

Section 3.    Professor Outlaw

625. Mills only goes to campus because he loves teaching. Teaching undergraduate students is the only time of the week that he is happy – he stops being a scary Black man, even just for one hour a week. It allows him something that he excels at and give him some confidence in his most difficult time. It allows him to get a taste at teaching, which was why he came to AU. That is, until all the professors, the deans and the provosts take it all away.

626. Mills excels as a teaching assistant. When his supervising professor sent him his student reviews for fall 2019, he was happy for the whole day (which was very rare). On a 1-7 Likert scale, 1 being the best, Mills consistently scored 2 across all performance indicators. The major themes of textual reviews were: extremely knowledgeable; great at inducing student discussion; listens to different opinions before presenting his take; thought-provoking; approachable; and thoroughly engaging ("BOMB powerpoints"). The glowing student evaluation would have greatly aided Mills in securing a tenure-track professorship, if he can graduate from the program.

627. Two of the dog-whistle *Counter-Narrative* authors and Mills are professorial teaching assistants for different sections of the same course. The teaching assistants meet every week for work. Mills does not know or ever commented about them.

628. After Mills notices the authors' campaign telling every student that every student is legitimately intimidated by Mills, Mills feels extremely uncomfortable at work.

629. It has only been 5 months since Mills was called an angry Black man for the first time in his life, by the former PD; now, the whole program has

heard it, and half of the program do.[32] If the history of lynching and false conviction teaches Black people anything, it is that when a group of white women say an law-abiding Black man scare and disrespect them, [internal cite to former PD's testimony re female student saying so] the Black man should expediently extract himself, because that sort of proceedings has no relationship to reality.[33]

630. One day, when Mills is sitting outside of his classroom, an AUPD officer stands two feet away behind Mills and observes him over his shoulder. His undergraduate students all notice that the officer is monitoring Mills' behavior within his personal space. On another occasion, an AUPD officer stands outside of Mills' classroom. The officer stares at Mills for a whole minute through a floor-to-ceiling glass wall.

631. At first, Mills keeps telling himself that it is a coincidence. But AUPD would not tell him whether anyone reported him as a threat again, whether they were following him around campus, or whether they are watching him from security camera. Of course, even if someone is constantly telling AUPD that he is going berserk and needs to be put down (which is what all Black man do), AUPD would not tell him. If he is still white and not the Angry Black Man, he would have cussed the police out. But, he is trying to graduate, not getting shot on campus.

632. The unending and uncertain perception of threat messes up with Mills' flight or fight response. He feels like a dog who cannot control its emotions. He tries to act calm and normal in public, even if he feels

---

[32] Well-educated people are susceptible to groupthink. Mills was almost the only person in SIS who predicted that former President Donald Trump would win in the 2016 election.

[33] Emmett Louis Till was a 14-year-old African American boy who, after being accused of flirting with a white woman in her family's grocery store, was abducted from his uncle's home, had one of his eyes gouged, then killed with a bullet to his head, and dumped into a river in Mississippi in 1955. His white male murders were acquitted by an all-white, all-male jury. Next year, *Look* magazine paid the murderers for an interview with the murderers about the circumstances of Till's kidnapping and murder. pbs.org/wgbh/americanexperience/features/till-killers-confession/

unsafe. When he goes home, he either lashes out or feels nothing. He does not like to sleep because it always means nightmares: going to the grocery store and getting arrested by AUPD; professors telling him his ideas make them barf; when he opens his mouths and tries to speak to the deans, no voice comes out, but he is yelling in his bed, asleep. He feels more tired than before going to bed. He falls off his bed. He starts smoking. He stops recycling – because why save the world and your health when the world is evil?

Section 4.    Action and Reaction

By what standard of morality can the violence used by a slave to break his chains be considered the same as the violence of a slave master?

-Walter Rodney

633. The dog-whistle *Counter-Narrative*, the professor's frivolous legal threat, and the professor's and the former PD's violation of his FERPA rights are the last straw for Mills.

634. For racist abusers such as the 808 professor, Mills realizes that the proper, safest response is to demonstrate strong boundary as early as possible. Mills regrets excusing the professor singling him out as a lazy or incompetent student the first day they met. He should have drawn a line in the sand on the first day. Had Mills taken the inappropriate comment seriously, condemned and reported it, it would have deterred the professor from creeping into more damaging behaviors, such as withholding the option to write a non-policy analysis paper. In IR language, this is called brinksmanship - forcing a conflict to the threshold of confrontation to gain an advantageous negotiation position. Mills' substitution petition worked because he did not hold back.

635. Given that the professor gave him a legal letter, Mills thinks that a strongly worded legal threats is called for.

636. Given the professor broke FERPA and the Civil Rights Act, and Mills has no plan to break the law, Mills chooses to insult the professor. Insulting the professor is an acceptable risk.

637. First, the law and AU Policy says a single insult cannot be considered a violation. According to AU's policy, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a violation.

638. Second, Mills recalls that AU does not take insults seriously. When Mills reported the White-People-Are-Not-Free incident, the NNN-Political-Correctness-Rebellion incident, and the go-back-to-Wakonda incident, AU bent the rules to not even investigate.

639. Third, judging from the Dean Report, as long as Mills can insult the professor while plausibly deny an intention to do so, AU would not do anything. The professor denied that his singling Mills out had anything to do with Mills' race and ethnicity, and AU accepted his innocence at his words.

640. Therefore, Mills sends the professor the following email.

> I demand that you immediately stop having your acolytes harass me as a form of retaliation for complaining about your anti-Black racism. I demand that you immediately stop sending your lawyer FERPA protected emails that you have illegally obtained from SIS faculty. I demand that your lawyer stop harassing me and triggering my PTSD or I will sue you for 5 million dollars and enslave you like the Black people you hate so much.

> Fuck off back to Nazi Germany you piece of shit fucking shit. All I can say is that if you've been emotionally traumatized by anything that's happened, maybe you will have finally learned that you should treat Black people with respect instead of like subhumans.

641. Mills can plausibly deny that his referencing Nazi Germany is due to the professor's country of origin, modern Germany. Nazi is a common colloquial American insult for abusive and oppressive and/or racists. Modern Germany has nothing to do with Nazi Germany, which, in 2020, is an imaginary place. Telling such people to "fuck off back to

Nazi Germany" is fully in line with American social rules that applaud self-defense and hatred for racists.

642. As for "piece of shit fucking shit[,]" it is a reference to the professor's telling the class on the first day that all German are enthusiastic about scatology. If the professor can say that about all Germans, then Mills can make fun of him for making fun of all Germans.

643. After five days, and after threatening AU with litigation, the same lawyer of the professor's ghost-wrote a student conduct complaint against Mills. The lawyer claimed that Mills' Nazi insult is related to the professor's country of origin, modern German, that it coincides with the rumor in the 2018 botched investigation that he told students that his ancestors were in the Nazi party. His lawyer claims that, in modern Germany, calling someone a Nazi is a jailable criminal offense. His lawyer claims, by extension of that German law, that AU Discrimination Policy and American discrimination law should consider a German being called a Nazi an automatic discriminatory harassment. His lawyer also claims that Mills has been telling everyone he is a racist since the botched investigation, and that it is national-origin harassment because the Dean Report held that his actions were not severe enough to violate Discrimination Policy.

644. Other than ethnically motivated harassment, the professor is also accusing Mills of endangering his safety, misrepresentation, possessing or using false information, disorderly conduct, and retaliation for the 2018 investigation.

645. The professor's lawyer's arguments makes no sense.

646. Mills has never made a threat to anyone's physical safety. The professor presents no evidence of it.

647. Mills is not being a reverse-racist because Mills did not say that all Germans are Nazi, merely that the professor is a Nazi, or an oppressive racist. There is no social rule that a German who behaves like a Nazi is somehow exempt from being insulted as Nazi. AU policy and American law only forbids unwarranted insult, but the professor's behaviors give

Mills a just reason to humiliate him in self-defense, which American discrimination law calls protected activity.

648. Moreover, according to German state-media DW, calling someone a Nazi is not a jailable offense – especially if it political, polemical, or satire, rather than factual.[34] DW explains that the closest criminal offence is slander, under paragraph 185 of the German penal code, which only prohibits an insulting statement if it is heard by a third party.

649. Even if it is legal in Germany, there is no reason that an American should be subjected to German law or social rules in an American jurisdiction, not when the German foreigner is not respecting American social rules about racism. Otherwise, the U.S. would need to enforce every supposed foreign social rule for every foreigner here.

650. Mills calling the professor a Nazi is at most comparable to the professor singling him out as a bad student in class, which Dean Report said is not severe enough to violate AU Discrimination Policy. The professor is an adult who refuse to go to work because Mills told him what he is in an email. Mills went to work the day he received the botched Dean Report, after AUPD invaded his home and followed him around on campus.

651. With regard to Mills discussing the Dean Report, first, Mills never said the Dean Report held the professor responsible under AU policy. Second, whatever the Dean Report says, Mills has the freedom to dissent from a botched report. Third, the Dean Report says the professor committed racial microaggressions that made Mills extremely uncomfortable.

652. AU and the professor knew that whatever Mills said about the Dean Report could not support a conduct charge. Immediately after Mills received the Dean Report, Mills told the professor he will publicize the cover-up. The professor immediately reported Mills for conduct violation. But neither the Office of the Dean of Students nor the Office

---

[34] https://www.dw.com/en/is-it-illegal-to-call-someone-a-nazi/a-42313527

of the Provost would take his complaint. No one contacted Mills about the professor's complaint. Mills only found out that this happened years later from his FERPA records request.

653. These are exactly the defense Mills give to AU.

654. It is a miscalculation. Mills is not considering that AU, the former PD, the PD and a host of deans, directors and provosts hate his guts for the *Inside Higher Ed.* article; that his questioning of the 2018 cover-up threatens the President and the Civil Rights Provost's professional reputation; that his questioning of the 2019 welfare check threatens the Office of the Dean of Students and the responsible professors' job.

655. Mills is not considering how the implicated individuals have anticipated the risk he would pose and concluded that they share an interest in getting rid of Mills.

656. Most of all, Mills is not considering that they have broken the law and are willing to break the law again to conceal their improprieties once and for all.

657. Mills' insult gives Mills' enemies an opening to get rid of Mills.

658. However, AU can care less about Mills' defense. It made secret plans to rid itself of Mills before Mills' insult. Mills' insult only gave AU an opening to accelerates its plans. Stafford

659. When the professor files the complaint, Mills is trapped in a fog of war. He lacks experience with AU's tactics and does not know that he has a viable path to defend himself and avoid dismissal. By the time Mills figures out the full extent of AU's plans and found the evidence that AU hid that he needed, it was already too late.

### Section 5.    Internal Affairs

660. While the Office of Dean of Student is investigating Mills for insulting the 808 professor, Mills has alleged to AU that he was being retaliated against through a) the welfare check; b) the former PD leaking his FERPA email to the 808 professor; c) dog-whistle *Counter-Narrative* authors.

661. The welfare check presents a problem – too many employees across too many offices know too many things.

662. SIS leadership had frenziedly portrayed Mills as an active violent and insane threat who needed a welfare check and a criminal investigation. The purpose is to intimidate Mills from protesting SIS to its students. The Office of Dean of Students also went along with SIS, after Deputy Provost intervened. The entire leadership of the Office of the Dean of Students know and have documentary evidence of what SIS did. The office cannot legally destroy the evidence. If they investigate the professor's complaint, the truth may come out.

663. AU needed to segregate information, and to establish nominally independent work processes for each of the four investigations, even though its Discrimination Policy asks for eliminating duplicated effort.

664. AU's brilliant solution is to a) limit the most important investigation (welfare check) to one person AU trusts the most for internal affairs – the Deputy Provost, who is about to leave for a new job in Colorado; b) outsource the 808 professor's retaliatory complaint to maintain an appearance of neutrality.

665. The hit job goes to a professional outfit - D. Stafford and Associate - the premier higher education consulting firm specializing in compliance and misconduct response and investigation. For the right price, it will provide a school with fair, thorough, and impartial investigations that promise to rescue a school from actual or perceived conflict of interest in their internal investigation process. References from prior happy customers are available upon request.

### Section 6.    Dog-Whistle Counter-Narrative

666. An investigation into dog-whistle *Counter-Narrative* authors would have revealed that the former PD, the PD and the 808 professor were encouraging the authors to create hostile racial environment for Mills.

667. Mills was intimidated from pursing the complaint for several reasons.

668. First, AU was not playing by its own policy. AU Discrimination Policy designate one official to handle each type of complaint. Mills was making a "non-Title IX discrimination complaints [] against students[,]" the Designated Official for which is Dean of Students.

669. Yet, AU decided to task the investigation to the Designated Official for "[Resolving] Title IX complaints filed against students[.]" Mills was not making a sex discrimination claim. The official acted as if he cannot understand that Mills was not making a sex discrimination claim.

670. Second, the official is coincidentally a partner at a top national law firm, coincidentally moonshining for Mills' case.

671. Third, even though Mills gave him a detailed written complaint, the partner acted as if he needed Mills' support to know what to investigate. Mills knows the trick – Deputy Provost and the Investigator especially likes to pretend to investigate, as we explain below. An investigation will always turn up nothing, as long as the investigator is willing to pretend to be bad at the job: cannot understand the allegations, cannot understand the evidence found, do not know to ask follow-up questions, etc. It is a relative safe trick too – can the court really blame an investigator for being incompetent? Mills does not allocate time to play this game with another lawyer, because he has disability, and have other investigations to deal with.

Section 7.    FERPA Violation

672. AU needs to impede the investigation into the former PD giving Mills FERPA protected email to the 808 professor. The investigation would have established that the former PD was retaliating against Mills by feeding private information to the 808 professor, who was perfectly willing to serve this purpose.

673. AU Deputy Provost and Dean of Faculty is responsible for the investigation, with assistance from the Faculty Relations Investigator.

674. Mills has alleged that, because the 808 professor's lawyer wrote Mills a cease and desist letter that included a direct quote of a sentence from

Mills' 8/27 email to the former PD, it is likely that the former PD gave the email to the 808 professor. Because the email contained his mental health and academic information, the former PD and the 808 professor both violated FERPA and AU's FERPA policy.

675. The 808 professor had admitted to AUPD that the former PD broke privacy rules by even talking about the email with him. He was just surprised that the former PD believed that the threat to his safety was so great that breaking privacy was warranted.

676. For what she calls a thorough investigation, the Deputy Provost and the Investigator does not interview or collect evidence from either the former PD and the 808 professor.

677. Instead, she concludes that no FERPA violation had occurred for three reasons.

First, the Cease and Desist Letter contains no mental health or academic information. Instead, it relates to allegations you had made to [the former PD] about [the 808 professor]'s behavior and how he performed his duties as a faculty member.

Second, [the former PD] disclosed the allegations to [the 808 professor] based on a legitimate educational interest, which is an exception to the Confidentiality Policy. See Confidentiality Policy 'I/IV, p. 3. This exception applies because [the former PD] determined that [the 808 professor] needed to know about serious complaints related to how he performed his duties.

Third and finally, a transient email like this is not protected by the Confidentiality Policy's definition of student education records because individual emails are not "maintained" by the University and therefore not protected by the Confidentiality Policy.

678. To summarize, the Deputy Provost and the Investigator conclude that, first, because the sentence directly quoted in the cease and desist did not contain mental health and academic information, it is not a violation of FERPA for the former PD to give the 808 professor the email that contains Mills' mental health and academic information. Also, the former PD supervises how the 808 professor "performed his duties as a faculty member", even though the former PD was nominally

not his supervisor. Based on the position AU has taken here, we allege that the former PD is a supervisor, such that AU is responsible for her actions.

679. Second, even though the 808 professor no longer teaches Mills after summer 2018, he still have a legitimate educational interest in knowing what protected activities Mills were engaging in in opposing his discrimination in August 2019.

680. Third, although AU pays Google for commercial email service, Google is not AU's agent; therefore, AU is not maintaining the emails; Google is. Also, although modern emails can exist into perpetuity, they are nevertheless transient.

681. This sort of legal garbage is an insult to Mills' intelligence. It is also intimidation and humiliation of Mills, that AU can pervert federal law in civil rights proceedings as it wishes, and there is nothing Mills can do to stop AU.

Section 8.    Welfare Check

682. AU Deputy Provost and Dean of Faculty is responsible for the investigation into the PD, the former PD, and the 808 professor for retaliation. This is arguably the most important investigation to AU, because it and its employees illegally invaded Mills' home for the purpose of intimidating Mills from engaging in protected activities regarding SIS. AUPD also had no jurisdiction to operate in Mills' off-campus home.

683. Deputy Provost interviews Mills and agrees to receive evidence from Mills. But, it is patently clear that she had no real intention of investigating anything. She is more interested in knowing what Mills knew.

684. The following is the result of the Deputy Provost's "thorough" investigation regarding the PD.

> I do not find that a preponderance of the evidence supports the allegation that Professor Atzili acted in bad faith when he filed a CARE report about you. To the contrary, the evidence leads me to

conclude that a faculty member who received the type of emails you sent to Professor Atzili could reasonably have concluded that you might benefit from assistance. Under such circumstances, the decision to file a CARE report out of concern for a student so that the Dean of Students could reach out and provide assistance would be a reasonable and appropriate action.

In addition, Professor Atzili said he did not know how the University responded to CARE reports. He also said he did not know whether or when AUPD might go to a student's home in response to a CARE report. I found the responses Professor Atzili provided to me on this issue to be credible.

Accordingly, I do not find that a preponderance of the evidence supports the conclusion that Professor Atzili acted in bad faith and filed a CARE report so that AUPD would detain you and prevent you from attending a meeting with other students.

685. The following is the result of the Deputy Provost's "thorough" investigation regarding the former PD.

The preponderance of the evidence does not support your allegation that Professor Weiner filed a CARE report in bad faith and so that AUPD would detain you at your apartment and prevent you from meeting with your fellow Ph.D. students to discuss Professor Atzili's performance as Faculty Director.

When I interviewed Professor Weiner, she explained that she did not know whether or how the Dean of Students responded to CARE reports. She also said she was not aware whether the Dean of Students would contact AUPD in response to a CARE report or whether or not AUPD would take any action as a result.

She further stated that our conversation was the first she had heard that you, around the time she filed her CARE report, intended to meet with your fellow graduate students together for any purpose, including to discuss a vote of no confidence in Professor Atzili. Since she did not know about the planned Ph.D. student meeting (and planned vote of no confidence in Professor Atzili) until we spoke, she clearly was not motivated by concerns about this student meeting more than six months earlier when she filed the CARE report.

I found Professor Weiner credible. I do not think she was specifically aware how the Dean of Students responded to CARE reports or whether AUPD would be involved. I also do not believe she knew that you planned to meet with your fellow Ph.D. students. As a result, it is

not reasonable to conclude that she filed the CARE report so that AUPD would detain you and prevent you from attending a meeting with other students.

686. To summarize the Deputy Provost, the PD and the former PD's position, first:

They are not familiar with AU procedure for care reports by training and by immersion and does not know whether AUPD carries out welfare checks, despite her six-year tenure and his two-year tenure as the program director and despite, on information and belief, AU orders AUPD to carry out about 300 welfare checks every year;

They do not know what would happen when police or a school receive reports of suicide and violent threats by a Black man, despite growing up in the U.S. and despite their stated familiar with and interest in racial sensitivity [internal cite], common anti-Black tropes and U.S. racial dynamics;

They do not know that a common method of intimidating a black person is to take advantage of common anti-Black racial tropes and to exaggerate his or her mental health conditions and violent tendency;

They do not know that sending police to the home of a black person experiencing racial trauma and protesting racism would have an out-sized impact compared to sending police to another person.

687. Second, to rephrase the Deputy Provost's strange sentence construction, the former PD states that she did not know that Mills intended to meet with SIS students on 8/28/2019, or that there would be an SIS meeting on 8/28/2019 Wednesday afternoon.

688. The former PD knows that Wednesday afternoon is the only occasion during a week when SIS Ph.D. students and faculty congregate for one hour and a half. The former PD was the Ph.D. Program Director in SIS between 2012 and June 2018. Since Mills matriculated in August 2016, and until the PD took over in July 2018, she emailed SIS Ph.D. students and faculty about the topics for upcoming congregations on every Wednesday afternoons. She knows that if Mills wanted to speak in person to as many people in SIS as possible about institutional racism at SIS and a vote of no confidence regarding the PD, Mills would certainly choose to do so on Wednesday afternoon.

689. Even assuming that the former PD did not know Mills will protest on 8/28, she still could have made the Care Report to instigate a welfare check to deter Mills from attempting the protest in the future.

690. The Deputy Provost thinks the PD's Care Report was reasonable, compared to Mills' 8/27 email to him, despite his care report fails to mention any context or origin of their dispute [internal cite].

691. By contrast, the Deputy Provost takes no position on whether the former PD's Care Report was reasonable. compared to Mills' 8/27 email to her.

692. Both the PD and the former PD know more about the welfare check than what the Deputy Provost care to ask.

693. Even the Deputy Provost know more about the former PD's action then what the Deputy Provost disclosed in the report. [internal cite]

Section 9.    The Anatomy of SWATTING

694. If AU really investigated the welfare check, which Mills repeatedly demanded, it would surface that the PDs and the 808 professor were retaliating against Mills.

695. That is why, AU and its employees impeded Mills' effort to uncover records of the welfare check for as long as they could.

696. ADOS told him that he would "address" Mills' concern about the welfare check; then ADOS said Mills misunderstood him, that he only has the authority to pass along Mills feedback about the welfare check to AUPD, as if he works in customer service.

697. AU Discrimination Policy requires all employees except confidential sources to refer reports of discrimination and retaliation to designated civil rights official. No one does.

698. Mills tried to get records about the welfare check in September 2019. AUPD would not tell him anything. Mills keep calling until AUPD police chief agrees to give him the incident report about the welfare check, because, he says, AUPD policy requires the release of such reports to involved parties. However, he instructed the custodian to redact most

useful information first. When Mills asks for AUPD's written policy for redacting, he says it is an unwritten procedure.

699. The redacted report shows that AVP of Campus Life had called the AUPD police chief about Mills hours before the AVP's underling ADOS called AUPD emergency line and ordered the welfare check.

700. The unredacted report of the welfare check would show that AUPD officers were investigating an "off-campus criminal incident" and "conducting check on person" in relation to the 808 professor. It would show that on the same day, AU requested a skip tracing, investigative research and risk management report of Mills. It would show that, on the same day, either before or after the welfare check, AU Threat Assessment Team consisting of AUPD, Office of Campus Life met about Mills.

701. Because FERPA provide student access to educational records but specifically exclude law enforcement records, AUPD database becomes the best place to hide evidence that AU never want Mills to find, such as evidence indicating that the welfare check was actually a criminal investigation.

702. AUPD documents Mills obtained years later shows that the AU Threat Assessment Team's meeting on the same day as the welfare check are attended by the AU Office of General Counsel and the AUPD police chief.

703.  The KGB-esque meeting discussed current status of Mills based on a group reading of

current documentation of inappropriate behavior involving faculty member and other background material found in other media section of this report. The assessment concluded that there was no evidence of criminality in any of the document or behavior reviewed. There were no indicators of pathways to violence. His status should be monitored should his behavior change and this matter should be handled by the DOS.

704. Of course, AU has always had the documents that show how the welfare check unfolded. AU knows Mills is looking for the documents.

Assistant DOS giving him the three care reports was but the safest
records to release - a distraction.

Chronological Account of SWATTING

705. The following is a chronological account of the SWATTING based on
documents that Mills obtained from AU years later.

706. Mills emailed both PDs about his plan to protest the PD late afternoon
on 8/27/2019. On the same day, the former PD contacted the PD and
SIS Associate Dean about Mills' emails.

707. The former PD called the 808 professor's cellphone. She said she was
acutely concerned for the 808 professor's safety due to Mills' email.
While refusing to show or read the email to him because of FERPA, she
told him her interpretation of Mills' email:

that Mills planned a "campaign to destroy [you] professionally."

that Mills "might be considering harming [you;]"

that Mills suffers from "severe" "acute mental issues"

that Mills "is not in control [of himself] anymore."

708. Thereafter, the 808 professor called AUPD and MPD. He told AUPD that
he is "apparently being threatened" and "there is evidence of it"; that
there is a "frenzy" about his safety that warranted "break[ing] privacy".
He presumably told MPD the same thing.

709. The former PD sent a group email

August 28, 2019 9:42 AM

To: [SIS Associate Dean, the PD, AU Deputy Provost and Dean of
Faculty, Mills' academic adviser]

Subject: very disturbing email from a student

All: Below I am forwarding an email I received last night from SIS
PhD student Zach Mills. I know you are all familiar with him. I am
forwarding this email because in my history of communicating with
Zach, the email below conveys a sense of rage and instability that is
new and disturbing. The level of rage, the typos, and the language are
different and I worry about Zach but also people at AU that he may
come into contact with. I have replied to Zach and told him I'm

worried about him and asked him to seek counseling. I'm going to file a care network request. But I found this email so disturbing that I wanted to share it with you.

[forwarding Mills' 8/27 emails [internal citation]]

710. The PD described to Mills that the AU Deputy Provost and Dean of Faculty is the "captain of the ship" and the President is, by comparison, a figure head. [internal citation]

711. 5 minutes later, AU Deputy Provost involved SIS Dean and VP of Campus Life and Inclusive Excellence, and offered to involve Dean of Students and Assistant VP of Campus Life.

712. At 10:13, VP of Campus Life and Inclusive Excellence reports that

Thanks. DOS is aware and Traci is working with the team on next steps related to the case. So it is being looked into.

Thanks. Carol as you receive more emails be sure to forward on to Jeff and Traci.

713. At 10:14, SIS Associate Dean wrote to Dean of Students and Assistant VP of Campus Life.

Hello, it is the Senior Associate Dean in SIS. I'm sorry to bother you but we have an emergency situation with one of our students (Zach Mills).

Under separate cover I will be forwarding several troubling emails from Zach. These emails have gone to several faculty, including the assistant dean for graduate education and the PhD director. Faculty are worried about Zach, and in some cases their personal safety.

[VP of Campus Life and Inclusive Excellence] asked that I forward these emails. I asked 2 people to file care reports yesterday and I gather others have done so on their own.

Please let me know what else I can send you/info I can provide you.

[forwarding Mills' 8/20~27 emails to the PD]

714. SIS Associate Dean told Mills she was too busy with meetings for two business days around the welfare check and did not know what happened. Instead, during this time, she requested Mills' supervising professor, and other faculty members to forward her all Mills'

communications to them, which she then forward to the "team", in effect surveilling Mills.

715. Before noon, Mills' emails to both PDs about a vote-of-no-confidence had been forwarded to SIS Dean; SIS Associate Dean, AU Deputy Provost and Dean of Faculty, Dean of Students, Assistant VP of Campus Life, VP of Campus Life and Inclusive Excellence. Because Mills' email to the former PD about his plan to protest SIS was only half a page long, and because everyone on the working group devoted their day to coordinate a response to this sudden development, everyone must have realized that Mills' was planning to protest SIS, although everyone was careful not to write down what they were actually responding to.

716. SIS Dean advised the 808 professor that he should not leave his home, implying that Mills knew where he lived. SIS Dean also told him that if he comes to campus "you must tell us your location."

717. The AUPD corporal who received the 808 professor's police report was dubious because it sounded like the 808 professor is mixing up harm to his body with harm to his reputation. SIS Dean, SIS Associate Dean and Mills' academic adviser then met with the corporal to provide evidence and to persuade him to act on Mills. Due to the lack of probable cause or reasonable suspicion, the sergeant did not take action or contact Mills.

718. Assistant DOS is Black. He did not make the decision to initiate the welfare check, despite him telling Mills that he was the decision maker. He was the last to be forwarded Mills' email by his supervisor AVP of Campus Life. Nevertheless, he was the one who called AUPD emergency line and told AUPD that a faculty member reported that Mills had suicidal ideations. AVP of Campus Life had called AUPD police chief about Mills an hour prior to Williams' supposed decision making.

719. AUPD had no authority to refuse ADOS' instruction. ADOS did not ask for AUPD's opinion in whether to conduct the wellness check. AUPD also did not ask for details about what the faculty member reported. The only questions AUPD asked of ADOS is his name, phone number,

AU ID number, Mills' name, AU ID number, phone number, address, and current whereabout. ADOS asked AUPD to send a black officer out of concern for Mills' "mental health and his perception of bias"; that "apparently [Mills], when he mentions suicide cited it being due to racial trauma"; and that Mills "essentially is really just upset and says he is suffering from racial trauma."

720. An AUPD operator called MPD emergency line for assistance for an "welfare check" because Mills lived off-campus in his private home, where AUPD has no jurisdiction. AUPD confirmed that AUPD officers were in uniform and in a marked police vehicle. AUPD first told MPD Mills expressed "suicide ideation". When MPD asked AUPD where did the information come from, AUPD said that "the faculty member involved in the situation against [Mills] was the person who reported it because they did not feel safe and felt as though their lives were in." AUPD abruptly stopped. AUPD then told MPD that the faculty member's safety was not the reason for the welfare check, and that the real reasons was "the Dean of Students requested it. He intervened."

721. MPD was the first to arrive at Mills' home, which was a mile and a half away from the campus.

### Aftermath

722. As it turns out, Mills precisely grasped the anonymous message SIS sent with the welfare check: speak publicly about racism within SIS, then we will tell everyone you are insane, radical, angry and violent so no one will believe you. If you are not already insane, we will drive you insane - we will ostracize, isolate and monitor you. Then, AU's internal security apparatus will have the excuse to deal with you at school. If you are at home or off-campus, where AUPD has no jurisdiction, AU will borrow D.C. police's jurisdiction.

723. The brilliance of this tactic is plausible deniability - who would question if AUPD arrests, shoots or commits to mental institution an

insane and violent Black student who fantasizes about white supremacy?

724. Had the four investigations been carried out by the same investigator, and carried out thoroughly and fairly, it would have been clear that Mills' allegations are true.

725. In fact, even if one of the four investigations were conducted thoroughly and fairly, it would have severely interfered with AU's likelihood of success in other investigations.

726. Each AU office has limited manpower. Had the four investigations been carried out by the same AU office, Mills would have had a chance to match the office's manpower and use procedure rules to force the investigation into the right direction.

727. After Mills emailed all Ph.D. students about the SWATTING, AVP of Campus Life wrote the following email confirming that a group of AU and SIS leaders led a propaganda effort, in which, on information and belief, they told concerned students that the welfare check was fully justified and that they cannot explain more for privacy reasons, implying that Mills was an insane, angry, violent Black man.

   TO: SIS Dean, VP of Campus Life and Inclusive Excellence

   CC: SIS Associate Dean

   Forwarded to: Dean of Students, AUPD Chief

   September 4, 2019 4:36 PM

   Thank you for the call just now [SIS Dean]. Just wanted to keep the **group** updated that we discussed that you already shared with [the 808 professor] the appropriate response to his request for more information, and the DOS team is working directly on the conduct concerns with Zach.

   We also talked about me joining [SIS Dean] and [SIS Associate Dean] in a meeting with the doctoral students, which I think could be helpful to provide them with support and assurance. Look forward to building out details of that soon.

Section 10.   Reverse-Racism Hit Job[35]

728. Mills alleged that the 808 professor was retaliating against him.

729. The Deputy Provost concluded that the 808 professor did not.

730. A thorough investigation into the professor's retaliation against Mills would show that the professor has made criminal allegations about Mills to the police without reasonable suspicious.

731. It would reveal that the professor has threatened to cease working on campus, because Mills told him in the email that his retaliations has triggered Mills' PTSD.

732. It would reveal that the professor has sent the following email to AU Provost Daniel J. Myers, AUPD Police Chief Philip Morse, SIS Dean, SIS Associate Dean, SIS Associate Dean Rose Shinko, SIS Faculty President Aaron Boesenecker, and SIS Undergraduate Program Director Gina Lambright.

> According to a recent study published in the Journal of Psychiatric Research, "childhood and adult trauma and PTSD burden were highly associated with being a perpetrator of interpersonal violence." [Gillikin, C. et al. (2016). "Trauma Exposure and PTSD Symptoms Associate with Violence in Inner City Civilians." Journal of Psychiatric Research, 83: 1–7. DOI: 10.1016/j.jpsychires.2016.07.027]

> [I do not] know anything about his symptoms, co-conditions such as alcohol or drug abuse (which have been shown to significantly increase violent behavior by individuals with post-traumatic stress disorder), or his medical prognosis, I am acutely concerned that Mr. Mills could resort to physical violence. I am unclear about how an unarmed AUPD officer would be able to protect me in this case.

733. This is racist behavior in American social rules. New York's Amy Cooper was at least in the presence of a Black man walking his dog that she called the police on for no reason. The professor has ran into Mills once in the years after the policy analysis class. Mills even avoided him

---

[35] There is too much procedural and substantive errors in this section that such that we cannot finish in the time available. We will supplement.

then. Should Mills have reported the professor for telling the class that he has ongoing undiagnosed mental illness?

734. Moreover, Mills is not from the "Inner City." Other than the professor, no one who talk to Mills would conclude that Mills is from the "Inner City." Most Black people do not live in the "Inner City." The word itself is a dog whistle - or a polite way to say where N-words live.

735. As a scientist who uses statistics in every one of his published papers, the professor should know it is unscientific to extrapolate from Mills' race and ethnicity that Mills would commit a violent crime with this paper.

736. The "Inner City Violence" paper recruited participants for its survey in a downtown Atlanta hospital. The population characteristics of participants is categorically different than Mills. 90% of the population have not finished college. 70% are unemployed. 89% receive less than $24,000 income per year. The professor knows Mills does not fit these characteristics, and therefore has no predictive value regarding Mills.

737. The only population characteristics Mills share are race and ethnicity: 92% of the participants are Black.

738. Out of all the papers about whether PTSD causes interpersonal violence, the professor picks the "Inner City" one. The professor must believe race and ethnicity can predict behavior more so than education, income and employment can. He must believe race to be an intrinsic characteristics rather than a socially constructed categorization based on phenotypes.

739. It is unscientific for the professor to advocate predictive policing based on this paper. Setting aside the rigorousness of a study that gives $15 to participants in exchange for self-report their history of violence; setting aside whether this research design can be reproduced in another population segment; the paper finds that the change in PTSD diagnosis only explains 10.8% of the corresponding change in violent behaviors.

740. Given the limitation of the data, using the paper for its stated goal of advocating for more effective PTSD screening and treatment could waste public health funding, but at least it would presumably not harm Black people. Using the paper to deploy armed police, as the professor advocates, could end lives.

741. It is difficult to convict Mills if this email was found. None of the recipients report this as improper behavior, as the AU Discrimination Policy requires. Mills is denied access to this email in his defense against the professor's reverse-racism claim.

742. No one made a care report, whose stated goal is to help students in distress such as Mills. There is a culture of impunity for civil rights laws at AU's highest level.

Procedural Skullduggery

743. The Dean of Students is a loyal client of DSA and did everything to remain DSA's client. Mills' informs the DOS that he was very ill after reading the professor's complaint, threw up, and had a stress attack. Mills asks for disability accommodation because he could not even read the complaint. The DOS does not respond to the request for ten days. When the DOS get in touch with Mills, Mills realizes that he can contest the choice of the DSA as the investigator. The DOS tells Mills he should have contested the choice on the fifth day.

744. Mills gives the DOS AU's disability accommodation letter that says Mills has been approved for the accommodation of flexible deadlines. The DOS tells Mills that the letter is not retroactive.

745. [Mills being denied character witness]

746. Because none of the students witnesses were in the policy analysis course, or otherwise witnessed anything Mills did or say, other than Mills' written statements, they are character witnesses.

747. The DOS told Mills that character witness would not be considered. As a result, Mills did not submit his German-speaking grandparent as a character witness.

748. DSA conducted interviews of 11 of 12 witnesses prior to the stated deadline for Mills to submit questions for those witnesses. DSA denied Mills the opportunity to cross-examine the witnesses.

749. DSA determined that each and every witness and witness question Mills submitted to be irrelevant to the investigation, when the questions and witnesses are relevant to AU and many accepted witnesses' retaliation against Mills.

750. DSA refused to consider or investigate a question Mills presented to DSA: whether Esser's complaint was an retaliation against Mills. If Esser's complaint was an retaliation, DSA cannot reach a finding against Mills.

751. DSA's reasoning for refusing to address Mills' contention is that DSA has no power to initiate a complaint against Esser, which is irrelevant to the question Mills presented.

752. During the investigation, DSA condoned AU's suppression of evidence that supports Mills' case.

753. We will supplement the complaint with procedural problems with the investigation later.

754. We will also supplement why the Stafford Report is illegal and discriminatory.

Witnesses or Plants

755. To prevail, the professor needs to claim that Mills' insult has made going to work impossible for him. He needs witnesses.

756. The former PD and the PD are willing allies, because Mills is complaining that they acted improperly in the welfare check. The former PD had given the professor Mills' FERPA-protected email to help the professor threaten Mills about the IHE article. Both PDs had influenced the *Counter-Narrative* authors to propagate the professor's argument: that Mills could not handle the professor's academic rigor and respectful difference of opinion, and therefore made false accusations of the professor to gain special treatment.

757. For a conspirator such as the professor, it is always a smart insurance policy to make co-conspirators commit, lest they let him take the fall alone - gangs commonly have initiation ceremony for the same reason.

PD

758. The PD testifies that, for the 18 months that he worked with Mills, he had always advised Mills to let the professor's discrimination and the botched investigation go and focus on academics instead. He testifies that he refused to credit the case Mills presented about those issues, that he tried to be agnostic about whether the professor or Mills was right.

759. He testifies that Mills informed him via email of the rumor, that the professor was calling a white female professor mentally unstable for accusing him of sexual harassment. He testifies that he forwarded the email to SIS Associate Dean. To the best of Mills' knowledge, AU never investigated the rumor or contacted Mills about it. The investigator notes that it does not know of the report or any action the University took; the investigator considered the rumor to be outside the scope of the investigation.

760. In the same email, Mills also questioned whether the professor was propagating rumors about him and caused at least one professor to comment that Mills is famous, refuse to explain why, and thereafter cut off communication.

761. The PD does not testify to the fact that Mills simultaneously reported significant difficulty in studying for the comprehensive exam. He does not testify that he wrote multiple emails to Mills to not mention racism or his mental health problem in his petition for extension. He does not testify that he was trying to avoid written communication in his effort. He does not testify that, once Mills agreed to not mention racism or mental health, he contacted the decision makers to support Mills' petition. He testifies that he had gave Mills as much flexibility as possible.

762. The PD testifies that he did not know how to deal with Mills' complaint that the professor is propagating rumors about Mills that he is a lazy and incompetent student. He testifies that he has no power or responsibility to intervene unless AU does first.

763. The PD testifies that he initially believed Mills' complaint of the professor to be sincere. However, when Mills began complaining of his racism which he disagrees with, he changed his opinion and believes that Mills was lying about the professor.

### PD on Welfare check

764. The PD testifies that, when Mills emailed him in the days before the welfare check to complain about the botched investigation, he believes that Mills was fabricating a grievance about race, or race-baiting.

765. The PD testifies that he did not read the part of Mills' email about planning a vote-of-no-confidence of him. He testifies that the former PD alerted him to the plan on the day of the welfare check. He testifies that the former PD said Mills was rambling and being incoherent and that he is in danger from Mills. He testifies that he did not believe he was in danger, but his wife did, so he arranged security escort.

766. He testifies that he had no role in the decision to transfer his role as PD to the SIS Associate Dean.

767. He testifies that the professor is arrogant and quick to judge. He testifies that the professor had spoken to him about Mills and Mills' allegations about him.

### former PD

768. The former PD testifies that she has not heard the professor make any comment that could be perceived as racist.

769. The former PD testifies that, even before the welfare check, she regarded Mills' complaints about the professor to be false, that she regarded Mills as angry, aggressive and exaggerated, that she regarded Mills' racism complaints as attempts to gain special treatment.

770. Regardless, she testifies that Mills was open to her about the racism he experienced. She testifies that she did not share her rejection of Mills' view with Mills in the hope of remain close to Mills and thereby supporting Mills. She testifies that she always believes Mills' complaint to be his subjective belief that does not conform with her perception of the professor.

771. In line with her comment during the 2018 investigation that Mills' view of AU would depend on the finding, she testifies that Mills thinks AU is racist because the finding was not in his favor.

772. She testifies that the reason she feels safe from physical violence from Mills is that she did not live in D.C.

773. She testifies that Mills has attacked other students. She testifies that a female student who presented at an academic conference felt that everyone there perceived her as a racist due to Mills' allegations of anti-Black racism in SIS in the IHE article. She testifies Mills was making female students in the program vulnerable with the article.

Student Testimony

774. Because they authored or signed the Counter-Narrative that is consistent with the professor's argument [internal cite], the professor also requests eight SIS Ph.D. students and a graduate to testify. Six of them do testify.

775. Because the investigators keeps the student witnesses anonymous, Mills do not know who each witness is and could not effectively cross-examine their statements.

776. Student Witness 1 testifies that they know nothing about the dispute between the professor and Mills. They testify that the allegations in the IHE article are baseless, because the implicated professors had only encourage them; the investigator does not ask whether they know enough to testify to that, or what their personal experience can demonstrate about Mills' experience.

777. Student Witness 2 testifies that they do not know Mills personally and cannot question Mills' experience with discrimination. They testify that they have not personally experienced discrimination in SIS. They testify that the professor has made jokes to them about their ethnic origin but the professor did not intend it.

778. They testify that they are close to the professor and both PDs, who, except the former PD, told them that they are distressed because of Mills' complaints. They testify that it is unfair that Mills and the IHE article had accused the three professors. They testify in support of the PD's argument that SIS has tried its best to increase minority student enrollment.

779. Judging from their testimony, they are one of the four authors of the Counter-Narrative, who we identify as Student B. They are white and female. Both PDs acted improperly in approving her prospectus by waiving the requirement of an independent examination member.

780. Student Witness 3 testifies that they do not know Mills personally and Mills has always treated them with respect. They testify that they disagree with the IHE article, that they support professors liberally initiate welfare checks. They testify that many people worry about being accused of racism but they want to counter the article's allegations. They do not testify that they have information relevant to those allegations.

781. Judging from their testimony, we have some confidence that they are one of the four authors of the Counter-Narrative, who we identify as Student D. They are white and female. Contrary to SIS rules, barring abnormal circumstances that we do not know of, the PD allows her to remain in the program despite not having defended a prospectus by the end of her third academic year.

782. Student Witness 4 testifies that they has had little interaction with Mills. They testify that the professor is awkward and sometimes say inappropriate things unintentionally. They testify that, although they were not in Mills' policy analysis course, that only people like Mills

who was predisposed to take offense would be offended by the professor's comments to Mills.

783. They testify that they and other students met SIS Dean after the welfare check to discuss it. They testify that they do not know anything about the IHE article's allegation, beyond the article itself.

784. They testify in support of the PD's argument that SIS has tried its best to increase minority student enrollment. They testify that minority students do not feel included at AU but the problem is hardly unique among other universities and Ph.D. programs, and therefore SIS bears no responsibility for minority students feel excluded.

785. Student Witness 5 testify that they has not said more than hello with Mills. They testify that the professor has told his students that he was innocent. They testify that the professor has a sharp tongue and makes jokes that can be offensive if someone wanted to be offended. But, they testify that the professor does not intent harm and his statements do not strike them as racist.

786. Student Witness 6 testify that they have never met Mills. They testify that some unidentified faculty members have bent over backwards to help them with getting a Ph.D. They testify that they are upset that the IHE article would accuse SIS of anti-Black racism, because the article does not represent their experience. Judging from their testimony, they are not the only other Black student in the program.

787. They testify that they the professor does not move from his opinion in their multiple conversations about academic topics. They attribute the professor's stubbornness to his German origin.

### Jordan Tama

788. The professor also pulled in his friend - another professor who co-wrote the 808 syllabus, who did not witness the professor's behaviors in the policy analysis class.

789. After the 2018 investigation, Mills had emailed the friend whether the 808 syllabus required a policy analysis and whether the professor was

misrepresenting it. It was a simple, straight-forward question. The friend never replied.

790. Instead of giving the investigator Mills' email, the friend testifies that Mills had met him in person under false pretense. The friend accuses Mills of cooking up an intricate plan to trick him from making derogatory statements of the professor.

Malini

791. As a white man arguing about cultural insensitivity who the Dean Report has found to be culturally insensitive to Mills, and because Mills has criticized his racism from a critical race theory perspective, the professor wants to pull in a diverse face on his side, who can plausibly claim expertise in racial justice and critical theory and testify that Mills' insult crossed the line.

792. That expert witness is Professor Malini Ranganathan. She testifies that she is an immigrant, non-white female of southeast Asian origin and uses an anti-racist pedagogy. She testifies that Mills does not have an expertise in critical race theory but that Mills could engage her in discussions about her expertise.

793.  She testifies that her expertise and personal background let her understand the intricacies of implicit bias, which the Dean Report concludes as the reason the professor singled Mills out as a lazy or incompetent student on the first day of class. She testifies that the professor is not undermining minority student success.

794. She testifies that the professor has always respected her when they worked together in multiple context or when she asked him for professional advices.

795. She testifies that SIS fails to adequately admit and retain Black students and African students. She testifies that SIS is inadequate in being equal and inclusive to minority students, that Mills faced great difficulty in this environment. She testifies that she has went above and beyond to try to address these issues.

796. She testifies that she has not witnessed any allegedly offensive interaction between Mills and the professor. She testifies that Mills has never harassed her. However, she testifies that Mills has always accused other professors of racism, the veracity of which she cannot judge. She testifies that Mills has said that the professor is an actual member of the Nazi party and that the former PD is an actual member of the KKK where there is no evidence of their respective actual membership. As such, she testifies that Mills' insult is heinous and unacceptable in any social context.

Corporal Ballerini

797. To support his allegation that Mills endangered his safety, the professor requests an AUPD corporal to testify. The corporal testifies that the professor called him to complain Mills of defamation and harassment on the same day as the welfare check. According to the corporal, the professor said he was in fear for his life, and requested security escort to walk him to the parking lot, office and classrooms. The corporal testifies that the professor asked him for security assistance when the professor was publishing an academic article. That article is about racial inequality in D.C. for which the professor is a second-author and which has not been cited two years after publication.

798. The corporal testifies that SIS Dean and her employees had met and gave him information about Mills.

799. The corporal testify that he was asked to assess Mills' as a criminal but has found no probable cause or reasonable suspicion. As such, he did not try to contact Mills about the professor's criminal allegations over the last seven months.

Section 11.   Mills' Dismissal

800. AU Dean of Graduate Studies retaliated against Mills. She did not properly consider many factors that prevented Mills' inability to

152

produce a prospectus: lack of summer research; the PD and the Associate Dean's false allegations that Mills stole summer research grant; etc.

801. As to the hostile environment, retaliation and discrimination that prevented Mills from making academic progress, AU Dean of Graduate Studies refused to consider such factors on the basis that AU false investigations did not find Mills was subjected to hostile environment, retaliation and discrimination.

### Chapter F.   Evidence AU Hid

802. Mills fought AU for years to obtain his educational records under FERPA. For months, AU simply refused to acknowledge receipt of his requests. Then, Mills made an official complaint to the Department of Education. Even then, AU resisted the Department for months. Eventually, an attorney drafted a twenty-page legal letter replete with legalese, definitions and instruction. That finally convinced AU to release some of his educational records, a year after he was dismissed from AU.

803. AU's compliance with FERPA is either negligent or malicious, in violation of the False Claims Act. We plan to petition the Department of Justice to file a False Claims Act claim regarding AU's false promises to the federal government to comply with FERPA and the Civil Rights Act in exchange for federal funding. If the DOJ refuses to prosecute, we plan to prosecute the claim in the DOJ's place.

### Section 1.    About the 2018 Botched Investigation

804. Among the records AU gives up, Mills finds an Investigator Report about the botch investigation into the 808 professor's discrimination. It contains the meat of the information gathered during the investigation. Dean Report is a filtered summary of Investigator Report.

805. Mills did not know it existed. Dean Report gave no hint that Investigator Report existed. Neither did AU's policies, website or any

communications. Without knowing about its existence, Mills could not have exercised diligence to obtain it.

806. Investigator Report makes it clear that Investigator made numerous mistakes in investigating and fact-finding, despite having strong experience in prosecuting cultural insensitivity and her certification as a civil rights investigator. She failed to follow up with Mills. She failed to allow Mills to respond to the professor's false statements and evidence. She failed to draw obvious connections from the evidence she did gather. She reached the wrong conclusion.

807. The Investigative Report contains the professor testimony. The primary theme of his testimony was that he was not biased against Mills, but that Mills was a weak student in terms of form and content, in marked contrast with the rest of the cohort.

808. To support that theme, before the Investigator presented specific complaints from Mills, the professor volunteered the following comments, to prove that Mills was a terrible student.

809. First, during the family emergency, Mills did not reply to the his emails until the PD conveyed his message to Mills: that Mills would fail if Mills does not reply. In reality, Mills replied to him before being asked to; unlike he promised, he did not inform the PD when Mills contacted him.

810. Second, he suggested the option of Incomplete to Mills first.

811. Third, in their third meeting, he told Mills that his first two assignments were passable. He told Mills the primary problem with his work is bad writing.

812. Fourth, That Mills had called quantitative research methodology "voodoo" in class.

813. These statements are false. The Investigator obtained evidence that showed that these statements are false for 1 (internal cite), 2 (internal cite). The investigator did not find 2 significant.

814. The investigator could have followed up with Mills, who would have refuted 3 (internal cite) and 4.

Mills did not say "voodoo".

815. The class was discussing an article the professor assigned that criticizes Supreme Court justices for being allergic to mathematics in Gill v. Whitford, 138 S. Ct. 1916 (2018).

816. Several justices had reservations about complex metrics that purport to objectively measure gerrymandering bias.

817. While the justices called the metrics "gobbledygook," "baloney" and "hazardous enterprise," Mills did not call it "voodoo." Mills defended the justices, that the public and judges cannot understand complex metrics; that metrics can be manipulated; and that adopting the metrics would give experts the final say instead of judges.

818. Instead of relaying the substance of Mills' opinion to the Investigator, the professor said Mills made a facetious joke and called an entire methodology "voodoo." He said he called Mills out for lacking critical thinking in the class. He guessed that Mills had complained about this event to the Investigator because, by his own reflection, he was harsh on Mills; he then ventured to guess that Mills took his criticism harder than he intended to be. Mills had not reported this event.

819. As context, while Black freed slaves in Jim Crow South did practice Voudou, it had little to do with the vicious trope invented by white newspapers to justify Jim Crow. According to the trope, freed slaves elect Black leaders to perform mind-control on white politicians; they recruit white women in midnight orgies, and have them raving, frothing at the mouth and worshiping human sacrifice and cannibalism. The trope has persisted in popular culture in U.S. and Europe.

820. Over the next years, the professor would go on to spread a rumor that Mills lashed out when he respectfully challenged Mills' academic opinions. The dog-whistle authors will repeat the rumor.

Non-Policy Analysis Paper

821. Other than hostile environment, Mills' most severe allegation was that the professor withheld the alternative of writing a non-policy analysis paper from Mills.

822. The Investigator Report shows that the professor proposed two conflicting explanation as to why Mills was the only person did not know about the easier option. These two explanations differ from what he told Mills.

823. During the interview, before the Investigator specifically asked about the alternative, the professor did not mention it. Instead, he said he allowed Mills every flexibility, such as suggesting to Mills that he can take an Incomplete.

824. Then, the Investigator presented the following allegations from Mills:

> He was held to standards that non-black students were not. He was not told about a most important change to the syllabus: a required paper originally was required to focus on policy analysis, but the professor had decided that it   only had to be a publishable manuscript.

> The professor did not communicate this change through Blackboard, as was his habit.

> On other occasions, Esser sent out emails about syllabus changes. Yet, the professor did not send out an email.

> He had to find out about this change from another student.

> He had had several meetings with the professor during the relevant time period and at no point was he informed by the professor about the syllabus change.

825. In response, the professor testified that he had mentioned the change during several lectures. He noted that because Mills had missed so many classes, he could not say whether Mills was aware of the change.

826. Let us briefly assume that the professor was testifying that he announced the change in class in November, because Mills has evidence that he attended all lectures prior to November. During their second meeting on October 30, the professor instructed Mills to propose a new policy analysis paper. Although he then asked for an extension, Mills

did not inform the professor that he intend to ignore the instruction and write a non-policy analysis paper. In fact, Mills said he was having difficulty with the policy analysis paper. The professor also knew Mills' difficulty because he rejected Mills' policy analysis paper proposal on October 30.

827. Knowing that Mills was having difficulty with proposing an acceptable policy analysis topic, it would make sense for the professor to inform Mills of an easier alternative. The professor never did that, until Mills learned it from other students and confronted the professor.

828. On the other hand, if we assume that the professor was testifying that he announced the change in class before November, then he would need to explain why he gave Mills the opposite instruction on October 30.

829. Furthermore, this assumption conflict with what the professor told Mills during their third meeting, which the Investigator would have known if she followed up with Mills. [internal citation]

830. Other than false facts, the professor also offered three excuses.

831. First, the professor stated that he needed not tell Mills because the paper was due at the end of the semester.

832. Second, without being accused that he had removed Mills from the class email list, he volunteered that he did not violate AU rules in doing exactly that after Mills applied for Incomplete.

833. Third, the professor volunteered his belief that, even if his failure to inform Mills was improper, since Mills did not start working on the paper, his failure did not cause harm because he told Mills in their third meeting in January.

834. All of these excuses were nonsensical. They may be how the professor justified his improper actions to himself.

835. First, just because an assignment is due at the end of the semester, it does not follow that a student does not need to be informed of a relevant change before the deadline.

836. Second, no AU rules required the professor to remove Mills from the class email list. Although Mills had asked for an Incomplete, was it not better to keep Mills in the loop? There was no cost to do so. Why did he made an effort to remove Mills? Did the professor remove Mills because subsequent class emails mention the easier alternative? We could not find out because the investigator did not collect that evidence.

837. Third, this excuse assumes that Mills would not have worked on the paper between granting the Incomplete and their meeting in January. Whether the professor negligently forgot to tell Mills or maliciously decided not to tell Mills about the alternative, when he did so, he did not know 1) whether Mills will work on the paper before their next meeting 2) whether a lowering of difficulty will allow Mills to write the paper. In other words, for this excuse make sense, that the professor did not prejudice Mills, the professor must prove that, even if he had told Mills, Mills would not have attempted to write a non-policy analysis paper. The professor might have persuaded himself that Mills is lazy, incompetent and deserve discipline, but he will not be able to persuade other people of that.

838. Moreover, as he told the investigator and the professor, Mills only decided to not work on the paper because the professor had falsely promised him 18 months to work on the paper. Here, the professor was trying to take advantage of one of his misconducts to justify another.

839. Perhaps realizing that he had inadvertently revealed his misconduct, a week later, the professor emailed the Investigator a different explanation, that he announced the alternative in an updated syllabus on October 30th. The professor also gave the Investigator that particular syllabus, which did allow non-policy analysis paper. The professor argued that Mills should know about the alternative and that he forgot about this version during the interview. Dean Report credited this version of event and cleared the professor of misconduct.

840. It is illogical to credit this version of event from the professor.

158

841. First, Mills met with the professor on October 30. He instructed Mills to read more book and write another literature review in order to propose a policy analysis paper. It does not make sense that, on the same day, the professor had both changed the syllabus to allow non-policy analysis paper AND instructed Mills otherwise.

842. Second, as Mills noted to the investigator, the professor frequently made minor and major changes to the syllabus and obsessively communicated the changes in writing. When he made changes, the professor always either 1) writes a separate email explaining the changes; 2) tell the student the page number where the changes are; and/or 3) highlights the changes.

843. The professor's usual practice of frequent minor changes and pointing out even minor changes led students to not read the 8 page document word for word after each change. Students only paid attention to the changes he pointed out. In fact, after that semester, one student told Mills that they thought the alternative was never reflected in the syllabus.

844. For the October 30 syllabus, the professor did not point out the option to write non-policy analysis to students. The professor had emailed the class about the update. Mills read the email. The email only noted other minor updates, not that students can now write non-policy analysis paper, which is by far the most important change of the semester. The email told students which pages of the syllabus was changed, but did not mention the page number where the alternative is. The alternative was not highlighted on the syllabus.

845. As such, if the professor really forgot to point out the change, it would be a negligent professional misconduct that prejudiced Mills.

846. Third, while the professor did not inform the investigator of his practice of pointing out changes in various email, Mills did.

847. Within the FERPA records about the investigation Mills recently obtained, the October 30 syllabus is a black and white copy that does not display highlights. It is unclear whether 1) the professor gave a

black and white copy to the investigator to mislead her, 2) the
investigator printed a black and white copy and overlooked the fact
that the alternative was not highlighted, or 3) the investigator used a
color copy for investigation and ignored the fact that the alternative
was not highlighted.

848. In every scenario, the professor misled the Investigator. In every
scenario, the Investigator should have concluded from the evidence she
did gather that the professor misled her; or she should have followed
up with Mills, which would have led her to discover that he misled her.

849. Instead of finding the facts, Dean Report told Mills that

[Regarding the non-policy analysis paper, the Professor] clarified in
class what the syllabus already indicated about the final paper (i.e.
that it does not have to be a policy analysis). This was not a change to
the syllabus and so an email updating the syllabus was not necessary.

850. The Investigator also had at least two versions of the syllabus. The 8/17
syllabus requires policy analysis paper. The 10/30 syllabus allows non-
policy analysis paper. It is illogical if not misleading for Dean Report to
say that the syllabus was never changed. Given the evidence available
to the investigation and assuming its findings were accurate, had the
Dean Report try to accurately inform Mills of the facts, the Dean Report
would have included the following alterations.

[While the 8/17 syllabus required policy analysis paper, the 10/30
syllabus allowed non-policy analysis paper. The 10/30 syllabus was
ambiguous as to whether non-policy papers were allowed. Therefore,
after 10/30, the professor needed to] clarified in class what the
[10/30] syllabus already indicated about the final paper (i.e. that it
does not have to be a policy analysis). [A professor only need to
inform students of a syllabus change in writing, not necessary
clarifications.] This [subsequent clarification] was not a change to the
[10/30] syllabus and so an email updating the syllabus was not
necessary.

[We now discuss whether the professor should have point out the
change between the 8/17 syllabus and the 10/30 syllabus to you. We
note that the professor has a habit of communicating syllabus
changes even if they were minute and even if all students were

present when a change was announced. We further note that, when the professor communicated such changes, he always 1) writes a separate email explaining the changes; 2) tells the student the page numbers where the changes are made; and/or 3) highlights the changes. While updating the 8/17 syllabus with the 10/30 syllabus, as usual, the professor emphasized other minute changes therein. It was extraordinary that he did not emphasize the lowering of difficulty of the final paper, which was the most important change in the semester.

Nevertheless, the professor did not make a mistake in not emphasizing to you the change about non-policy analysis paper. He had no obligation to ensure you are aware of the changes. Reading every word of every syllabus posted on the class website was your responsibility, even though they are about 100 pages, combined. The professor emphasizing other syllabus changes were a courtesy. You should not have relied on the professor's habit.

Regarding the fact that the professor instructed you to propose a new policy analysis paper during your 10/30 meeting with him about the paper, we find it irrelevant. You should not rely on what the professor tells you in-person over written documents. First, a professor might forget to inform you. Second, a professor perhaps did not feel the need to tell you what he also posts on class website. In any event, the written syllabus is the official standard. Please abide by the syllabus, even if your professor instructed otherwise.

In addition, we point out that you stopped attending lectures in November and missed the clarification. Had you continued to attend the lectures, you would have been in class when the professor subsequently clarified the 10/30 syllabus.

Regarding the fact that the professor allowed two white female students to write non-policy analysis paper about one month before the 10/30 syllabus, while you were in Arizona  and while repeatedly request you to write a policy analysis paper, we find it irrelevant. When a professor lowers the class difficulty for some students, he does not need to lower it for others. Even if the professor should have informed you, the professor did so on 10/30. The one-month delay is not significant during a 3.5 months semester, even considering you were dealing with a real family emergency and had trouble proposing a topic.]

"The Truth"

851. Evidence in the Investigative Report suggests that the professor's first reaction when Mills confronted him about the alternative is the most likely version.

852. The professor's first response was that he did not inform Mills of the alternative because Mills did not "hang in there". The professor was referring either to Mills' stopped attending lectures or requesting an extension beyond the semester, or both. As soon as the professor said it, he realized that withholding the alternative was unethical and prejudiced Mills. This was their third meeting.

853. Here is a chronology, assuming this version is true.

854. The professor failed to teach the class how to write a policy analysis paper. Other students wanted to abandon the learning goal. When students were submitting assignment 1 (abstract), 2 (methodology) and 3 (literature review), in Mills' absence, other students, separately or collectively, asked the professor to accept their assignments which proposes non-policy analysis papers. The professor granted their requests in Mills' absence. According to the professor, only one out of eight students submitted a paper with a component of policy analysis.

855. While Mills was busy handling his family emergency, he did not reply to two emails from the professor asking him to submit assignments. Although Mills had attended every lecture, the professor repeatedly complained to the program director that Mills is absent. The professor also told her that he senses that Mills' family emergency is not the only reason for Mills' silence.

856. After Mills returned on 10/12, he submitted Assignment 1 and 2 and a brief draft of Assignment 3 on 10/26, one day after original deadline of Assignment 3. He proposed several policy analysis paper. They met about the paper on 10/25 and 10/30. The professor gave very negative reviews. He said Mills' research design was unscientific, cannot be improved, and asked Mills to start over.

857. Six weeks remained in the semester. Mills stopped attending lectures. The professor first questioning the legitimacy of Mills' family

emergency and then calling his proposal scientifically invalid and descriptive[36]. It made Mills uncomfortable being in the same room.

858. In any event, it was a calculated risk for Mills. The lectures also did not teach Mills how to write the paper. Deduction for absences is limited to 5% of final grade. The professor had praised his prior consistent and exceptional class participation.

859. Mills also decided to ask for an Incomplete because of the family emergency and because it became impossible for Mills start a paper from scratch that the syllabus said should take 14 weeks.

860. Five days later, on 11/21, the professor wrote an email and agreed warmly. He gave Mills an average of B on completed grade components. He told Mills that he had at least 18 months to finish the paper. He asked Mills to propose a timeline of completion in six months.

861. The professor immediately forwarded his email to the program director[37], adding only "FYI, as discussed. [Nota Bene, or particularly important]: No action by him by the end of April 2018 will result in an F."

862. The email suggests that the professor had complained to the PD about Mills' request, and argued that Mills should receive an F. She had instructed him to grant the request because AU regulations allow such an extension due to family emergency. The professor needed to show her that he complied with her instruction, but protested that he has not ruled out failing Mills.

863. The professor also removed Mills from the course's email list.

864. Mills did not reply to the professor's 11/21 email. 20 days later, the professor wrote to the PD.

> P: As I finalize the grade for 808, I realize that Mills has not replied to my 11/21 email. Revised AU regulations requires that I assign a

---

[36] "Descriptive", or lacking in theorization, is the worst insult a Ph.D. can hurl at another.

[37] This is the former PD.

default grade[38] and it cannot be an F. But, in his case, it would have to be. What's your advice?

865. PD:

Reading your 11/21 email to Mills, it is unclear to me why you needed him to respond. You gave him the terms of the Incomplete. You do not ask for a timeline until April. I do not understand why you were expecting to hear from him. What am I missing?

866. Professor:

I think it is normal to acknowledge an email like this because agreeing to Incomplete adds a lot of work to my plate. In fact, letting him fail the course would probably be worth doing for the teachable moment it entails.

867. After his third meeting with Mills on 1/26, professor wrote to former PD:

[I met Mills during office hour. It was supposed to be 20 minutes; Mills left after 85 minutes. He sent me a nice thank-you note that evening.]

I maintain that he will struggle when trying to come up with a prospectus as he has virtually no understanding of what knowledge creation at the doctoral level entails. I am committed to helping him got a non-failing grade for what he hopefully produces by early May, but I am struck by the parallels with [John Doe]'s case - as you know, I remain convinced that Bin won't come up with anything, because Bin has no idea what be is actually researching.

I took an hour to explain to him that merely finding something "interesting"[39] (his words) is insufficient as a 'case selection rational [sic]'." My broader concern here is that his first response was that "ethnographic research doesn't need a rationale. It is about going out there and discovering things that are interesting."

Who (if anyone) tells them this? It's not what Geertz says. Or Ferguson. Or Scott. Or Scheper-Hughes. Or anyone else in anthro whose work is influential.

---

[38] A student granted an Incomplete must sign a contract with the responsible professor that outlines a default grades - which the student would receive if they do not fulfill all conditions in the contract.

[39] Mills never said so. He said his case selection rationale is data availability.

[I alluded to you about these problems when we met last week.]

868. This email makes clear that the professor sees his academic view as vastly superior to that of Mills based on their difference of opinion on methodology.

869. The professor did not mention to his supervisor that he withheld the non-policy analysis paper option from Mills.

870. When Mills had to ask the professor for an extension to 7/1 due to the professor's mistake about AU regulations, the professor had a conversation with the PD and Mills' academic adviser.

871. Professor: I am not willing to review Mills' work over the summer under a 7/1 deadline. I can do 11/1.

872. Academic Advisor: We do not have that power. We would have to get approval upstairs from AU. I do not think they will agree on Mills' reasons.[40]

873. Program Director: Professor, what rationale can you provide to support the extension?

874. Professor:

First, I have serious doubts as to whether he would be able to write anything passable over the coming months. I understand that he has been facing major personal challenges. For him to write something viable by July 1st, he would need to start now. I do not get the sense that he is able to do so.

Second, I am unwilling to carve time out of my summer months to engage in what will be a six-step process. His record suggests that substantial handholding will be required. I am happy to do this -- as I would have in F17 -- during the semester, but not when I am not formally under contract.[41]

875. The professor then told Mills that:

I am fine with an extension, not least because I gave you a wrong deadline. But, I will not agree to a 7/1 deadline. I would need to review your work and comment in detail. I will not do that when I am

---

[40] Again, the professor necessitated this extension.

[41] According to AU Faculty Manual, all AU professors are expected to be available to Ph.D. students over the summer.

under contract in the summer. I will agree to a 11/1 deadline. You just
need to get the program director and your academic adviser to agree.

876. Having offloaded the problem he created to them in the email, the
professor then forwarded the email to the program director and Mills'
academic adviser to show them that he has offloaded the problem.

877. The PD:

An extension to 11/1 is difficult. I will need to argue a rationale that
you do not believe you need to work during the summer, even in
exceptional circumstances. You may quibble but this is how it will be
received. I also have to argue that extension to 11/1 will impact Mills'
ability to defend their prospectus.

878. The professor's reply:

I am sorry to put you in this position.

Zach ranks among the most irresponsible and immature doctoral
students I have come across in a decade. I am not going to waste
parts of my summer on him. l would consider doing so for others, but
he has a record of bailing out, and frankly I have very little
confidence in his ability to complete the program and graduate. He
has overstretched my patience.

As for how this might affect his progress, I do not think that he will
produce a prospectus this summer - or anytime in the foreseeable
future, for that matter. He is nowhere near anything that would be
defensible.

Again, I am sorry (for you, not for him) -- but I am done with this. It's
November 1st or end of this semester. I have more deserving projects
to work on over the summer.

879. The professor's pettiness and vindictiveness against Mills was so strong
that he was willing to argue against his supervisor, to refuse to work
when he should, to appear ridiculous to AU leadership, just so that he
did not need to waste time on Mills over the summer. For a problem he
created, the professor was also willing to leave Mills with the risk that
AU leadership would not approve the extension, which would result in
Mills failing the class, having to retake the professor's class, and delay
his prospectus defense.

880. The professor's pettiness and vindictiveness should have alerted to Investigator that he deliberately withheld the option to write a non-policy analysis paper from Mills. His derisive view of Mills' academic potential and his view that Mills is a waste of his time are consistent with him making light of failing Mills, ending a student's academic future.

### Chapter G.   Epilogue

On Whether Critical Race Theory Hurts the U.S.

881. Scholars call this social phenomenon White Supremacy—the subjugation of racial minorities to a white social order.

882. As Mills' story demonstrates, White Supremacy inevitably leads the United States to lose out on the contributions that too many Black people would have made if they had an equal opportunity at success.

883. It is not a net gain for white people. Partaking in the unholy cult of White Supremacy causes white people to lose their humanity—manifestations of which have been termed White Rage and White Guilt. Because White Supremacy is an immoral order, it only pushes immoral people to the top while leaving all others to cope.

884. Black people are an ethnic minority group of Americans with full American citizenship since the 19th century. They have only known America as their home for hundreds of years. White Supremacy has driven some of them to seek another legal or even political arrangement. One body of these ideas is commonly referred to as critical race theory, whose methodology informs this complaint.

885. A mentor of Mills, after reading Mills' paper that apply critical race theory to international relations, tried to persuade Mills to deracialize his theory. After Mills insisted that race was central to his theory, the mentor secretly became the chief proponent of getting rid of Mills. When an opportunity presented itself, the mentor reported Mills as an insane Black Identity Extremist and a threat to campus and tells the discriminating professor Mills is a threat to his safety. The mentor is

no doubt a patriot and probably equated suppression of Mills' theory and critical race theory with safeguarding the U.S. interest.

886. We argue that the mentor was misguided. It is enticing to despise and repress a theory that calls for a fundamental change to a majority group's established social order and international order. However, the nature of ideas is such that they cannot be eliminated. An idea will become more powerful as reality proves its relevance, explanative power, and validity. As a historical example, although Romans killed Jesus, his teachings and beliefs survived the Roman empire to become a religion.

887. Chairman of the U.S. Joint Chiefs of Staff General Mark A. Milley is the nation's highest-ranking military officer and serves as the principal military advisor to the President, Secretary of Defense, and National Security Council. In response to Republican Rep. Matt Gaetz's criticism that the U.S. military is teaching critical race theory and removing a decorated officer who opposed it, Gen. Milley testified to the U.S. Congress as follows:

> I do think it is important for those of us in uniform, to be open-minded and be widely read. And the United States Military Academy is an university.

> I want to understand White Rage. I'm white, and I want to understand it. What is it that caused thousands of people to assault this building and try to overturn the Constitution of the United States of America? What caused that? I want to find that out. I want to maintain an open mind here, and I do want to analyze it.

> It's important that we understand that because our soldiers, sailors, airmen, marines, and guardians, they come from the American people. So, it is important that the leaders, now, and in the future, do understand it.

> I've read Mao Zedong. I've read Karl Marx. I've read Lenin. That doesn't make me a communist.

What is wrong with having some situational understanding about the country for which we are here to defend?

And I personally find it offensive that we are accusing the United States military, our general officers, our commissioned and non-commissioned officers of being "woke" or something else because we're studying some existing theories.

[Critical race theory] was started at Harvard Law School years ago. And it proposed that there were laws, prior to the Civil War, that led to a power differential with African Americans that were three quarters of a human being. And then we had a Civil War and Emancipation Proclamation to change it. And we brought it up to the Civil Rights Act of 1964. It took another hundred years to change that. So look, I do want to know … and it matters to our military and the discipline and cohesion of this military.

https://youtu.be/oz7yDU1FmJQ (abbreviated)

888. Gen. Milley testified to three simple ideas. First, it is foolish for a country to bury its head in the sand to an idea, because an idea can be learned and used by a foreign country. Second, an idea, once learned, can be used for one's own utility. Third, it is a leader's job to learn and utilize even an apparently hostile idea, so that the leader knows how to react to it.

889. It does the U.S. no favor when the New York Times in May 2022 describes "hundreds of Ukrainian fighters were taken by bus to Russian-controlled territory" as "being evacuated," because every foreign country knows they surrendered. Denying the reality only serves to delegitimize the policy maker, if not driving the country into a ditch it blinded itself to.

890. Critical race theory, on the surface, is an idea hostile to status-quo U.S. interests. It legitimizes Native American's sovereign claims and faults the U.S. government for segregating Black people in urban areas that could best be described as internal colonies after Reconstruction failed. Moreover, critical race theory interprets the so-called Liberal

International Order led by the U.S. as a hierarchical order built on White Supremacy.

891. It is a common view in the Middle East, Africa, and South America that white European countries and America, through neoliberal and neocolonial practices, continue to dominate an outdated and glaringly racialized international order.

892. This line of argument holds immense power in many low-to-middle income non-white countries because it explains their "underdevelopment," which began with colonization by white European countries, which continues after they gained independence despite receiving massive official and private aids from white countries.

893. Many academics argue that Russia and China, while still participants in the Liberal International Order, have long prepared for and may be constructing a new world order predicated on the belief that the U.S. and Europe should no longer dominate other countries or the international system.

894. China has engaged in diplomatic efforts and economic development partnerships with non-white countries around the world for decades and has won massive popularity with these states, the leaders of which often describe China's international leadership style as much more palatable to their populations, their social-political situations, and their development assistance needs. With massive productivity and advanced technology, many countries view China as a practical alternative to American hegemonic international order. As an example, after the U.S. blocked Russia from the American financial network as a sanction for invading Ukraine, Russia quickly negotiated the use of Chinese financial institutions and signed a historical energy deal that further immunizes Russia from U.S. sanctions. So far, the status-quo U.S. foreign policy establishment's Ukraine strategy produced negative domestic outcomes: extreme inflation, widespread economic hardship, 70% disapproval of the direction America is headed in. On top of that,

the Russian Ruble has more than rebounded from U.S. sanctions to pre-invasion of Ukraine level.

895. If and when this alternative worldview gains enough traction in the world to displace, and eventually replace the Liberal International Order, the U.S. and Europe could become extremely isolated. The U.S. could see massive pushback against its Monroe-Doctrine sphere-of-influence policy within Central and South America. Mills' research has touched on these issues in the context of Bolivia and the socialist movement of former Bolivian president Evo Morales.

896. Critical race theory proposes that U.S. foreign policy and U.S. domestic policy both originate from White Supremacy, and therefore evidence of domestic White Supremacy can prove that the U.S. government practices White Supremacy foreign policy. The U.S. has repeatedly engaged in self-interested unilateral actions that easily lend to the perception that the U.S. foreign policy upholds White Supremacy.

897. The world observes how non-white U.S. citizens are treated as second-class human beings despite a stated commitment to non-white full citizenship in the 14th Amendment. From this starting point, it is not difficult to conclude that the U.S. also treats foreign non-white peoples as second-class human beings whose interests and human rights can be violated on a whim despite its stated commitment to human equality since World War I. Contrast the treatment of Haitian migrants and Ukrainian migrants at the U.S.-Mexico border. Black Haitians are whipped by armed men on horseback; White Ukrainians are immediately admitted.

898. From an international relations standpoint, it does not make sense for a country to preserve a solvable domestic social division that foreign countries or adversaries can readily exploit.

899. Hypothetically, what if China or Russia were to endow $300 million to its own legal advocacy group in the U.S. with a stated goal of securing landmark legal victories for non-white historically oppressed racial minority groups? If various critical U.S. institutions such as American

171

University, the Council on Foreign Relations, and Google remain plagued with institutional racism, will the U.S. courts turn a blind eye when a foreign civil rights advocacy group presents those wrongdoings? It would be a PR nightmare. What if someone like Mills in such critical institutions cannot get justice other than from a foreign government?

900. Or, what if the money went to an educational or housing program for racial minorities? Or a financial institution for the economic prosperity of U.S. racial minorities? It would severely undermine U.S. morale and national unity. It would reduce the U.S. government's freedom of action in many foreign policy arenas.

901. The U.S. investment in dividing Uyghurs and Tibetans from China has seen little success because China provides prosperity and dignity to those populations. Just the same, if the U.S. provides prosperity and dignity for Black and Native Americans, it would be impossible for foreign countries to sow division here. In this view, critical race theory may be exactly what America needs for its national security.

902. For its part, China is expanding education, infrastructure and health care to its poorest populations so that they can be a productive of the national market. By comparison, the U.S., under White Supremacy, continues to deprive its poorest populations - racial minorities - of education and economic opportunity.

903. Top U.S. universities such as American University complain that they cannot recruit a representative student body and resort to affirmative action, which causes white backlash. Being ignored is the fact that only 40% Black high-school graduates are prepared for college, compared to 70% of their white counterparts.

904. Even if a Black student survive K-12, like Mills did, once they enter higher education, they face a racially hostile environment that dehumanizes, humiliates and abuses them, unless they bow to White Supremacy. If they do not, as Mills did not, they will each have to possess superhuman will, infinite wealth and all human knowledge to

survive. They do not. We could not identify any Black male Ph.D. students who have ever graduated from Mills' Ph.D. program. A foreign country can easily name this phenomenon the Black Educational Genocide.

905. President Truman established Mills' international relations institution. He intended the school to "wage peace on the world". To perpetuate the U.S. worldview around the globe, moral authority is essential.

906. However, this flagship foreign policy institution, by its internal corruption and incompetence, has exposed itself and U.S. to the criticism that it does not practice the values that it purports to promote on behalf of the U.S. government- universal equality, legal institution and freedom of speech.

907. In this view, the institution's purported value to the U.S. government - to provide moral and intellectual authority - is entirely bankrupt.

908. The institution receives hundreds of millions of dollars from the federal government. In exchange, it promises to comply with the Civil Rights Act, a law designed in part to shore up U.S. moral authority internationally. The institution does not keep its promise.

909. SIS has too thick a history of racial discrimination, impunity and repression. Mills was not the first Black person to be subjected to it. But, Mills might be the first Black person to meticulously document it, with a determination to make his case in a court of law, wherever it may be.

910. In 1951, Paul Robeson and William L. Patterson, on behalf of the Civil Rights Congress, presented *The Historic Petition to the United Nations For Relief from a Crime of the United States Government against the Negro People*, or *We Charge Genocide* for short. It charged that 10,000 Black American have been lynched since the end of slavery due to U.S. government inaction and complicity. It was a diplomatic disaster for the U.S., which resorted to forbidding W. E. B. Du Bois from leaving the country to present the petition.

911. AU and SIS, by their corruption and thorough incompetence, has created an opening for a preventable debacle of the same kind. The only reason it has escaped the law and accountability is that, without reparation, Black students are too poor to litigate their discrimination, or not determined enough to take the fight to the finish line. By the law of math, sooner or later, one of them will.

**Part IV.    Parties**

Plaintiff

912. Plaintiff Zachariah Mills Mills is the son of a Black man, the grandson of a Black sharecropper and the grandson of a White World War II Veteran, who received higher education under the GI Bill and became a city manager in Arizona.

913. Mills grew up with his white mother in Tuscon, Arizona. He graduated *magna cum laude* from University of Arizona as a B.A. in both Anthropology and Political Science. He wanted to research climate change and teach students. The school selected him for its graduate school preparation program that serves to increase minority representation in Ph.D. programs.

914. Mills was then admitted as a full-time Ph.D. student by American University's School of International Service. He matriculated in the institution after accepting the institution's good faith and promises of top-quality education, graduation rate, employment prospect, diversity, equity, inclusion, academic freedom, due process, freedom of speech, and safety. Instead, he was discriminated against, defrauded, dehumanized, repressed, intimidated, and prosecuted by the institutions, because he did not relent on demanding the institutions to keep their promises and comply with the civil rights laws.

915. Mills would have filed this lawsuit in 2018 if he had the money. He does not have rich parents and has not been paid the reparation owed to his Black ancestors. The lawsuit is necessary because the institutions are too depraved to allow him equal dignity and human rights, too

corrupt to see how much they have taken from a human being, and too blind in their estimate of what a Black man can demonstrate about them.

916. Mills is a resident of the State of Alaska.

917. To all American University students, staff and professors who have been, are being, and will be retaliated against for rending aid to Mills or encouraging Mills during the civil rights conspiracy against Mills, we applaud you for choosing to act morally and ethically despite facing a corrupt institution and an immoral and illegal social order. We thank you for supporting Mills at his most difficult time. We invite you in reforming the institution and the social order that dehumanized both of us by joining the lawsuit as a class of plaintiffs under the KKK Act, 42 U.S.C. 1985 (3),[42] and the D.C. Human Rights Act, D.C. Code § 2–1402.61 (a).

918. To all American University students, staff and professors who have been, are being, and will be oppressed and injured by the corrupt institution and the immoral and illegal social order, we are in the same place, at the most difficult time. We empathize with you because we are also braving dark water. At first, we thought we are but the outliers. It is through education, action, and luck that we learn about the normalized, depraved, and decayed policies, patterns and practices that did, are doing, and will do to you what was done to us. We want to and can initiate the lawsuit to expose these illegal policies, patterns and practices. With the best wishes for the future, we invite you to join us as a class of plaintiffs in stopping the public nuisance. We may succeed and advance the human society. If we fail, we will have more knowledge, which, in combination with future actions, will ultimately

---

[42] For the legal theory, *see LeRoy, M.H.*, 2020. Whitewashing Coaching Racism in NCAA Sports: Enforcing Civil Rights Through the Ku Klux Klan Act. Ariz. St. U. Sports & Ent. LJ, 10, p.104-09 (a student who did not participate in the institution's civil rights conspiracy and, as a result, did not receive the award the institution offered to a student who did participate, may sue the institution).

transform the corrupt institution and the immoral and illegal social order.

919. To all American University students, staff and professors who have been threatened or coerced into participating in the civil rights conspiracy against Mills[43], and those have been rewarded for their silence and inaction despite a duty,[44] we condemn your immoral and unethical choices; you understood what you should have done, yet chose not to. We also understand that you are living in an immoral and illegal social order and a repressive institution that dehumanize both the oppressed and the oppressor. Our dehumanization continues until we transform the social order and the institution, which necessitates action from both the oppressor and the oppressed. We invite you to join the lawsuit as a class of plaintiffs under the KKK Act, 42 U.S.C. 1985 (3).

## Institutional Defendants

920. Defendant American University is a private research university in Washington, DC, originally chartered by an 1893 Act of Congress. AU's student body numbers over 13,000, and its main campus is located at 4400 Massachusetts Ave., NW, in Washington DC.

921. American University includes the American University Police Department. On information and belief, the AUPD is a subdivision of AU that is wholly controlled by AU. AU, through AUPD, employs more than 60 individuals who are licensed as special police officers in the District of Columbia. These special police can carry weapons and wear uniforms. As employees, they are required to follow the directions of AU and its officials.

---

[43] D.C. Human Rights Act, D.C. Code § 2–1402.61 (a).
[44] For the legal theory, see LeRoy, M.H, p.100-04 (where an institution offered or awarded a student a scholarship for their silence to its civil rights conspiracy, the student may sue the institution for the transaction as an invidious discriminatory insult).

Due to limitation of time, we have not enumerated all individuals subjected to the suit below. We will notify individuals not so enumerated as soon as possible, once the complaint is accepted for filing.

### Professors

922. Daniel Esser is a tenured associate professor of American University School of International Service. He is a member of the Fulbright U.S. Student Program National Screening Committee, a member for AU Faculty Senate Hearing Committee, a seven-time member of AU faculty search committees, Director for SIS Honors Scholars Program, a decade of tenure on SIS Ph.D. Committee. Of his peer-reviewed papers, the most cited was a 2006 paper with him as the second author; he is the first author of a 2011 paper cited 78 times; he is not the first author of any academic paper published after 2015 that has been cited by any scholar. On information and belief, he still works and resides in the District of Columbia.

923. Sharon Weiner was the program director and an associate professor of AU SIS Ph.D. program. On information and belief, she still works and resides in the District of Columbia.

924. Boaz Atzili is an employee of American University. On information and belief, he works and resides in the District of Columbia.

### Administrators

925. Christine Chin, Dean of SIS, is an employee of American University. On information and belief, she works and resides in the District of Columbia.

926. Carolyn Gallaher, then Associate Dean for Faculty Affairs, now Senior Associate Dean, is an employee of American University. On information and belief, she works and resides in the District of Columbia.

927. Jaris Williams, then Assistant Dean of Students (ADOS), now Associate Dean of Students, is an employee of American University. On information and belief, she works and resides in the District of Columbia.

928. Mary Clark was the Deputy Provost and Dean of Faculty. On information and belief, she works and resides in Colorado.

929. Traci Callandrillo is the Assistant Vice President of Campus Life. On information and belief, she works and resides in the District of Columbia.

930. Fanta Aw is the VP of Campus Life and Inclusive Excellence. On information and belief, she works and resides in the District of Columbia.

931. Carol Crawford is an employee of American University. She was the Faculty Relations Investigator. On information and belief, she works and resides in the District of Columbia.

932. Jeffery Brown is the Dean of Students of American University. On information and belief, he works and resides in the District of Columbia.

Students

933. Eleni Ekmektsioglou is a student of American University. On information and belief, she works and resides in the District of Columbia.

934. Luciana Storelli-Castro is a student of American University. On information and belief, she works and resides in the District of Columbia.

935. Manaswini Ramkumar is a student of American University. On information and belief, she works and resides in the District of Columbia.

936. Marcelline T. Babicz is a student of American University. On information and belief, she works and resides in the District of Columbia.

**Part V.     Causes of Action**[45]

**Count 1.     Breach of Contract Against American University**

937. All previous paragraphs are incorporated here.

938. Mills and AU entered into a contractual relationship that began in August 2016, when Mills matriculated as a Ph.D. student at AU SIS. Mills has fulfilled his duties under the contract by paying tuition, attending the school and following its rules.

939. In consideration for his tuition and attendance, AU promised Mills that it would comply with the policies and procedures it publishes, including its Discrimination and Sexual Harassment Policy and Disability Policy, custom and practice in U.S. higher education,[46] and AU's contracts with its faculty, other employees and agents, which intend Mills as a third-party beneficiary[47].

940. Moreover, AU promised Mills that, via its contractual relationships with AU employees and other students, AU would ensure that they also comply with the policies and procedures it publishes, so that they would not interfere with Mills' contractual rights. For example, AU Discrimination Policy "covers all faculty, staff, and students of American University, and related third parties...."

941. Under AU Discrimination Policy, AU promises not to discriminate against Mills based on race, color, national origin, sex, sexual

---

[45] Because of limitation of time, and because we lack manpower, while we have completed the majority of Statement of Facts, we have not completed the allegations. Nevertheless, we believe this complaint gives adequate notice to involved parties about our allegations. For the same reasons, we have to submit a shotgun pleading at this hour. If given more time to polish the allegation section, we will endeavor to accurately cite to specific paragraphs of the Statement of Facts.

[46] The American Association of University Professors' policy documents are the authoritative source of customs and practices in higher education. These policies are collected in its Red Book, or the AAUP's Policy Documents and Reports.

[47] For example, AU Faculty Manual explains that, AU provides "favorable working conditions for its faculty....In return, the university expects faculty members to devote themselves with energy to the primary duties of teachers...."

orientation, disability, political affiliation, source of income, an individual's genetic information or any other bases under applicable federal and local laws and regulations (collectively "Protected Bases").

Section 1.    SIS 808

942. Under AU Graduate Academic Regulations and SIS Ph.D. Handbook, AU has the following contractual duties:

943. First, AU promises to accurately evaluate Mills' academic performance; as is the custom and practice in higher education, AU has a duty to evaluate Mills' performance in each course according to the syllabus of each course. Graduate Academic Regulations Chapter 3: Evaluation of Academic Performance. AU has a duty to calculate and stand behind Mills Grade Point Average that serves to demonstrate Mills' fitness for employment and other merit-based opportunities to third parties. *Id.*

944. Second, AU promises to provide Mills with a real and non-discriminatory opportunity for Mills to fulfill degree requirements. This duty is imposed in exchange for Mills' promise to fulfill degree requirements, which include passing core courses such as SIS 808, SIS 809, the Field Comprehensive Examination (i.e. the second comprehensive exam), and defending a prospectus and a dissertation.

945. Third, AU promises to provide Mills with academic freedom, according to AU policies, the custom and practice in higher education, and. As a part of the favorable working environment, AU provides professors "full freedom in scholarship and in the publication of the results" and "full freedom in the classroom in discussing their subject". Faculty Manual; 1940 AAUP Statement[48]. AU also provides tenure to its tenure-line faculty. "Tenure is a means to certain ends; specifically: (1) freedom of teaching and research and of extramural activities, and (2)

---

[48] With regards to academic freedom, AU "endorses the Statement of Principles on Academic Freedom and Tenure issued jointly in 1940 by the American Association of University Professors (AAUP) and the Association of American Colleges." AU Faculty Manual, Section 4.

a sufficient degree of economic security to make the profession attractive to men and women of ability." 1940 AAUP Statement.

946. According to AAUP, it is a "unprofessional conduct" for professors to use "dishonest tactics" to "deceive students". 2011 AAUP Committee A Report on Academic Freedom and Tenure 100, 113. Under a "two-fold test", "[i]ndoctrination occurs when instructors dogmatically insist on the truth of such propositions by refusing to accord their students the opportunity to contest them" thereby "denies students the right to take 'reasoned exception' and to 'reserve judgment.'" *Id.* at 99-100.

Academic Freedom

947. AU, through its employee Esser, employed dishonest tactics to violate Mills' academic freedom in the following manners, at least until their third meeting. ¶¶58-59, 82-83, 105-124, 126, 138-146, 150-165, 179-187, 196, 198 applies to the following.

948. Indoctrination, by dogmatically insisting on the truth of Esser's professionally contestable propositions and refusing to accord Mills the opportunity to contest them, thereby denying Mills the right to take reasoned exception and to reserve judgment;

949. Substantially falsifying data, sources, and arguments to defraud Mills that his proposals are not scientific and cannot be improved to an acceptable quality; Compare ¶ 106 (informing Mills that scholars at Mills' dissertation examination would barf in their jacket if Mills' case selection rationale is data availability) with ¶ 126 (of the papers Esser served as the first author, the most cited paper uses data availability as case selection rationale);

950. Failing to set forth justly, without suppression or innuendo, the divergent opinions of other investigators;

951. Failing to cause Mills to become familiar with the best published expressions of the great historic types of doctrine upon the questions at issue;

952.    Failing to train Mills to think for himself instead of providing Mills with ready-made conclusions;

953.    Holding Mills up to obloquy or ridicule for an idea grounded in politics, or anything else; (cite to voodoo incident)

954.    Failing to evaluate Mills solely on an academic basis, not on opinions or conduct in matters unrelated to academic standards; (cite to voodoo incident), (regarding Mills as lazy and bad student for family emergency)

955.    Requiring Mills' to obtain Esser's approval for paper topic, contrary to the syllabus; ¶56;

956.    Insist on micro-managing Mills because of the methodology of his proposal, but not other students applying similar methodologies; ¶187.

Adverse Decision Discrimination in 808

957. Due to Mills' Protected Bases, intentionally or negligently, AU, through its employee Esser, discriminated against Mills from students not sharing Mills' Protected Bases enrolled in SIS 808, whether during fall 2017 or other semesters, whether by Esser or other professors, by subjecting Mills to the following adverse decisions. Indications of a causal relationship between Mills' Protected Bases and AU and Esser's adverse decisions are discussed for each adverse decision.

958.    1) rejecting, strictly scrutinizing Mills' paper proposals, and micro-managing Mills while accepting without strictly scrutinizing other students' proposals that are similar or worse in terms of rigor, research design, methodology, and innovation, and not micro-managing them;

959.        a) comparator cases. ¶¶179-187 (accepting two white female students' proposal without meeting them while rejecting Mills' similar proposal); [FERPA section, great experience with other students]

960.        b) incredible explanation. Despite having a terminal degree in the field, a decade of experience, having extensively discussed Mills' assignments and proposals and having read *Conduct of Inquiry*, Esser claimed that did not realize that he and Mills had a difference of opinion about ontology and methodology until their third meeting; ¶119.

961.        c) Despite least similar case comparison being a well-accepted research design, ¶76, Esser informed Mills that the least similar case comparison research that Mills independently designed is not a valid form of scientific inquiry; ¶150.

962.    2) violating Mills' academic freedom, while not violating that of other students; [cite the last section]

963.    3) withholding from Mills' the easier alternative to author a non-policy analysis instead, while making it available to other students, ¶¶ 94-102; and later offering conflicting factual accounts and inculpatory excuses [cite ferpa section].

964.        a) predetermined decision. Esser stated that he should fail Mills to teach him a less about respect, prior to Mills confirming with Esser that the easier alternative was available to other students.[ferpa citation].

965.    4) giving Mills a false Incomplete due date unacceptable under academic regulations at least since 1980, ¶ 168, which forced upon Mills a higher workload during spring 2018, ¶ 88, and partially caused Mills to fail his second comprehensive exam, ¶ 90.

966.    5) after giving Mills a false Incomplete due date, and after determining Mills to be a waste of his time, [cite ferpa section], Esser attempted to prevent Mills from receiving an extension of the Incomplete due date by deliberately giving a rationale unacceptable to AU, such as a false assertion that his contract allows him not to work with Mills over the summer[cite ferpa section], while

pretending to Mills that he had done all he can to help Mills obtain the extension [ferpa citation]

967.         a) predetermined decision. In response to Weiner stating prolonged extension will impact Mills' ability to defend his prospectus, Esser stated that Mills has no hope of graduating anyways. [citation]

968.    6) defaming Mills' integrity, competence and diligence to the program director and other students in the same course, while not defaming that of other non-Black students in similar situations; [cite FERPA section]

969.    7) regarding a difference of opinion over methodology, Esser refused to assume Mills' methodology to be correct, which is a custom in higher education, ¶ 87; instead, he required Mills to work with other professors who have no obligation to do so yet refusing to arrange for other professors' cooperation; ¶ 119 while not similarly treating other students with whom Esser had a difference of opinion, such as ¶¶ 179-187 (accepting two white female students' proposal with similar methodology to Mills' without requiring them to work with other professors);

970.    7) evaluating Mills assignments, ¶¶ 179-187, attendance and participation, ¶¶ 232-233, with bias, while not doing so to other students;

971.    8) ruthlessly, unfairly and unscientifically attacking Mills' paper proposal, allegedly in the hope that Mills would fight him, without informing Mills that his pedagogy is playing the devil's advocate; while not subjecting other students to this flawed pedagogy; ¶¶ 124-125.

972.    9) exercising excessive subjectiveness with regards to Mills, while not doing so to other students;

973.         a) comparator cases. ¶ 113 (work with another student to write a paper not about the country of her career focus, but not doing so with Mills);

Discriminatory Harassment in 808

974. With the following actions, Esser applied negative stereotypes commonly associated with such Protected Bases. These actions intimidated, ridiculed and insulted Mills, which were sufficiently severe or pervasive to alter Mills' educational conditions and to create abusive educational environment such that Mills feared being supervised by Esser.

975. As a decision maker for Mills, Esser intimidated Mills by attracting reasonable suspicion that he is biased, ¶ 128-198, and by declaring his willingness to violate professional ethics and academic rules, ¶ 198 (confessing to Mills that he is abusive, that he feels comfortable destroying other students' chance at graduation based on personality, and gave an detailed example thereof).

976. Esser then intimidated, ridiculed, insulted Mills by pretending to other faculty Mills' reasonable suspicion are baseless and that Mills invented his suspicious to obtain special treatment [citation].

977. Esser ridiculed and insulted Mills by questioning his integrity, competence and diligence without basis. ¶ 131 (accusing Mills of inventing a family emergency or using his family emergency as an excuse to gain special treatment, to Mills' face); [FERPA citation] (to the program director, which led the director to question Mills about his integrity, diligence and competence).

978. In the context of these actions that cause reasonable suspicion of bias, Esser making a host of other intentional or negligent adverse decisions about Mills that is statistically impossible to happen to Mills alone.[cite last section]

979. As a result, Mills could not pass the class until May 2019; as Weiner predicted to Esser, the 17 months delay derailed Mills' graduation progress. As a result, Mills' grade for SIS 808 is inaccurate.

Section 2.    Botched 2018 Investigation

980. AU undertook a duty under its Discrimination Policy to address Mills' complaints of discrimination. "The University will address complaints related to an AU Community member's participation in those programs and activities, regardless of whether the offending conduct occurred on or off campus." AU Discrimination Policy.

981. AU has a duty to thoroughly investigate.

982. AU has a duty to fairly investigate

983. Under AU Discrimination Policy, AU has a duty to interpret the Policy "consistent with applicable local and federal laws and regulations."

984. It promises to enforce on its employees a "Duty to Report Complaint" of such nature. It promises to "promote compliance with the policy and familiarity with reporting procedures;" conduct "training programs, including bystander intervention."

985. It promises to develop and implement consistent procedures to provide for prompt and effective response   to reports of discrimination

986. It promises that its civil rights enforcement employees would receive periodic training on issues related to Prohibited Conduct and how to conduct an investigation process that promotes accountability, equity and fairness.

987. It promises that its civil rights enforcement employees will answer questions and be available to meet with students, employees, and others about this policy.

988. As a result of AU's breach, Mills was deprived of a degree and his career which depends on the degree. Mills suffered extensive mental health conditions. Mills' reputation was injured. Mills' incurred significant expense.

989. We intend to seek all legally available damages and equitable relief. We do not have time as of this complaint to fully calculate and explain the damage, but it will exceed $100,000. We do not have time to contemplate equitable relief. We intend to do so at a later time.

### Count 2. Breach of Contract and Wrongful Disciplinary Decisions Under DCHRA, Title 6 and Title 7 of the Civil Rights Act against American University.

990. All previous paragraphs are incorporated here.

991. AU made multiple wrongful disciplinary decisions as a result of Mills' protected bases, such as Mary Clark's investigation regarding the welfare check; FERPA breach; retaliation by Esser, Weiner and Atzili; Stafford's investigation. There are plenty of causal connections between these decisions and and Mills' protected bases.

992. Correct disciplinary decisions in these cases would have prevented various retaliations against Mills by various individuals, which caused a hostile environment and prevented Mills' graduation.

993. AU also made multiple wrongful disability determinations after Mills had requested reasonable accommodations.

994. As a result, Mills was deprived of a degree and his career which depends on the degree. Mills suffered extensive mental health conditions. Mills' reputation was injured. Mills' incurred significant expense.

995. We intend to seek all legally available damages and equitable relief. We do not have time as of this complaint to fully calculate and explain the damage or contemplate equitable relief. We intend to do so at a later time.

### Count 3. Adverse Decision Discrimination and Retaliation Under DCHRA, Title 6 and Title 7 of the Civil Rights Act, and ADA against American University

996. All previous paragraphs are incorporated here.

997. AU retaliated against Mills as a result of Mills' protected activities. AU made multiple adverse decisions regarding Mills such as Wendy Boland's decision to dismiss Mills, various wrongful disciplinary decisions, and refusal to address Mills' requests for investigation and accommodation.

998. Boland dismissed Mills according to various progress reports issued after the welfare check.

999. There are plenty of causal connections between these adverse decisions and Mills' protected activities.

1000. According to Atzili and his relaying of Mary Clark's statements, AU has a pattern and practice of allowing a civil rights complainant extra time for fulfilling academic deadlines. Mark Clark offered the extra time to Mills during the 2018 investigation, even though Mills did not ask for it.

1001. After Mills engaged in protected activity and made civil rights complaints against higher-level employees than Esser, AU, Clark and Boland refused to give Mills extra time to fulfill academic deadlines outlined in Mills' progress reports issued after the welfare check.

1002. Moreover, Gallaher authored the progress reports after having advocated for Mills' SWATTING. Gallaher concealed her conflict of interest from Mills when she authored the progress report. According to Atzili, AU has a policy, custom and practice of disallowing a professor making decisions regarding a student when there is a conflict of interest.

1003. Shortly after the SWATTING, SIS Dean Chin, Gallaher, Fanta Aw, discussed filing conduct charges against Mills for his emails to Weiner and Atzili. Mills emails are a form of protected activity.

1004. They also made a plan to meet with all SIS Ph.D. students to whitewash the SWATTING. By information and belief, during the meetings, it was implied to the students that Mills had mental health issues that privacy rules forbid AU from explaining. It was explicitly stated that the students were to maintain confidentiality about the meeting. Ph.D. students were helping Mills to figure out why the police came. They stopped thereafter.

1005. AU, Atzili, Chin, Gallaher, and Callandrillo made one thing abundantly clear to Ph.D. students: the official line is that Mills did not experience discrimination; that Mills' perception of discrimination came from him

not able to handle academic rigor; that Mills then blamed the problem on nonexistent SIS institutional racism; that Mills mental health issues developed mental health issues; that administrators and professor was trying to help Mills by sending police to his home; and that anyone who sees institutional racism in SIS like Mills should volunteer their identity. But, why would they?

1006. Ph.D. students apprised Mills of Atzili and Chin retaliation. Mills formed a reasonable belief that AU and SIS leadership was determined to thwart his effort for civil rights. It was desperation, when his school intricately took away his civil rights and stopped his peers from helping him. The school wanted to get rid of him so much so that it would break the law. What would working on a prospectus change? His days at SIS were numbered.

1007. By invading Mills' private home, AU retaliated against Mills for opposing unlawful discrimination by AU.

1008. AU insists that the AUPD officers were solely conducting a welfare check for Mills' benefit and denies that any faculty members alleged Mills would commit a crime. However, AU denied Mills access to relevant AUPD records. The AUPD records that Mills obtained later show that AU was conducting a criminal investigation of Mills in his private home as a result of Esser reporting Mills as a violent threat.

1009. AU insists that Associate Dean of Students Jaris Williams (Black) decided independently to order AUPD to conduct a welfare check at Mills' home, based solely on three care reports. It is later revealed that there were four care reports.  Williams pretended to Mills that there were only three care reports during their meeting in October 2019. Williams authored an internal memo of his meeting with Mills. According to AU's computer system, the memo is dated June 24, 2020, 8 months after the meeting. He claimed in the memo that he gave Mills all four care reports, including Reitman's, dated days before the welfare check.

1010.  June 24 was a peculiar date to author the memo. On June 25, 2020, Mills made a FERPA request to AU for memo drafted by various AU employees including Williams. AU refused to acknowledge receipt of the FERPA request. Mills had to complaint about AU to the Department of Education. Even then, AU fought the Department of Education for months. In November 2020, AU lied the Department that it had gave Mills the requested records, producing to the Department a fabricated email to Mills. Mills never received the email. AU refuse to produce the email in native format or audit trail that demonstrate its authenticity.

1011.  AU finally gave up the memo and Reitman's care report in February 2021.

1012.  Because Williams memo and Reitman's care report existed on AU's computer systems, and because AU has made false representations and fabricated documentary evidence to the Department and Mills, it is difficult to determine the authenticity and actual date of the documents. We therefore alleged that each document and its date of creation are authentic; in the alternative, we allege that each document and its date of creation are fabricated, which support an inference that AU attempted to cover-up its improprieties regarding the welfare check.

1013.  Williams' direct supervisors Callandrillo and Brown received the emails supporting the welfare check first. Moreover, Williams denied having read those emails when initiating the welfare check. Furthermore, AU and Williams hid the SIS leadership's involvement in frenziedly advocating for SWATTING Mills.

1014.  That AU would choose a junior Black employee outside of the wrongful SWATTING decision making process to take the fall indicates a discriminatory motive.

1015.  Williams also tried to utilize his Black identity to gain Mills' trust. Williams shared his own experience of anti-Black racism, especially from the police, to persuade Mills that Williams, as a victim of racial police violence, ordered the welfare check in good faith.

1016.  These retaliations caused a hostile environment and prevented Mills' graduation.

1017.  As a result, Mills was deprived of a degree and his career which depends on the degree. Mills suffered extensive mental health conditions. Mills' reputation was injured. Mills' incurred significant expense.

1018.  We intend to seek all legally available damages and equitable relief. We do not have time as of this complaint to fully calculate and explain the damage or contemplate equitable relief. We intend to do so at a later time.

**Count 4.** **Denial of Reasonable Disability Accommodation under ADA and DCHRA against American University.**

**Count 5.** **Unlawful Entry, Illegal Search and Seizure, Trespass Under the Color of State Law in Violation of 1st, 4th and 14th Amendment of the United States Constitution and 43 U.S.C. 1983.**

1019.  All previous paragraphs are incorporated here.

1020.  Under color of state law, AU, identified and unidentified individuals who participated in the welfare check subjected Mills to unlawful entry, illegal search and seizure, and trespass.

1021.  This conduct deprived Mills of his right to be secure in his own home, to not be searched or seized without valid basis, and to shielding his property (his setter mix Bubba) from government destruction 4th Amendment of the U.S. Constitution.

1022.  This conduct, instigated to stop Mills' free speech, violated Mills' rights under 1th Amendment of the U.S. Constitution.

1023.  This conduct deprived Mills of equal protection of the law, to use 1st Amendment to advocate against his racial discrimination. It violated Mills' rights under 14th Amendment of the U.S. Constitution.

1024.  AU employees, under the instruction of various AU administrators, unlawfully entered and searched Mills' home. They assaulted Mills' dog. AU employees illegally detained Mills in his home until MPD Officer

Sotelo put a stop to the false arrest. AU employees was not authorized by D.C. law to operate in Mills' off-campus private home. Yet, they acted under the color of D.C. law.

1025. AU is a person within the meaning of Section 1983 because various AU administrators had the authority to make policy, and made policy, on behalf of AU when they directed AUPD officers to enter and search Mills' home and detain Mills in his home with the intention to conduct a criminal investigation and/or welfare check.

### Count 6.   Hostile Environment under DCHRA, Title 6 and Title 7 of the Civil Rights Act, and ADA against American University

1026. All previous paragraphs are incorporated here.

1027. Based on Mills' protested bases, these actions intimidated, ridiculed and insulted Mills. Mills perceived these actions as offensive. These actions are objectively offensive.

1028. They are sufficiently severe or pervasive to alter Mills' educational conditions and to create abusive educational environment such that Mills and a similarly-situated reasonable person could not graduate.

1029. As a result, Mills was deprived of a degree and his career which depends on the degree. Mills suffered extensive mental health conditions. Mills' reputation was injured. Mills' incurred significant expense.

1030. We intend to seek all legally available damages and equitable relief. We do not have time as of this complaint to fully calculate and explain the damage or contemplate equitable relief. We intend to do so at a later time.

### Count 7.   Breach of Contract Against Individual AU Employees and Students

1031. All previous paragraphs are incorporated here.

1032. AU and its individual faculty members, administrators or other employees and its students also enter into contractual relationships.

Students such as Mills are intended third-party beneficiaries of these contracts. For example, AU Faculty Manual states that "[AU] provide as favorable working conditions for its faculty as resources permit …. In return, the university expects faculty members to devote themselves with energy to the primary duties of teachers, scholars, and creators of knowledge and to challenge students intellectually and encourage them to acquire knowledge, understanding, and vision."

1033.  We intend to pursue individual liability against all individuals referred to in this complaint, whether their names are spelled out or not at this point.

1034.  These individuals' illegal actions breached their contract with AU, and injured Mills.

1035.  As a result of these individuals' breach, Mills was deprived of a degree and his career which depends on the degree. Mills suffered extensive mental health conditions. Mills' reputation was injured. Mills' incurred significant expense.

1036.  We intend to seek all legally available damages and equitable relief. We do not have time as of this complaint to fully calculate and explain the damage or contemplate equitable relief. We intend to do so at a later time.

### Count 8.   Failure to Train or Supervise, Retaliation, Breach of Contract, Breaches of Doctor-Patient Confidentiality; Breach of HIPPA Against American University and David Reitman

1037.  All previous paragraphs are incorporated here.

1038.  David Reitman is the medical director of AU Student Health Center. He was Mills' physician and psychiatrist.

1039.  In August 2018, Dr. Reitman disclosed in a Care Report to American University health and other information about Mills that Mills provided to him during medical care.

1040.  Dr. Reitman informed AU that Mills was planning to sue AU for racial discrimination, which is a protected activity.

1041.  Under AU Discrimination Policy, Dr. Reitman is a confidential source, forbidden from disclosing reports of discrimination to AU administration.

### Count 9.   Civil Rights Conspiracy Under the KKK Act Against AU and Related Individuals

1042.  All previous paragraphs are incorporated here.

1043.  AU, identified and unidentified individuals participated in a conspiracy with a shared goal to deprive Mills of his civil rights.

1044.  We will supplement the details. As an example, various unlicensed private investigators pretended to represent other AU minority students and pretended to be organizing a class action lawsuit against American University for racial discrimination. The goal was to defraud Mills of information, gain an upper hand in litigation and intimidate Mills in person.

### Count 10.   Failure to Render Aid Under the KKK Act Against Related Individuals

1045.  All previous paragraphs are incorporated here.

1046.  Various employees and students of AU had power to prevent the discrimination against Mills, had they exercised reasonable diligence. They refused to do so, for their own interest.

1047.  Most noteworthy is Dr. Ibram X. Kendi. He publicizes a personality of a radical anti-racist activist. As the Director of AU's Anti-Racism Center, he salvaged AU's reputation of racism and received much compensation.

1048.  Kendi has the power to prevent the civil rights conspiracy, yet he refused to.

1049.  Kendi refused to speak to Mills under false pretense when Mills asked for his aid in a civil rights conspiracy against Mills.

1050.  Kendi also refused to speak with similarly situated students using false pretenses.

May 23, 2022

Zachariah Mills