## U.S. District Court for the District of Columbia

| | |
|---|---|
| Zachariah Mills (pro se)<br><br>Plaintiff,<br><br>v.<br><br>American University, et al.<br><br>Defendants. | Case Number (1:22-cv-01001)<br><br>C.K.K.<br><br>JURY TRIAL DEMANDED |

### Preliminary Opposition to the Defendants' Joint Motion to Dismiss

The Defendants argue that our services of summons were improper for two reasons: (1) the Defendants did not personally sign for the USPS certified mails containing the summons; (2) the certified mails contained the complaint rather than the amended complaint.

Respectively, we argue that (1) AU's Authorized Agents personally signed for the certified mails to AU; other defendants may not have personally signed for the certified mails due to reasons beyond our control or knowledge at the time; (2) because the Defendants repeatedly received the amended complaint before, the mistake did not prejudice the Defendants, and we have made diligent effort to perfect the service in the two weeks following the Defendants' Motion.

However, because the service happened close to the deadline for this filing, most of the affidavits are still forthcoming, or have arrived too close to the deadline for proper citation. As a result, and because we want to meet the Court's September 23 deadline, we have not attached proof of service, and we cannot cite them in this filing. We describe the service in this filing in reliance on preliminary information the servers gave us, not their affidavits. We will submit an amended filing with the proof of service and proper citation before Monday.

The Defendants also argue that the amended complaint was not short and plain.



RECEIVED

SEP 23  2022

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

We plan to argue that the amended complaint's causes of actions are short and plain, and that the amended complaint's style and substance are chosen to properly notify the Defendants of our allegations and to argue for expansion of the law. However, because of the effort we put into perfecting the service, we have not finished writing the arguments. We also have not compiled the exhibits and fixed the citations. We will do so in an amended filing before Monday. As much as possible, we highlight where amendment is needed.

I.   Background: Our Diligent Efforts at Serving Summons to Date

[prior service history of service]

On September 7, the defendants, represented by two law firms, filed a Joint Motion to Dismiss. ECF No. 16. The Joint Motion primarily alleged that service was improper for two reasons: 1) none of the defendants (for American University, its General Counsel and Registered Agent) personally signed for our August 16 certified mails, [cite], and 2) the August 16 certified mails did not contain the Amended Complaint, [cite].

Upon reading the Joint Motion, we switched to employing personal service for all defendants with the amended complaint, discussed below individually.[1] We simultaneously inquired with USPS as to whether USPS restricted the delivery of each of the August 16 certified mails to the respective named recipient, and the reason therefor. For the certified mails to non-institutional defendants (except Atzili), to summarize USPS responses available to us, the USPS stated that some letter carriers are ignoring restricted delivery instructions due to surges of COVID-19 around the date of delivery.[2] This was when we first became aware of COVID-19 interfering with restricted delivery mails – after we had switched to personal service to accomplish service as soon as possible.

---

[1] Documents served: a copy of the summons, ECF No. 1 (complaint), ECF No. 5 (Order Establishing Procedures), and ECF No. 6 (operative amended complaint). Ex. X.

[2] Ex. X. The USPS informed us that USPS had an official policy of having letter carriers sign for restricted delivery mails, but that policy was officially rescinded on March 31, 2022. *Id.*

a. American University

In view of AU's protest that the certified mails did not contain the amended complaint and that the mails were not signed for by someone authorized to accept service of summons, we employed a process server, who personally served the General Counsel on September 21.

b. Daniel Esser

The Joint Motion informed us that Esser is not in the country. Thereafter, we deducted that he is in Germany. He apparently has not set a date of return to U.S. jurisdiction.

On September 16, we engaged a German licensed private investigator to lawfully obtain the German address Esser registered with the Germany government. On September 19, we contacted Esser's attorney of record in Esser's SLAPP suit against us, requesting the attorney to relay a message to Esser to arrange service. The attorney did not respond to our request. On September 20, the private investigator obtained Esser's address. To verify the address, the private investigator sent a dummy mail to the address; the mail was successfully delivered on September 23 D.C. time.

We move the Court to authorize us to serve Esser via the email address listed on his professional resume listed on his profile page on AU website.[3] We have researched serving him under the Hague Convention: unless he voluntarily accepts service in Germany (which Esser likely would not), we must serve him with a German translation of the required documents. The cost of the translation would be in the thousands and would significantly impact our ability to litigate the case; it would also take at least three months.

Alternatively, we move the Court to not dismiss Esser from the case because Rule 4(f) does not set a time limit for serving summons on an individual in a foreign country, and because we have been diligently attempting service. For the same reasons, we move the Court to extend the Rule 4(m) time limit for serving him in the U.S., in the event that he comes back to the U.S.

---

[3] https://www.american.edu/sis/faculty/esser.cfm

c. Sharon Weiner

A process server has made three attempts of personal service at her D.C. residence. She was not home; no other adults lives at the residence. Ex. X (9/13, 9/15 and 9/18). A house watcher confirmed that she permanently lives at the residence, but is currently not in D.C.

d. Boaz Atzili

A process server has made three attempts of personal service at Atzili's D.C. residence. His spouse lives at the residence and co-owns the residence with him. During the second attempt, the spouse refused to accept service on his behalf and indicated he will be out of the country for the next two months. During the third attempts, no one answered the door although there were two vehicles in the driveway. Ex. X (9/14, 9/17 and 9/22).

e. Christine Chin and Fanta Aw

Process servers have made five attempts of personal service at their Maryland residence. No one answered the door. Ex. X (8/23 7:45 PM – no lights on, 8/27, 9/14 8:16 PM – light on inside, 9/17 1:50 PM – no light can be seen and 9/19 7:16 PM - light on inside).

Fanta Aw was served personally on September 23. Affidavit thereof is forthcoming.

f. Jeffery Brown

A process server has made three attempts of personal service at Brown's D.C. residence. No one answered the door. Ex. X (9/13 7:18 PM, 9/16 7:46 PM and 9/17 8:32 AM). On the first attempt, the server saw a package bearing Brown's name outside of the residence. The package disappeared by the second attempt. Lights on the first floor was on during the first two attempts; it was off during the third attempt.

g. Traci Callandrillo

A process server served Callandrillo's husband at their residence on September 13, 2022. The husband identified himself as the husband and willingly accepted the service. He also confirmed that the couple had received "four" mailings of our legal documents.

On Thursday, September 22, we confirmed with Brown's assistant that Brown and Callandrillo works in person on campus on Fridays. We engaged a process server to serve Brown, Aw and Callandrillo. When the server arrived on Friday, September 23, the server asked for Aw, Callandrillo and Brown. The secretary directed the server to Aw's office (Room 410). After serving Aw, the server asked for Callandrillo and Brown, who Aw directly supervises; Aw told the server that Brown (Room 408) and Callandrillo (4th floor) do not work in person on Fridays. The server left because there was no reason to not believe Aw, the server told us. We told the server that Aw likely was misdirecting the server; we asked the server to go back. The server went back in the afternoon and personally served Brown and Callandrillo. The affidavits are forthcoming.

   h.  Carolyn Gallaher

A process server served Gallaher's husband at their residence on September 18, 2022. The husband identified himself as the husband and willingly accepted the service.

   i.  Jaris Williams

A process server personally served Williams at his residence on September 17, 2022.

   j.  Mary Clark

A process server personally served Clark at her Denver residence on August 17. But for our serving the summons with the complaint, rather than the amended complaint, this attempt of service would have been timely and properly completed.

We have engaged with the server to serve her again at the same address by September 28 with the amended complaint.

   k.  Carol Crawford

We were unable to locate Crawford's residence through Beenverified.com. It is public information that, after serving as Faculty Relations Investigator of AU, she is now an immigration judge at the Federal Plaza Immigration Court. Therefore, we focused our effort on serving her at her place of employment. On July 12, we mailed a certified mail containing the amended complaint to her workplace. The mail was

addressed to her personally and bore no external signs of relevance to litigation. We received no response. [cite]

Out of respect for the court, we attempted to arrange a respectful manner of serving her. We reached Crawford's non-judicial assistant. We said: we are trying to deliver a message to Judge Crawford in regard to a D.C. civil case; we have a legal document for her. The assistant said: he does not know what we are talking about, and, whatever we were talking about, they do not do. We pleaded that we do not know of her residential address; that we have no choice but to reach out to her workplace; that we had attempted to mail the documents to her office; and that we do not know whether she received our mail. He replied that he only handles her official mails, that Crawford personally handle her personal mails, including mails addressed to her personally and sent to the building. He said he wants no part in our business with Judge Crawford, and ended the conversation. The assistant did not inform us of Judge Crawford attending a funeral of her late father.

Given the assistant's statement, we believe that Crawford had received our July 12 certified mail and chose to not respond. By August 23, we also confirmed that she works at the building in person via the court's means of public access. It was proposed that it would be respectful to move the Court for federal marshals to serve her – it seemed respectful for a federal employee to serve another internally – but there were also sound opposing opinions.

Instead, we engaged a New York process server who promised to attempt personal service at the courthouse in the most respectful means. Consistent with New York CPLR 308(2), the process server gave the court staff the summons – we gave the server the complaint rather than the amended complaint. [cite]. Consistent with CPLR 308(2), the server and us separately and immediately mailed the same set of documents to her workplace. [cite proof of delivery]. But for our serving the summons with the complaint, rather than the amended complaint, this attempt of service would have been properly completed.

Upon reading the Joint Motion, on September 12, we obtained Crawford's residential address through a skip-tracer. However, the New York process server stated, based on his professional experience, serving her in the high-end Upper West Side building is near impossible: because doormen generally would not allow a server to access the building, he believed it is near impossible to serve her by knocking on her door or by

fixing a notice on her door under New York law; he also stated that a server accessing the building without permission are guaranteed to be criminally prosecuted. We double-checked his concerns – basically, if and only if the doorman blocks access to the residence, the server may serve by leaving the papers in the general vicinity of the doorman.[4] On September 23, we explained our research to the server over phone, wrote a memo for the server, and engaged the server to attempt to serve Crawford at her residence thrice with the amended complaint by September 28.

l.   Eleni Ekmektsioglou

A process server has made three attempts of personal service at Ekmektsioglou's D.C. residence.

During the first attempt at 6:05 PM on September 15, Ekmektsioglou's husband opened the door. He stated that he needed to go bacneglk inside to call Ekmektsioglou. Upon return, he stated that she was not available, and that he refused to accept service on her behalf because Ekmektsioglou said "the university is working to dismiss the case." He went back inside again to call Ekmektsioglou. The server saw a woman inside the home but could not positively identify her. He came back and again stated she was not available. After the server left at 6:28 PM, we instructed the server to return. The server returned at 6:53 PM. No one answered the door. When meeting the husband earlier, there were no indication that he would shortly leave.

The server again attempted service on September 18. No one answered.

m.  Luciana Storelli-Castro

A process server has made three attempts of personal service at Storelli-Castro's D.C. residence. No one answered the door. During the first attempt, the front desk staff of the building confirmed to the server that she lives there, that the staff last saw her a week before, and that she travels frequently; she owns the condo next door, whose tenant said they do not know her when she will be there; the server left her business card

---

[4] westlaw.com/0-578-6085?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0&documentSection=co_anchor_a1002218

on her door. The card is still there during the second and third attempt.
However, given that someone signed "Castro" for the return receipt on
August 19, and given that Storelli-Castro claimed she was in Hawaii on
that day, [cite], there is a good possibility that a close relative of Storelli-
Castro also lives at the condo. If so, and unless that close relative never left
the condo between September 13 and 18 and never saw the server's card,
there is a good possibility that the close relative had been instructed to
leave the card there to create an appearance that no one was there. Ex. X
(9/13, 9/17 and 9/18).

n. Manaswini Ramkumar

On August 23, a U.S. skip-tracer gave us the only probable U.S.
residential address of Ramkumar. On the same day, a process server
attempted personal service at the address, and confirmed that the current
resident of the address is unrelated to her. Social media research indicates
that her husband works in Toronto, Canada, and that she lives there.[5]
Therefore, our working theory is that she lives in Toronto, Canada. We
engaged a Canadian skip-tracer on September 6. The skip-tracer indicated
that, within the week, they had exhausted available means to locate her –
databases of driver's license, lien and property ownership – to no avail.
According to the skip-tracer, the only hopeful avenue is to obtain his
husband's biographic information from a U.S. skip-tracer. On September 9,
we engaged another U.S. skip-tracer, who returned the information on
September 19. We immediately relayed the information to the Canadian
skip-tracer. The Canadian skip-tracer was tied up in courts for the week.
On September 23, the skip-tracer positively identified the husband's
residential address in Toronto utilizing the biographical information, and
stated that service will be attempted over the next week.

o. Marcelline T. Babicz

A process server personally served Babicz at her residence on
September 14, 2022.

---

[5] [citation]

II. Non-Prejudicial Defects and Delay of Service of Summons Do Not Warrant Dismissal in view of the Overwhelming Policy Preference for Resolving Cases on the Merits.

The Defendants cite the Court's *Ilaw v. Dep't of Justice* to argue that the plaintiff's case should be dismissed on procedural grounds rather than resolved on the merits. 309 F.R.D. 101 (D.D.C. 2015). Quite the opposite, in *Ilaw*, the Court vacated a Clerk's entry of default so that the case may be resolved on the merits.[6] An entry of default is disfavored, compared to the overwhelming policy goal of resolving each case on the merits.[7] Here, the Defendants are asserting procedural grounds to prevent resolving the case on the merits.

a. The Defect of Serving the Original Complaint was Insignificant.

Admittedly, our services of summons were defective – we served the summons with the complaint rather than the amended complaint. However, the defect was not significant. The Defendants do not argue that the defects prejudiced them.

The Court has ruled on a similar issue. In *Smith v. United States*, a civil tax case, the plaintiff served the summons by certified mail, but sent the mail themselves, rather than having a non-party mail it; the defendant filed a motion to dismiss similarly arguing for dismissal for defective service – that. 475 F. Supp. 2d 1, 8-9 (D.D.C. 2006). The Court held that

---

[6] *Ilaw*, 309 F.R.D. at 106 ("the Court has reviewed Defendant's Motion to Dismiss and finds that Defendant's defenses appear to be potentially meritorious") (citing *Keegel*, 627 F.2d at 374 (internal citation omitted) ("Defendants' allegations are meritorious if they contain 'even a hint of a suggestion' which, proven at trial, would constitute a complete defense.")).

[7] In deciding on a motion for relief from a default judgment, the court should consider whether "the alleged defense was meritorious." *Ilaw*, 309 F.R.D. at 103 (citing *Keegel v. Key West & Caribbean Trading Co., Inc.*, 627 F.2d 372, 373 (D.C. Cir. 1980)).

the defect was insignificant and therefore did not warrant dismissal. *Id.* at 10-11.[8]

Our defect was insignificant and did not prejudice the Defendants because we had sent the amended complaint to them earlier electronically and via certified mail. [cite].

The *Smith* defect was more obvious to any plaintiffs than our defect was. The *Smith* plaintiff relied on Federal Rule of Civil Procedure 4(c)(2) to serve the defendant by certified mail. By mailing the summons himself, the *Smith* plaintiff violated the clear text of the rule: "[s]ervice may be effected by *any person who is not a party* and who is at least 18 years of age." Fed. R. Civ. P. 4(c)(2) (emphasis added).

We relied on Sup. Ct. R. D.C. 4(c)(4) to serve summons via certified mail. The rule instructs a plaintiff to "mail[] a copy of the summons, *complaint*, Initial Order…." Sup. Ct. R. D.C. 4(c)(4) (emphasis added). Neither the D.C. or federal Rule 4 contains the word "amended complaint," or otherwise explains that the amended complaint, once filed, should be served in place of the complaint. Ditto for the Advisory Committee's Notes thereto. Moreover, the D.C. and the federal Rule 5 say that "a pleading filed after the original complaint" – such as an amended complaint – must be served by "mailing it to the person's last known address[,]" which we did on July 12.

While the Court's July 25 Rule 4(m) Order said that "the Court shall nonetheless accept Plaintiff's Amended Complaint as the operative complaint in this action[,]" the Order did not explain the significance of "operative complaint." Ditto for Rule 4 and 5 and notes thereto.

Rules 4 and 5 are judicially interpreted to mean that 1) the complaint loses its legal effects once an amended complaint is accepted, 2) the summons must be served with the operative complaint, and 3) Rule 5's instruction to serve the amended complaint via "mailing it to the person's last known address" does not apply until the summons was served under Rule 4. These interpretations are well known to seasoned attorneys such that few cases mention them. However, they are not obvious to other

---

[8] The Court granted the motion to dismiss on other grounds: non-exhaustion and lack of jurisdiction to hear a declaratory relief claim. *Smith*, 475 F. Supp. 2d at 11-15.

reader of Rules 4 and 5. A reader not already familiar with the interpretations may very well read the Rules to – explicitly and somewhat counter-intuitively – require service of summons with the original complaint instead of the amended complaint.

To dismiss our case for making such an insignificant mistake that did not prejudice the Defendants would be draconian rigidity.

> b. But for Mistakenly Serving the Summons with the Original Complaint, Our Service of Summons Around August 19 on AU was Timely and Proper.

American University (AU) contends that, because AU General Counsel and AU Registered Agent-Chief Financial Officer did not personally sign for the two certified mails addressed to each of them, the service of summons was defective, and our case should be dismissed.

AU does not deny the two executives having possession of the mails. According to the Joint Motion to Dismiss, the certified mails were "found sitting in the common area of their respective offices, unsigned for, and not even delivered with the regular post." ECF No. 16-1 at 14 (citing the Affidavit of Qwendolyn Brown (AU Associate General Counsel)). However, the Affidavit only says that

> I have personal knowledge of the status of purported service of process by Plaintiff on AU….
> The signatures shown on the Electronic Return Receipts … for [AU] were not made by [] an individual authorized by [AU] to receive service of process.
> Brown Affidavit ¶¶ 4 – 5.

Setting aside the reason Brown did not swear that she personally "found" the mails "sitting in [the] offices, unsigned for, and [delivered with irregular post,]" the curious question is, how did the mails, in fact, travel from USPS to the two executives' offices? It must be the operation of either 1) supernatural teleportation, 2) a trespasser-good-Samaritan devoted to the cause of mail delivery, or 3) individuals who AU authorized to deliver mail for the two executives and who AU neglected to identify.

Upon reading the Joint Motion, we inquired with the USPS the reason why USPS did not deliver the certified mails directly to the two executives. The Complaint and Inquiry department of USPS informed us it "verified the delivery with the American University mail room

Representative, as being accepted on 8/19/2022." Ex. X (referring to Siraaj Abdullah, an Operations Manager of American University).[9]

A representative of USPS national call center informed us that the "Caller Mail" (not "Caller Mark," as the opposing counsel read) written on the electronic return receipts for both mails meant that AU utilized caller mail service and that AU's Authorized Agents had picked up the two mails. The USPS representative referred us to an USPS web page to explain that businesses processing large volume of mails such as AU would have to utilize Caller Mail, and would designate, with the local post office, Authorized Agents "who are authorized to pickup and sign for Accountable Mail." [10] The page also says, for these authorized agents, "acceptable forms of identification … are company ID, uniforms with a company name, or a company vehicle."

Accountable Mail is a mail that "requires a signature … from the recipient or the recipient's agent before delivery can be completed."[11] A certified mail with requests for restricted delivery and return receipts "requires a signature" – all thirteen return receipts were signed.

The representative said that USPS regards that it has honored our restricted delivery instruction where AU Authorized Agents picked up the mails; and that it was irrelevant whether or not the named recipients (the two executives) personally sign for the mails or picked up the mails from USPS.

In light of USPS having "verified the delivery [of the two mails] with the American University mail room Representative, as being accepted",

---

[9] We have not received a response for the inquiry of the certified mail to the Registered Agent and Chief Financial Officer of American University. Because the signature and time of delivery were identical for both mails to AU, the two mails were likely picked up by the same AU agent at the same time.

[10] https://faq.usps.com/s/article/Authorizing-Someone-to-Accept-Your-Redelivery#Guidelines

[11] https://faq.usps.com/s/article/USPS-Mail-Requiring-a-Signature-Accountable-Mail#:~:text=Accountable%20mail%20requires%20a%20signature,delivered%20by%20a%20mail%20carrier.

Brown's assertion is a legal conclusion: AU mail room employees operate as a filter that kills the legal effect of all mails containing summons. We are sure Brown and the opposing counsels are seasoned attorneys. However, we believe that, as a matter of basic principle, an affiant cannot have personal knowledge of a legal conclusion.

Brown's and the opposing counsels' legal position is divergent from precedents. *See Gresham v. D.C.*, No. CIV.A. 09-0029 JR, 2009 WL 5910241, at *2 (D.D.C. Apr. 29, 2009);[12] *Hoffman v. District of Columbia*, 629 F. Supp. 2d 49, 52 (D.D.C. 2009)(denying defendant's motion to quash service).[13]

In any event, AU's mail handling procedures was an "outside factor" that we did not know of and cannot control for, thereby constituting a good cause to extend the time limit for service of summons.[14] We served AU's general counsel personally on September 21. Ex. X.

> c. Our Services of Summons Around August 19 on Other Defendants May Have Failed for Reasons Beyond Our Control

As to our August 16 certified mails to other non-institutional Defendants, the USPS stated that some letter carriers are ignoring restricted delivery instructions due to surges of COVID-19 around the date

---

[12] "A plaintiff is placed in an impossible situation if, having provided (and paid for) clear delivery instructions, his correct use of the mails can be defeated by an inattentive letter carrier or by sloppy mail handling in the Mayor's office. Such a result would effectively read the word 'mailing' out of the rule."

[13] "These are valid concerns, but they are fully met when the return receipt specifies delivery to the designee by name, when the plaintiff has arranged for restricted delivery, and when . . . there is no question that the defendant has actually received the papers served and has actual notice of the suit."

[14] There is a good cause to extend the time limit for service of summons "when some outside factor ... rather than inadvertence or negligence, prevented service[.]" *Mann v. Castiel*, 681 F.3d 368, 374 (D.C. Cir. 2012) (citing *Lepone–Dempsey v. Carroll Cnty. Com'rs*, 476 F.3d 1277, 1281 (11th Cir.2007)).

of delivery.[15] We first became aware of COVID-19 interfering with restricted delivery mails from USPS, not the Defendants. This was an "outside factor" that we did not know of and cannot control for, thereby constituting a good cause to extend the time limit for service of summons.[16]

      d. We Diligently Perfected Service after the Defendants Filed a Motion to Dismiss

The court in *Lindsey v. United States* approved of the plaintiffs perfecting service after the defendants filed a motion to dismiss for failure of service of process. 448 F. Supp. 2d 37, 47 (D.D.C. 2006). We did.

      e. Dismissing the Case would have Preclusive Effect due to Expiring Statute of Limitations.

Several of our causes of action rely on the D.C. Human Rights Act. Unlike Title 6, DCHRA grants punitive damages. It also forbids aiding and abetting discrimination. The statute of limitation for the DCHRA is one year.

In March 2020, the D.C. Court of Appeals tolled statute of limitations due to COVID-19 public health emergency. Mills was dismissed from AU in May 2020. The D.C. Court of Appeals ended the tolling on March 31, 2021. We filed the complaint on March 31, 2022, one year after the March 31, 2021. As such, dismissing the case would preclude us from utilizing the DCHRA.

---

[15] Ex. X. The USPS informed us that USPS had an official policy of having letter carriers sign for restricted delivery mails, but that policy was officially rescinded on March 31, 2022. *Id.*

[16] There is a good cause to extend the time limit for service of summons "when some outside factor ... rather than inadvertence or negligence, prevented service[.]" *Mann v. Castiel*, 681 F.3d 368, 374 (D.C. Cir. 2012) (citing *Lepone–Dempsey v. Carroll Cnty. Com'rs*, 476 F.3d 1277, 1281 (11th Cir.2007)).

III. Style and Substance of Amended Complaint Does Not Warrant Dismissal

This portion will be amended in the amended filing by Monday.

Respectfully,

*Pro Se*

zachmillsisawesome@gmail.com

520-358-3574

[Address in ECF. No. 2]